**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE DOE,

                              *Plaintiff*,

              v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK; KEVIN PITT;
ALYSSA ANZALONE-NEWMAN; KRISTIN
COLLADO, in their official capacities,

                              *Defendants*.

No. 1:21-cv-05839 (ER)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Gabrielle E. Tenzer
Kyla Magun
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
212.763.0883
gtenzer@kaplanhecker.com
kmagun@kaplanhecker.com

October 13, 2021

## TABLE OF CONTENTS

PAGE(S)

**PRELIMINARY STATEMENT** ........................................................................ 1

**RELEVANT BACKGROUND** ....................................................................... 2

    I.    Columbia's Gender-Based Misconduct Policy and Procedures ..................... 2

    II.    The January 8, 2019 Incident ............................................................... 4

    III.    Plaintiff's and Roe's Communications After the January 2019 Incident ...................... 5

    IV.    The GBM Investigation and Investigative Report ........................................ 6

        A.    The Credibility Determinations ...................................................... 7

        B.    The Findings .............................................................................. 8

    V.    The Hearing Panel ............................................................................. 9

    VI.    The 2020 Title IX Rule Change ........................................................... 9

    VII.    This Action .................................................................................... 11

**STANDARD OF REVIEW** ............................................................................ 11

**ARGUMENT** .............................................................................................. 13

    I.    Plaintiff's Title IX Claims Against the Individual Defendants Fail as a Matter of Law. ................................................................................... 13

    II.    Plaintiff's "Systemic" Title IX Violation Fails as a Matter of Law. ............... 13

    III.    Plaintiff's Deliberate Indifference Claim Fails as a Matter of Law............... 15

        A.    Plaintiff Fails to Allege that She Was Denied Educational Opportunities. ............ 16

        B.    Plaintiff Fails to Allege that Columbia's Actions Were "Clearly Unreasonable.".. 16

    IV.    Plaintiff's Erroneous Outcome Claim Fails as a Matter of Law................... 20

        A.    Plaintiff Fails to Allege Clear Irregularities in the Process. ................... 21

        B.    Plaintiff Fails to Allege a Minimal Plausible Inference of Gender Bias. ............... 24

**CONCLUSION** ........................................................................................... 25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................. 11, 19, 24

*B.B. v. New Sch.*,
  No. 17 Civ. 8347, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018) ........................................... 25

*Bailey v. N.Y. L. Sch.*,
  No. 16 Civ. 4283, 2017 WL 835190 (S.D.N.Y. Mar. 1, 2017) ................................................ 13

*Bailey v. N.Y. L. Sch.*,
  No. 16 Civ. 4283, 2017 WL 6611582 (S.D.N.Y. Dec. 27, 2017) ................................... 2, 12, 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 11

*Chen v. Major League Baseball Props., Inc.*,
  798 F.3d 72 (2d Cir. 2015) ......................................................................... 10

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................. 15, 16, 17, 20

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) ......................................................................... 21

*Doe v. East Haven Bd. of Educ.*,
  200 F. App'x 46 (2d Cir. 2005) .................................................................... 16

*Doe v. NYU*,
  438 F. Supp. 3d 172 (S.D.N.Y. 2020) ............................................................ 25

*Doe v. Rensselaer Polytechnic Institute*,
  20 Civ. 1185, 2020 WL 6118492 (N.D.N.Y. Oct. 16, 2020) .................................... 14

*Doe v. Univ. of Chi.*,
  No. 16 Civ. 08298, 2017 WL 4163960 (N.D. Ill. Sept. 20, 2017) ........................... 15

*Doe v. Vassar Coll.*,
  No. 19 Civ. 9601, 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019) ............................ 23

*Feibleman v. Trs. of Columbia Univ. in City of N.Y.*,
  No. 19 Civ. 4327, 2020 WL 3871075 (S.D.N.Y. July 9, 2020) ................................ 16

ii

*Fisk v. Letterman*,
    401 F. Supp. 2d 362 (S.D.N.Y. 2005) ............................................................. 12

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009) ................................................................................. 13

*Hauff v. State Univ. of N.Y.*,
    425 F. Supp. 3d 116 (E.D.N.Y. 2019) ............................................................. 25

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
    No. 11 Civ. 5881, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ........................... 10

*Heller v. Bedford Cent. Sch. Dist.*,
    144 F. Supp. 3d 596 (S.D.N.Y. 2015) ............................................................. 12

*KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*,
    No. 12 Civ. 2200, 2013 WL 177911 (S.D.N.Y. Jan. 16, 2013) ................... 12, 17, 18

*Martinetti v. Mangan*,
    No. 17 Civ. 5484, 2019 WL 1255955 (S.D.N.Y. Mar. 19, 2019) ........................... 17

*Menaker v. Hofstra University*,
    935 F.3d 20 (2d Cir. 2019) ................................................................... Passim

*Nungesser v. Columbia Univ.*,
    244 F. Supp. 3d 345 (S.D.N.Y. 2017) ............................................................. 17

*Portz v. St. Cloud State Univ.*,
    No. 16 Civ. 1115, 2018 WL 3579109 (D. Minn. July 25, 2018) ...................... 13, 15

*Roe v. Pa. State Univ*,
    No. 18 Civ. 2142, 2019 WL 652527 (E.D. Pa. Feb. 15, 2019) ............................. 20

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) ......................................................................... 10

*Soriano ex rel. Garcia v. Bd. of Educ. of City of N.Y.*,
    No. 01 Civ. 4961, 2004 WL 2397610 (E.D.N.Y. Oct. 27, 2004) ..................... 18, 20

*Thomas v. Westchester Cnty. Health Care Corp.*,
    232 F. Supp. 2d 273 (S.D.N.Y. 2002) ............................................................. 12

*Yu v. Vassar Coll.*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2015) ............................................................. 20

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994) ..................................................... 14, 20, 21, 24

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 11

**REGULATIONS**

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020)...................................................... 10

**OTHER AUTHORITIES**

Office of Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment*
    10 (July 20, 2021),
    https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf........................ 10, 13, 15

R. Shep Melnick, *Analyzing the Department of Education's final Title IX rules on sexual
    misconduct*, The Brookings Institution (June 11, 2020),
    https://www.brookings.edu/research/analyzing-the-department-of-educations-final-title-ix-
    rules-on-sexual-misconduct/.................................................................................................... 10

Defendant The Trustees of Columbia University in the City of New York ("Columbia" or the "University") and Defendants Kevin Pitt, Alyssa Anzalone-Newman, and Kristin Collado (the "Individual Defendants," and collectively with Columbia, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint ("Complaint," ECF 12).

## PRELIMINARY STATEMENT

Title IX requires that a university act without gender bias when responding to a student's complaint of sexual misconduct. Columbia has done just that here—and the materials from the underlying gender-based misconduct ("GBM") proceeding that *pro se* Plaintiff Jane Doe attached to her Complaint show it. The 131-page Investigative Report from Plaintiff's GBM proceeding demonstrates Columbia's thorough and unbiased investigation of Plaintiff's August 2019 complaint that she was sexually assaulted by another Columbia student. Plaintiff's claim that Columbia should have applied to her 2019 complaint its 2020 GBM Policy, which was based on federal regulations that went into effect in August 2020 (the "2020 Title IX Rule"), is contradicted by both University policy and the 2020 Title IX Rule itself, which the U.S. Department of Education ("DOE") has clearly stated is not retroactive. And Plaintiff's claims that the University was "clearly unreasonable" in its response to her GBM complaint and reached an "erroneous outcome" by finding the student respondent, John Roe, not responsible (if she could even bring such an erroneous outcome claim) are contradicted by both the Investigative Report and Columbia's GBM Policy.

Plaintiff's dissatisfaction with the outcome of her GBM proceeding falls far short of constituting a Title IX violation. Because Plaintiff has failed to plausibly allege any gender bias by the University, her Title IX claims should fail as a matter of law and the Complaint should be

dismissed.

<b>RELEVANT BACKGROUND</b>[1]

**I.      Columbia's Gender-Based Misconduct Policy and Procedures**

Columbia's Gender-Based Misconduct Policy and Procedures for Students ("GBM Policy") are designed to address allegations of sexual misconduct involving students. ECF 12-1 ("2019 GBM Policy") at 1–56.[2]  The processes and procedures described here are from the 2019 GBM Policy, which is the policy that was applied to Plaintiff's GBM proceeding. *See* ¶ 13;[3] ECF 12-1 at 1–56.

A student who believes that they have been the victim of a GBM Policy violation may file a report with Columbia's GBM Office. *See* ECF 12-1 at 20–21. The GBM Office assesses the available information and determines whether to proceed with an investigation. *Id.* at 30, 33–34. When there is an investigation, the University notifies the complainant and respondent of the alleged GBM Policy violations and appoints two investigators (the "Investigative Team"). *Id.* at 34–35. The parties may each have an advisor accompany them to any meeting or hearing, and that advisor may be an attorney. *Id.* at 24. A student may request that the University arrange for an attorney-advisor, in which case one will be provided at no cost to the student. *Id.* at 25; ¶ 86.

At the start of the investigation, the parties are interviewed by the Investigative Team and may "provide a list of witnesses and/or any relevant documents or evidence to be considered." ECF 12-1 at 35. With respect to experts, "[a] party may [] request that a topic be considered by an

---

[1]     As is customary on a motion to dismiss, the factual allegations in the Complaint are accepted as true only for purposes of this motion, but not to the extent that they are contradicted by documents attached to the complaint, documents integral to the complaint or incorporated by reference, or documents of which this Court can take judicial notice. *See, e.g.*, *Bailey v. N.Y. L. Sch.,* No. 16 Civ. 4283, 2017 WL 6611582, at *7 (S.D.N.Y. Dec. 27, 2017) (Ramos, J.); *see also infra* at p. 12.

[2]     Page references for ECF 12-1 are to the ECF page numbers in the top, right-hand corner of the page.

[3]     References to "¶ __" are to paragraphs of the Complaint (ECF 12).

expert, but a party is not permitted to retain their own expert to consider a topic or submit testimony and/or reports as part of the investigation." *Id.* at 36. "The Investigative Team has the discretion to determine the relevance of any proffered witness and/or evidence and determine that certain witnesses and/or evidence should be included or excluded in the investigative process"; the same applies to expert testimony and materials. *Id.* at 35–37. As for mental health records, "[e]ach party has the right to request that evidence regarding their mental health diagnosis and/or treatment be excluded from consideration when responsibility is being determined. However, if an individual wishes to present evidence of their *own* mental health diagnosis and treatment, he/she may do so in limited circumstances." *Id.* at 37 (emphasis in original).

After completing the investigation, the Investigative Team produces an Investigative Report "based on interview summaries, witness statements and other documents gathered during the investigation." *Id.* at 39. The final Investigative Report includes, among other things, a factual summary, credibility assessments, and an analysis of the charges. *Id.* at 39–40. After reviewing the Investigative Team's recommended findings, the parties may accept the recommendation or have the matter referred to a Hearing Panel for adjudication. *Id.* at 40. Should either party request a hearing, a Hearing Panel is "tasked with evaluating and analyzing all relevant information in the Investigative Report . . . as well as any relevant additional submissions and information presented by the parties in the hearing process." *Id.* at 41. During the hearing, the parties have the opportunity to make opening and closing statements. *Id.* at 42–43. Only the Hearing Panel may pose questions to either party, each of whom appears separately before the Hearing Panel, and to the Investigative Team. *Id.* "Witnesses are not involved in the hearing process." *Id.* at 42.

Following the hearing, the Hearing Panel determines whether any violation of the GBM Policy occurred using a preponderance of the evidence standard. *Id.* at 43–44. The parties may

appeal the decision of the Hearing Panel and any resulting sanction. *Id.* at 47.

## II.     The January 8, 2019 Incident

Plaintiff and John Roe were both students at Columbia in January 2019. ¶¶ 6, 21. On January 8, 2019, shortly after midnight, Plaintiff, who alleges that she suffers from a subset of complex post-traumatic stress disorder called reactive attachment disorder, ¶¶ 16–17, reached out to students—including Roe—via Instagram, looking for someone to "confide in," ¶¶ 19–20. Plaintiff and Roe did not know each other and had never communicated prior to these messages. ECF 12-1 at 67. They messaged for several hours before Roe suggested that Plaintiff come to his dorm room. ¶¶ 22-25, 31; ECF 12-1 at 70–72. Plaintiff agreed and arrived around 2:30 a.m. ¶ 31.

Plaintiff alleges that after engaging briefly in conversation, the two laid on Roe's bed to watch a television show, and Roe began touching Plaintiff "in various places." ¶¶ 33–34. Plaintiff further alleges that she "verbally indicated that she did not want to have sex with John Roe," ¶ 35, and that Roe did not respond, instead putting "his hand under Plaintiff's pants and start[ing] finger[] Plaintiff's external genitalia," ¶ 36. Plaintiff alleges that Roe asked her if this was "okay" but that she "was unable to speak." ¶¶ 37–38. Plaintiff also claims that "Roe never verbally expressed that he wanted to have sex with the Plaintiff throughout their encounter . . . , nor did John Roe seek Plaintiff's permission for any sexual activity." ¶ 39.[4]

Plaintiff and Roe have differing accounts of the subsequent sexual activity and whether it was consensual, but both parties agree that they engaged in oral sex and unprotected vaginal intercourse. ¶¶ 46, 53, 55; ECF 12-1 at 96, 104. Plaintiff alleges that Roe forced her to perform oral sex on him and to have unprotected vaginal intercourse, ¶¶ 39, 46, 51–59; Roe told

---

[4]     According to the Investigative Report, Plaintiff told the Investigative Team that after Roe started touching her, "they began 'negotiating for sex,'" "she asked him if they could go to sleep 'without having sex,'" and that "the first couple of times" Roe "asked her whether the given activity was 'okay'" she "responded affirmatively." ECF 12-1 at 67.

investigators that Plaintiff "began performing oral sex on him without him asking her to do so," ECF 12-1 at 103, and that with regards to the vaginal intercourse, "he asked her if he could 'go in without a condom,' and she indicated that he could," *id.* at 104.

### III.    Plaintiff's and Roe's Communications After the January 2019 Incident

Plaintiff and Roe did not have additional contact following the January 8, 2019 encounter until April 2019, when Plaintiff sent Roe an Instagram direct message informing him that she had tested positive for a sexually transmitted infection ("STI"). ¶¶ 63, 67–68; ECF 12-1 at 107. That same month, Plaintiff utilized various confidential resources at Columbia, including the University's Gay Health Advocacy Project ("GHAP") and Sexual Violence Response ("SVR").[5] ¶¶ 71, 75. She alleges that a specific counselor at GHAP informed her that what she had experienced was rape, although notes from the meeting indicate that it was Plaintiff who introduced the term "rape" to their conversation. *Compare* ¶ 71 *with* ECF 12-1 at 75.

Around June 1, 2019, Plaintiff again contacted Roe about their January 8, 2019 encounter. ¶ 76; ECF 12-1 at 68, 80, 107. Roe "begged" Plaintiff not to report the incident to the school. ¶ 76; ECF 12-1 at 107. Throughout June and July 2019, Plaintiff and Roe continued to message via social media. ¶¶ 77–80; ECF 12-1 at 107. During these conversations, Plaintiff told Roe on multiple occasions, "if you don't [get help] I will go to gender-based misconduct office [*sic*]." ECF 12-1 at 76–77. In response, Roe promised Plaintiff (as well as two of his friends) that he would get help and "someday get normalized." *Id.*; *see also* ¶¶ 77, 79–80. Plaintiff requested that

---

[5]    GHAP's mission statement reads, "GHAP welcomes students of all gender identities and orientations, and we are especially committed to LGBTQ students. We keep the name Gay Health Advocacy Project to reach out to Columbia students who have been at highest risk for HIV and to honor those who started our group during the early years of the epidemic." *See* Columbia Health: Gay Health Advocacy Project, https://health.columbia.edu/content/gay-health-advocacy-project (last visited Oct. 11, 2021). SVR, a division of Columbia Health unrelated to Columbia's GBM Office, is a confidential resource for students to access support after experiencing sexual misconduct. *See* Columbia Health: Sexual Violence Response, https://health.columbia.edu/content/sexual-violence-response (last visited Oct. 11, 2021).

Roe provide her with his social media passwords so that she could ensure he would not be "impulsive" or "promiscuous" again and that he would "become a better person." ECF 12-1 at 79. Plaintiff alleges that during this time, she was "holding onto the hope" that not reporting Roe would "achieve restorative justice," ¶ 80, while simultaneously having "difficulty [] accept[ing] the reality that she was sexually assaulted by someone she trusted," ¶ 81. At the end of July 2019, Plaintiff "realized that John Roe never meant to address his behavior," ¶ 82, and she decided to report the incident, ¶ 85.

**IV.    The GBM Investigation and Investigative Report**

In August 2019, Plaintiff reported the January 8, 2019 encounter with Roe to the GBM Office. ¶ 85. Plaintiff also filed a report with the New York City Police Department ("NYPD"). *Id.* The University connected Plaintiff with *pro bono* counsel from Sanctuary for Families, ¶ 86, and after speaking with Plaintiff, determined that her complaint involved the following alleged violations by Roe: (1) Sexual Assault: Penetration (penis to vagina); (2) Sexual Assault: Penetration (penis to mouth); and (3) Sexual Assault: Contact (hand to vagina). ECF 12-1 at 62. In February 2020, while the investigation was ongoing, Roe filed a cross-complaint, alleging that Plaintiff had engaged in stalking and other unwanted behaviors, as well as violated the No-Contact Directive. *Id.* at 62–63; ¶ 108. In March 2021, Plaintiff reported an alleged violation of the No-Contact Directive by Roe. ¶ 119; ECF 12-1 at 116.

The Investigative Team interviewed Plaintiff, Roe, and five other witnesses, including other students and the NYPD detective who interviewed Plaintiff regarding her August 2019 report. *See generally* ECF 12-1 at 62–95. The Investigative Team also considered a wide range of evidence, including electronic communications between Plaintiff and Roe; Plaintiff's and Roe's electronic communications with others; social media and text messages provided by Plaintiff, Roe,

and other witnesses; medical records provided by Plaintiff; an explanatory blog post about trauma bonding provided by Plaintiff; and written statements by Plaintiff and Roe. Investigative Report at 8-11, attached as Exhibit 1 to the Declaration of Kyla Magun ("Magun Declaration").[6] Consistent with the 2019 GBM Policy, *see* ECF 12-1 at 37, the Investigative Team reviewed all of the evidence submitted by Plaintiff regarding her mental health treatment and diagnosis, Ex. 1, Rep. at 4 n.4, 9–10 (*see* Nos. 12, 16, 33–34, 49);[7] ECF 12-1 at 69, but only attached some of the evidence as exhibits to the 131-page final report issued in May 2021, Ex. 1, Rep. at 1–2 (*see* Exs. 12 & 16); ECF 12-1 at 62–110 (final 48 pages of Report).

### A.    The Credibility Determinations

In determining the credibility of the parties and witnesses, consistent with the 2019 GBM Policy, the Investigative Team considered: "the consistency or inconsistency of their accounts over time; their motive to lie; the presence or absence of any corroborating evidence; and, whether their statements included specific details that indicated their accounts were reasonable and logical." ECF 12-1 at 65 (footnote omitted); *see also id.* at 38. Based on these factors, the investigators found that neither Plaintiff nor Roe was "fully credible or reliable." *Id.* at 89.

With respect to Plaintiff, the Investigative Team determined that while her story remained

---

[6]    Plaintiff attaches only an excerpt of the Investigative Report as Exhibit E to the Complaint. *See* ECF 12-1 at 62–110. Exhibit E includes only the Findings and Analysis section of the Report but not, for example, the Procedural History or Factual Summary, which describe the investigative record upon which the findings are based. The Complaint relies heavily on the entire Investigative Report, including information that is only in the Procedural History or Factual Summary. *See, e.g.,* ¶¶ 110 (describing Roe's Title IX Investigative interview); 115-16, 162-63, 203 (describing witness interviews); 113, 158, 181, 191 (describing mental health evidence allegedly considered or excluded); 121 (describing points of emphasis "throughout the investigative report"). Since this information is clearly incorporated into and integral to the Complaint, the entire document should be considered at the pleading stage. *See infra* at p. 12. Nevertheless, putting aside why Plaintiff may have chosen to include only some parts of the Investigative Report and not others, due to the sensitive nature of its content and related privacy considerations (including with respect to the non-party student respondent, John Roe), Columbia is submitting only discrete additional excerpts as Exhibit 1 to the Magun Declaration. Should the Court wish to review the full document, Columbia is prepared to file it under seal at the Court's instruction.

[7]    Regarding Exhibit 1, "Rep. at __" refers to the page numbers of the report found in the bottom, right-hand corner.

relatively consistent over time and some of her statements were corroborated by the evidence, *e.g.*, *id.* at 75–76, 79, her "anger, sense of betrayal, and resentment" of Roe negatively impacted her credibility, *id.* at 70, as did the lack of corroboration of certain of her statements regarding whether she consented to the sexual activity, *e.g.*, *id.* at 73, 76, and whether she threatened Roe during their conversations after the incident, *id.* at 77–78. Moreover, the Investigative Team determined that while some of Plaintiff's statements were logical and reasonable, others were not, including her expectations of the evening and her explanation that her communications with Roe throughout June and July were made with the aim of helping him get "better." *Id.*

With respect to Roe, the Investigative Team found that his narrative, too, was consistent and that while he may have had motive to lie—including because of his "frequent references to his involvement in a prior gender-based misconduct investigation, and his repeated statements reiterating how fearful he was of potential consequences if he were to be found responsible for the current allegations," *id.* at 81—his "candor and frankness" positively impacted his credibility, *id.* at 82–83. Nevertheless, the Investigative Team found that while some of Roe's statements were corroborated by the evidence, others were not, including that his account of the incident and whether he had affirmative consent to proceed with the sexual encounter differed widely from certain witnesses. *Id.* at 84–86. The Investigative Team also found that Roe's continued engagement with Plaintiff in the months following the incident was not completely logical—especially after the investigation had commenced, *id.* at 86–88—and his failure to provide certain evidence demonstrated a lack of forthrightness that did not support credibility, *id.* at 88.

**B.    The Findings**

Regarding the sexual assault allegations against Roe, the Investigative Team first determined by a preponderance of the evidence that Plaintiff was not incapacitated on January 8, 2019, including that her mental health issues did not impede her ability to consent, and that even

if she were incapacitated, Roe would not have known based on her actions and statements at the time.[8] ECF 12-1 at 98–100. The Investigative Team then determined that due largely to the fact that Plaintiff's and Roe's statements about the evening were "irreconcilable" and neither party was particularly reliable, they could not conclude by a preponderance of the evidence that affirmative consent was absent, and recommended that Roe be found not responsible for sexual assault. *Id.* at 100–06. With respect to the cross-complaint against Plaintiff for alleged stalking and violation of the No-Contact Directive, the Investigative Team recommended that Plaintiff be found not responsible as well. *Id.* at 110.

## V.    The Hearing Panel

On June 15, 2021, Plaintiff was informed that a hearing had been scheduled for June 29, 2021. ECF 12-1 at 113–14; ¶ 167. Plaintiff failed to attend the hearing and Roe subsequently opted to proceed without one. ECF 12-1 at 118. Accordingly, the Hearing Panel deliberated using the Investigative Report and any additional materials provided by the Investigative Team. *Id.*

On July 2, 2021, Plaintiff was informed via letter that the Hearing Panel had affirmed the findings in the Investigative Report, concluding that Plaintiff was able to consent to sex and that there was "insufficient information to conclude by a preponderance of the evidence that affirmative consent was denied or withdrawn." ECF 12-1 at 119. Plaintiff was provided with detailed instructions on how to appeal the decision and informed that any such appeal needed to be filed by July 14, 2021. *Compare id.* at 120 *with* ¶ 172.

## VI.    The 2020 Title IX Rule Change

On May 19, 2020, DOE promulgated the 2020 Title IX Rule, specifying how educational

---

[8]    As the 2019 GBM Policy states: "Whether sexual conduct with an incapacitated person constitutes gender-based misconduct depends on whether the Respondent knew or should have known of the Complainant's incapacitation, based on objectively and reasonably apparent indications when viewed from the perspective of a sober, reasonable person in the Respondent's position." ECF 12-1 at 13.

institutions must respond to allegations of sexual misconduct. *See* Nondiscrimination on the Basis

of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg.

30,026 (May 19, 2020) (to be codified at 34 C.F.R. 106). The regulations "narrowed the definition

of sexual harassment" and approved use of the "more demanding" clear and convincing evidence

standard for a finding of responsibility. R. Shep Melnick, *Analyzing the Department of Education's*

*final Title IX rules on sexual misconduct*, The Brookings Institution (June 11, 2020),

https://www.brookings.edu/research/analyzing-the-department-of-educations-final-title-ix-rules-

on-sexual-misconduct/. The new regulations also require schools to hold live disciplinary hearings

involving cross-examination of parties and witnesses. *Id.*

       The 2020 Title IX Rule became effective on August 14, 2020. *See* 85 Fed. Reg. at 30,026.

As the DOE has clearly explained:

> The 2020 amendments took effect on August 14, 2020, and *are not retroactive*.
> This means a school must follow the requirements of the Title IX statute and the
> regulations that were in place at the time of the alleged incident; the 2020
> amendments do not apply to alleged sexual harassment occurring before August
> 14, 2020. *This is true even if the school's response was on or after this date*. In
> other words, if the conduct at issue in the complaint took place prior to August 14,
> 2020, the 2020 amendments *do not apply* even if the complaint was filed with a
> school on or after August 14, 2020.

Office of Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment*

10 (July 20, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf

(emphasis added) ("DOE Q&A").[9] In light of the 2020 Title IX Rule change, Columbia adopted

the Gender-Based Misconduct and Interim Title IX Policies and Procedures for Students (the

---

[9]   Courts routinely consider agency guidance at the motion to dismiss stage. *See, e.g.*, *Salazar v. King*, 822 F.3d 61,
67–68, 76–77 (2d Cir. 2016) (considering DOE "Dear Colleague Letters" at 12(b)(6) stage); *Chen v. Major
League Baseball Props., Inc.*, 798 F.3d 72, 79–80 (2d Cir. 2015) (considering agency opinion letter at 12(b)(6)
stage). Moreover, the Court may take judicial notice of the DOE Q&A because it is a publicly available document.
*See, e.g.*, *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881, 2012 WL 4477552, at *5 (S.D.N.Y. Sept.
27, 2012).

"2020 GBM Policy") on August 14, 2020. *See* ECF 12-1 at 32–122.

**VII.    This Action**

On July 1, 2021, Plaintiff simultaneously filed her initial complaint and an order to show cause why the University should not be enjoined from concluding Plaintiff's GBM proceeding. ECF 1, 4. On July 13, 2021, the Court denied Plaintiff's application for preliminary injunctive relief, and on July 20, 2021, Plaintiff filed and served an amended complaint. ECF 8, 12. On July 22, 2021, Defendants requested that the Court schedule a conference to discuss the filing of any early motions, as well as the possibility of a mediation or judicial settlement conference. ECF 21. On August 11, 2021, after a conference with the Court, this case was referred to Magistrate Judge Sarah Netburn for a settlement conference. ECF 28. A settlement conference was held before Judge Netburn on September 1, 2021 but was unsuccessful. ECF 34. Following Defendants' submission of a proposed briefing schedule for this motion, on September 15, 2021, the Court approved the proposed briefing schedule, stayed discovery pending adjudication of this motion, and denied Plaintiff's requests for discovery and to pursue a motion for summary judgment. ECF 40. Plaintiff filed an appeal of the Court's September 15, 2021 order, which is currently pending in the Second Circuit. *See Doe v. The Trs. of Columbia Univ. et al.*, No. 21-2348.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). While courts must construe a *pro se* complaint "liberally," "[e]ven pro se plaintiffs asserting civil rights claims cannot withstand a

motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Bailey*, 2017 WL 6611582, at *7 (internal quotations omitted).

In addition to its factual allegations, a complaint is deemed to include any written instrument attached to it as an exhibit as well as any statements or documents incorporated into it by reference. *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 604–05 (S.D.N.Y. 2015), *aff'd*, 665 F. App'x 49 (2d Cir. 2016); *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275–76 (S.D.N.Y. 2002); *see also KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 Civ 2200, 2013 WL 177911, at *4 (S.D.N.Y. Jan. 16, 2013) (Ramos, J.) (internal citations omitted), *aff'd*, 531 F. App'x 132 (2d Cir.). Even where a document is not incorporated by reference, a court may nevertheless consider it at the 12(b)(6) stage where the complaint relies "on the terms and effect" of the document, rendering it "integral" to the complaint. *Heller*, 144 F. Supp. 3d at 604–05. Plaintiff attaches several documents to the Complaint as exhibits, all of which may be considered for the purposes of this motion.[10]

Moreover, on a motion to dismiss, "[i]f a plaintiff's own pleadings are contradicted by matters in such documents, the Court need not reconcile this difference or accept the plaintiff's pleadings as true." *Bailey*, 2017 WL 6611582, at *7. Since here, as discussed below, many of Plaintiff's allegations are "contradicted by other matters asserted or relied upon or incorporated by reference"—*e.g.*, the Investigative Report and the 2019 GBM Policy—the Court need not accept these allegations as true. *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) (applying same standard in a case with a *pro se* plaintiff).

---

[10]    As discussed above, Plaintiff has attached only an excerpt of the Investigative Report as Exhibit E to the Complaint, rather than the full Report. *See supra* at p. 7 n.6. Columbia is submitting additional select excerpts from the Report as Exhibit 1 to the Magun Declaration. *Id.*

## ARGUMENT

**I.    Plaintiff's Title IX Claims Against the Individual Defendants Fail as a Matter of Law.**

As an initial matter, Plaintiff's Title IX claims against the Individual Defendants should be dismissed. Title IX "'has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals,' since they do not personally receive federal education funding." *Bailey v. N.Y. L. Sch.*, No. 16 Civ. 4283, 2017 WL 835190, at *6 (S.D.N.Y. Mar. 1, 2017) (Ramos, J.) (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009)) (dismissing individual defendants). The Individual Defendants here are no exception.

**II.    Plaintiff's "Systemic" Title IX Violation Fails as a Matter of Law.**

Plaintiff's first cause of action ostensibly stems from Columbia's decision to apply the 2019 GBM Policy rather than the 2020 GBM Policy to her GBM proceeding. But as the DOE has clearly explained: "[T]he 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020. This is true even if the school's response was on or after this date." DOE Q&A 10. Indeed, Plaintiff's Complaint acknowledges as much. *See* ¶ 136 (noting that in an August 2020 blog post, the DOE Office of Civil Rights explained that the new regulations "will not be applied retroactively to incidents occurring prior to August 14, 2020"); ECF 12-1 at 57–58. Accordingly, Columbia acted appropriately and in compliance with DOE regulations when it applied its 2019 GBM Policy—rather than its 2020 GBM Policy—to Plaintiff's 2019 complaint of misconduct. *See, e.g.*, *Portz v. St. Cloud State Univ.*, No. 16 Civ. 1115, 2018 WL 3579109, at *4 n.2 (D. Minn. July 25, 2018) (noting that "[r]egulated entities [such as universities] rely on agency guidance . . . in deciding how to structure compliance" with Title IX and deferring to the DOE's interpretation of Title IX regulations). Importantly, Plaintiff does not allege that gender was a "motivating factor" in Columbia's decision to apply the 2019 GBM Policy to her GBM

proceeding, which is a required element of any Title IX claim. *See, e.g.*, *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). To the contrary, Plaintiff admits that Columbia decided to apply "the old Title IX policy for *all* pending cases," including Plaintiff's. ¶ 137 (emphasis added).

Plaintiff cites the out-of-district decision in *Doe v. Rensselaer Polytechnic Institute*, No. 20 Civ. 1185, 2020 WL 6118492 (N.D.N.Y. Oct. 16, 2020) ("*RPI*"), to suggest that a court might apply a different standard in a case (like hers) "where the hearing [had] not [yet] taken place" as of the time that the 2020 Title IX Rule went into effect. ¶ 140 & n.1. In *RPI*, Judge Hurd granted a preliminary injunction to prevent a school from applying its 2018 Title IX policy where the underlying incident for which the plaintiff was accused of sexual assault occurred before the 2020 Title IX Rule went into effect, but the hearing was set for after. 2020 WL 6118492, at *15.

*RPI* is of no help to Plaintiff. Judge Hurd specifically noted that, as is the case here, the university's choice to employ its earlier Title IX policy "applie[d] equally to both sexes" and was therefore not itself sufficient to allege gender discrimination under Title IX. *Id.* at *7. Instead, Judge Hurd found a "powerful inference of sex discrimination" because, among other things, RPI subjected claims based on the same underlying facts to different standards depending on whether it was assessing the responsibility of the male or the female cross-complainant in the same proceeding. *See id.* at *7–8. Plaintiff makes no such allegations here, nor can she.

Moreover, the *RPI* court's conclusion that "parallel procedures"—implementing RPI's 2020 policy for some proceedings and its 2018 policy for others—was "evidence of an irregular adjudicative process," *id.* at *6–7, is in conflict with DOE guidance and simple principles of regulatory compliance, as well as the Second Circuit's standard set forth in *Menaker v. Hofstra University*, 935 F.3d 20, 34 (2d Cir. 2019). It is also perhaps a reflection of the fact that the *RPI* decision is from October 2020, nearly seven months before DOE clarified that the 2020 Title IX

14

Rule "do[es] not apply to alleged sexual harassment occurring before August 14, 2020 . . . even if the school's response was on or after this date." *See* DOE Q&A 10.

Complying with federal regulations cannot be an irregular process. *See, e.g.*, *Portz*, 2018 WL 3579109, at *4 n.2; *see also, e.g.*, *Doe v. Univ. of Chi.*, No. 16 Civ. 08298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017) (concluding that a"[u]niversity's adoption of positions recommended by the federal government does not in turn suggest that the [u]niversity did so because of gender bias— all it plausibly suggests is that the [u]niversity sought to comply with OCR's recommendations"). Indeed, maintaining "parallel procedures" in compliance with DOE regulations comes nowhere close to the standard of "*clear* irregularities" set forth by the Second Circuit in *Menaker*, 935 F.3d at 34 n.50 (emphasis in original). *See infra* at pp. 17–18.

There is simply no plausible allegation of gender bias that Plaintiff has made or could make in connection with Columbia's decision to comply with DOE regulations and apply the 2019 GBM Policy here. Plaintiff's preference for one policy over the other does not, and cannot, state a claim under Title IX.

## III.    Plaintiff's Deliberate Indifference Claim Fails as a Matter of Law.

To survive a motion to dismiss, a plaintiff alleging deliberate indifference under Title IX must plead that: (1) the harassment was "sexual" in nature; (2) the harassment was "so severe, pervasive, and objectively offensive," and "so undermine[d]" and "detract[ed]" from the student's educational experience that it effectively "bar[red]" the student from access to educational opportunities or benefits; (3) the school had actual knowledge of the harassment; and (4) its response was "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633, 648, 650, 651 (1999). The Supreme Court has made clear that liability for student-on-student harassment is confined to those limited circumstances where the school's "own deliberate indifference effectively '*cause[d]*' the discrimination." *Id.* at 642–43

(emphasis added; alternation in original).

Here, Plaintiff's "deliberate indifference" claim fails for two independent reasons, either of which is sufficient to defeat Plaintiff's claim. First, Plaintiff does not plausibly allege that she was denied educational opportunities or benefits. And second, Plaintiff does not plausibly allege that the University acted in a manner that was "clearly unreasonable" when responding to her allegations of gender-based misconduct.

### A.    Plaintiff Fails to Allege that She Was Denied Educational Opportunities.

To successfully plead a deliberate indifference claim, Plaintiff must plausibly allege the "loss of an educational benefit that can be traced to [Roe's] alleged acts of harassment or assault." *Feibleman v. Trs. of Columbia Univ. in City of N.Y.*, No. 19 Civ. 4327 (VEC), 2020 WL 3871075, at *7 (S.D.N.Y. July 9, 2020); *see also Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 47 (2d Cir. 2005) (requiring plaintiff to show that the alleged harassment "had the systemic effect of denying her access to educational programs and activities"). Yet Plaintiff has failed to allege— plausibly or otherwise—that Roe's harassment "undermine[d]" or "detract[ed]" from her educational experience. In fact, the Complaint contains no references to Plaintiff's education. While Plaintiff does allege that "[a]s a result of Roe's actions, [she] was caused to feel fear, depression, anxiety, shame, and self-guilt" ¶ 70, she does not allege that these feelings impacted her education. Even with the liberal pleading standard afforded to *pro se* plaintiffs, these allegations are insufficient to withstand a motion to dismiss, as there is no alleged "link between [Plaintiff's] education and [the alleged] misconduct." *Davis*, 526 U.S. at 652. Plaintiff's deliberate indifference claim should be dismissed for this reason alone.

### B.    Plaintiff Fails to Allege that Columbia's Actions Were "Clearly Unreasonable."

Plaintiff's deliberate indifference claim also fails because she has not alleged that

Columbia acted in a manner that was "clearly unreasonable." As one court has explained:

> This is not a "mere 'reasonableness' standard." Title IX does not require schools to "'remedy' peer harassment" or to "ensure that students conform their conduct to certain rules." "On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable."

*Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017) (quoting *Davis*, 526 U.S. at 648–49). Put another way, deliberate indifference is a "high standard" that seeks "to eliminate any risk that [a university] would be liable in damages not for its own official decision but instead for [another individual's] independent actions." *Davis*, 526 U.S. at 643 (internal quotation marks omitted). For a court to find that a university acted with deliberate indifference, the "measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *KF ex rel. CF*, 2013 WL 177911, at *6 (internal quotation omitted).

Here, Plaintiff appears to provide three possible theories as to how the University was "clearly unreasonable," all of which boil down to disagreements with the University's GBM Policy or decisions the University made in accordance with that Policy, and none of which rise to the "high standard" of being "clearly unreasonable."

***Application of the 2019 GBM Policy.*** Plaintiff attempts to plead that applying the 2019 GBM Policy to her proceeding, instead of the 2020 GBM Policy, was "clearly unreasonable." For all of the reasons discussed above, it was not. *See supra* at pp. 13–15. Plaintiff is effectively trying to plead that she was somehow deprived access to other, different procedures that she would have preferred as part of her GBM proceeding. But a mere preference for different procedures, or even a disagreement with the University's procedures, is insufficient to state a claim for deliberate indifference. *See, e.g.*, *Martinetti v. Mangan*, No. 17 Civ 5484, 2019 WL 1255955, at *4–5 (S.D.N.Y. Mar. 19, 2019) (holding that plaintiff's belief that a "different type of investigation, or a more expansive one, was the appropriate response" did not serve as the basis for a deliberate

17

indifference claim); *Soriano ex rel. Garcia v. Bd. of Educ. of City of N.Y.*, No. 01 Civ. 4961(JG), 2004 WL 2397610, at \*4 (E.D.N.Y. Oct. 27, 2004) ("[T]he standard is not whether the administrators responded in a particular manner, but whether their response was clearly unreasonable . . . ."). As this Court has recognized, under Title IX, universities "are not constrained in their ability to fashion appropriate relief, but rather retain broad flexibility in devising a response." *KF ex rel. CF*, 2013 WL 177911, at \*7; *see also id.* at \*6 (holding that to meet the "clearly unreasonable" standard, a plaintiff "must provide '*something more* than a proffer indicating the ultimate inadequacy of preventative and curative measures.'" (emphasis added) (internal quotation marks omitted).[11]

***Use of Evidence.*** Plaintiff next attempts to allege that Columbia was "clearly unreasonable" by purportedly excluding evidence of her mental disability from her GBM proceeding, including alleged expert evidence of the same. *See* ¶¶ 189, 192. These allegations are squarely contradicted by the Investigative Report, however, and therefore need not be taken as true. *Bailey*, 2017 WL 6611582, at \*7. They are also in conflict with the 2019 GBM Policy, Columbia's compliance with which is not "clearly unreasonable."

Specifically, Plaintiff alleges that Defendants "excluded evidence of Plaintiff's mental disability." ¶ 192. But as the Investigative Report clearly explains:

> On multiple occasions throughout the investigation, [Plaintiff] offered information about her mental health to the Investigative Team . . . [Plaintiff] provided the Team with the following evidence: written records form her visits to GHAP, CPS, and a private mental health professional; a letter issued by the Law School Admission Council, indicating it had granted her a testing accommodation; and, a blog post describing the concept of "trauma bonding" . . . *While the Investigative Team reviewed all of this evidence, only those documents which were relied upon in this*

---

[11]  Plaintiff's stand-alone allegation that "Defendants failed to provide adequate policies, training, and supervision," ¶ 187, is not only conclusory but also contradicted by the 2019 GBM Policy and thorough Investigative Report, *see* ECF 12-1 at 1–56, 62–110, which demonstrate Columbia's comprehensive and considered policies in response to sexual misconduct claims. *See also id.* at 35 ("All Title IX investigators will have extensive training in investigating and evaluating conduct prohibited under the Policy.").

*report are attached to it as exhibits.*

Ex. 1, Rep. at 4 n.4 (emphasis added). Both Plaintiff's GHAP records and the blog post were attached as exhibits to the final Investigative Report. *See id.* at 1–2 (Exs. 12 & 16). Moreover, the Investigative Report demonstrates that the Investigative Team considered evidence of Plaintiff's mental health in its credibility findings, *e.g.*, ECF 12-1 at 69, as well as the analysis of the alleged violations, *id.* at 98. It was not "clearly unreasonable" for the Investigative Team, after reviewing all of the evidence Plaintiff provided, to use its expertise and discretion to include and rely upon only some of that evidence in the Investigative Report. In fact, to do so was completely consistent with the 2019 GBM Policy, which explicitly states that the Investigative Team has the "discretion to determine the relevance of any . . . evidence and determinate that certain . . . evidence should be included or excluded in the investigative process." ECF 12-1 at 35.

Plaintiff also alleges that Defendants "prohibited/excluded evidence from expert witness [*sic*] showing Plaintiff's mental disability and possible incapacity at the time of the incident." ¶ 189. Plaintiff's barebones allegation, which does not explain who the purported expert was or what evidence from the purported expert was allegedly excluded, does not plausibly allege that any such evidence was excluded at all. *Iqbal*, 556 U.S. at 678. Furthermore, as the 2019 GBM Policy explains, "if the Investigative Team determines that expertise on a topic will assist the Hearing Panel in making its determination(s), the Investigative Team may include in the investigative record medical . . . expert testimony and materials." ECF 12-1 at 36. While Plaintiff had the option to "request that a topic be considered by an expert," the 2019 GBM Policy explicitly states that the Investigative Team only grants such requests in "limited circumstances." *Id.* And under no circumstance does the 2019 GBM Policy "permit[ Plaintiff] to retain [her] own expert to consider a topic or submit testimony and/or reports as part of the investigation." *Id.*

***Permitting Roe to Return to Campus.*** Finally, Plaintiff alleges that Columbia acted with

deliberate indifference by permitting John Roe to return to campus after he was previously found responsible for sexual misconduct in 2016. ¶ 193. Plaintiff cannot establish that Columbia acted "clearly unreasonably" merely by proceeding with a disciplinary decision in accordance with its own policies and procedures. *See, e.g.*, ECF 12-1 at 44–46 (describing process for determination of sanctions); *Soriano*, 2004 WL 2397610, at *4. Such disciplinary decisions by university officials are afforded substantial deference by courts. *See, e.g.*, *Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second guessing the disciplinary decisions made by school administrators."); *id.* (noting that deliberate indifference does not require administrators to "purg[e] their schools of actionable peer harassment or . . . engage in particular disciplinary action").

IV.    **Plaintiff's Erroneous Outcome Claim Fails as a Matter of Law.**

Plaintiff's attempt to plead an erroneous outcome claim fares no better. As a threshold matter, Plaintiff cannot assert an erroneous outcome claim because she was the complainant, and therefore not accused or found to have committed the offense in question. As the Second Circuit has explained, the gravamen of an erroneous outcome claim "is that the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715; *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015). Accordingly, erroneous outcome cases are "[t]ypically . . . brought by individuals who have been accused and found responsible for committing misconduct." *Roe v. Pa. State Univ*, No. 18 Civ. 2142, 2019 WL 652527, at *10 (E.D. Pa. Feb. 15, 2019) (collecting cases). Here, Plaintiff, like the plaintiff in *Roe*, is "the alleged victim of sexual assault, not the target of the Title IX disciplinary hearing." *Id.* at *11. As such, an erroneous outcome claim is unavailable to Plaintiff as a matter of law. *Id.*

Nevertheless, even if such a claim were available to Plaintiff, she has failed to plead it. To successfully plead an erroneous outcome claim, a plaintiff must plausibly allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary

proceeding"; and (2) "a causal connection between the flawed outcome and gender bias," *i.e.*, "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. In the absence of direct evidence of gender bias, such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender," *Yusuf*, 35 F.3d at 715, none of which Plaintiff alleges here, a plaintiff may establish a "minimal plausible inference of such discrimination," *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016), by alleging "a clearly irregular investigative or adjudicative process . . . amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex," *Menaker*, 935 F.3d at 33. While the Second Circuit standard refers to a "minimal inference," it still requires a plaintiff to plead with plausibility both (1) "a clearly irregular investigative or adjudicative process," as well as (2) the fact that "gender [was] a motivating factor in the decision to discipline." *Id.* at 31–33 (internal quotation marks omitted). Plaintiff attempts here (unsuccessfully) to establish a minimal plausible inference of gender bias by alleging various "irregularities" with her GBM proceeding, combined with purported pressure on Columbia regarding complaints of sexual misconduct against men.

### A.    Plaintiff Fails to Allege Clear Irregularities in the Process.

As none of the "irregularities" Plaintiff alleges were irregularities at all, the Court can—and should—grant Columbia's motion on that basis alone. The Second Circuit has been explicit about the robust showing that is required to successfully plead a "clearly irregular" process for purposes of an erroneous outcome claim under Title IX: "[W]e emphasize that our standard requires *clear* irregularities to raise an inference of bias. . . . *[M]inimal irregularities* (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.3d at 34 n.50 (second emphasis added). In *Menaker*, the plaintiff plausibly pled "clear irregularities" where Hofstra University had allegedly "completely disregarded" the process set forth in its own harassment

21

policy, including failing to interview witnesses, not allowing the plaintiff to respond in writing, and not producing a written determination. *Id.* at 34–35.

Here, as demonstrated in the following chart, the documents attached to, incorporated by reference in, and integral to the Complaint make clear that Columbia's process, in which it followed its own GBM Policy in adjudicating Plaintiff's complaint, was in no way irregular:

| Compl. ¶ | Plaintiff's Allegations | Incorporated Materials |
|---|---|---|
| 111–112 | Investigators "requested from Plaintiff" STI test results but "failed to request such STI testing results from John Roe." | There is no discussion of any party's STI test results in the Investigative Report's Findings & Analysis. *See* ECF 12-1 at 61–110. As the 2019 GBM Policy states: "The Investigative Team will . . . ask each party to provide . . . any relevant documents or evidence to be considered." But a "party is not required to provide any particular evidence for an investigation to proceed . . . ." *Id.* at 35. |
| 113–114, 117–118 | Investigators requested "Plaintiff's all available mental health records [*sic*]," but "never requested any mental health records from John Roe" and "excluded information concerning John Roe's mental condition." | The Investigative Report explains: "On multiple occasions throughout the investigation, [Plaintiff] *offered* information about her mental health to the Investigative Team. . . ." Ex. 1, Rep. at 4 n.4 (emphasis added); *see also* ECF 12-1 at 73. Moreover, as the 2019 GBM Policy explicitly states: "Each party has the right to request that evidence regarding their mental health diagnosis and/or treatment be excluded from consideration when responsibility is being determined. However, if an individual wishes to present evidence of their *own* mental health diagnosis and treatment, he/she may do so in limited circumstances." ECF 12-1 at 37. |
| 115–116 | Investigators included "Plaintiff's response to the New York City Police Department ("NYPD") detective in the regarding the alleged sexual assault [*sic*]" but "excluded John Roe or his attorney's response." | The Investigative Team interviewed the detective in the NYPD Special Victims Squad who met with and interviewed Plaintiff in August 2019. The Team found that this witness was "consistent through his sole interview and did not present a bias for either party." ECF 12-1 at 89. |
| 119–120, 204–205 | "Both Plaintiff and John Roe reported each other for violation of No-Contact Directive" during the course of the | Violations of no-contact directives are considered possible retaliation under the 2019 GBM Policy and "may be investigated separately through the Dean's Discipline process and/or folded into the pending investigation, based on the circumstances of the |

| | Investigation, but only Roe's report was included in the Investigative Report. | allegations." ECF 12-1 at 11. Nevertheless, it is unclear how Roe's participation or efforts to settle a lawsuit commenced by Plaintiff, *see* ECF 20, could constitute a violation of the No-Contact Directive by Roe. |
|---|---|---|
| 122 | Investigators "emphasized that Plaintiff reported the incident seven months later . . . thus giving a false and misleading impression of Plaintiff." | The investigators examined the evolution of Plaintiff's statements over the seven-month period and determined that "her behavior and communications with others . . . were largely consistent" with what she told the investigators, thereby *favoring* her credibility. ECF 12-1 at 66. The Investigative Report contains no indication that the timing of the report influenced the investigation or its outcome. *See generally id.* at 62–110. |
| 125–128, 132; *see also* 121–122, 124, 132, 161 | Investigators "improperly deemed Plaintiff as not credible . . . based on . . . selective omissions, inclusions, and mischaracterizations, with actual knowledge of Plaintiff's pre-assault cognitive disability, [and] post-assault sexual trauma." | Plaintiff's disagreement with the investigators' credibility determinations and assessment of the evidence does not rise to the level of a procedural irregularity. *Doe v. Vassar Coll.*, No. 19 Civ. 9601, 2019 WL 6222918, at *8 (S.D.N.Y. Nov. 21, 2019) (observing in context of a preliminary injunction motion that a district court cannot "second-guess a university's credibility determinations and overall evaluation of the evidence"). Moreover, the investigators' thorough credibility assessment of Plaintiff, close to 15 pages in length, is clearly set forth in the Investigative Report, *see* ECF 12-1 at 65–80, and takes into consideration all five factors set out in the 2019 GBM Policy. *Id.* at 38. |
| 159 | Investigators excluded "evidence from expert witness regarding pro se Plaintiff's cognitive /mental impairment, proof of disability, and sexual trauma ('fawn')." | *See supra* at pp. 18–19. |
| 159 | Investigators excluded "[a]ny and all discussions" between Roe, Plaintiff, and witnesses regarding his "plan to seek professional help for" a mental health condition. | Both parties submitted a "significant volume" of electronic communications, Ex. 1, Rep. at 7–11, many of which were included in the Investigative Report, *id.* at 1–2, including those where Roe tells Plaintiff, "I've accepted that I need help[.] You're doing your best getting all the help and medication you need. . . . I need to do the same," ECF 12-1 at 77, and statements by witnesses that they discussed with Roe the "help [he] was seeking, like CPS appointments and stuff like this, counseling," *id.* at 93. Once again, the 2019 GBM Policy provides investigators with the discretion to determine the relevance of any . . . evidence and determine that certain . . . evidence should be included or excluded |

| | | in the investigative process in light of the allegations and/or Policy." *Id.* at 35. |
|---|---|---|
| 159, 203[12] | Investigators excluded "[a]ny and all original documents from the NYPD detective investigation." | As with other evidence that Plaintiff claims was "excluded," Plaintiff fails to plausibly allege what "original documents" she is referring to or that the investigators ever received any such documents. *See Iqbal*, 556 U.S. at 678. |
| 168–170, 173 | Columbia denied Plaintiff "protections afforded" under the 2020 Title IX Rule. | *See supra* at pp. 13–15, 17–18. |
| 172 | Defendants did not "specify[] which individuals Plaintiff should address . . . for the Appeal process." | The Hearing Panel's decision letter informed Plaintiff that her "request of appeal should be addressed to 'Appellate Panel'" and provided instructions for filing the appeal. *See* ECF 12-1 at 120. |

As demonstrated above, Plaintiff has not plausibly alleged any clear irregularity in Columbia's investigation or adjudication of her GBM complaint sufficient to establish an inference of gender bias or otherwise "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" sufficient to plead an erroneous outcome claim. *Yusuf*, 35 F.3d at 715.[13]

**B.    Plaintiff Fails to Allege a Minimal Plausible Inference of Gender Bias.**

Plaintiff's erroneous outcome claim fails for yet another reason: her allegations of "criticism" of the University "for reacting inadequately to allegations of sexual misconduct by members of one sex" are insufficient to create a plausible inference of gender bias. *Menaker*, 935 F.3d at 33. Plaintiff alleges that the University is "attempt[ing] to dispel . . . anti-male/pro-female doubt" resulting from *Feibleman* and the 2020 Title IX Rule by "favor[ing] the male respondent,"

---

[12]   Plaintiff also points to alleged discrepancies between her NYPD report, ECF 12-1 at 59-61, and the NYPD detective's testimony. ¶¶ 162–63. However, the Investigative Report is clear that the NYPD detective interviewed for the purposes of the GBM investigation was responsible for meeting with and interviewing Plaintiff and at no point indicates that he was the same individual who completed the NYPD report. ECF 12-1 at 89.

[13]   Plaintiff makes outlandish allegations suggesting that the University "collaborat[ed]" with her *pro bono* attorney ¶ 101, "manipulated and potentially falsified evidence," ¶ 206, and predetermines the outcome of GBM cases based on "what kind of outcome it needs," ¶ 207. Such allegations are completely unsupported and warrant no further response.

¶¶ 197, 199, and is on a "mission to combat anti-male criticism," ¶ 200. But these conclusory allegations, separately or together, do not support a minimal plausible inference of gender bias. *See, e.g.*, *Doe v. NYU*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020), *appeal dismissed* (June 8, 2020) (finding plaintiff's "conclusory" allegations "insufficient to establish a 'plausible inference of sex discrimination'" because they "neither establish[d] that [the university] was under public criticism during the pendency of the underlying investigations and proceedings" nor that defendants had "knowledge of the purported criticisms"); *B.B. v. New Sch.*, No. 17 Civ. 8347, 2018 WL 2316342, at *8 (S.D.N.Y. Apr. 30, 2018) (concluding that plaintiff failed to allege gender bias, in part because he failed to allege anything specific about "the Title IX investigators or members of the Disciplinary Review Panel to suggest they held anti-male biases" in his proceeding).[14]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: October 13, 2021                    Respectfully submitted,

By:    _____
       Gabrielle E. Tenzer
       Kyla Magun
       KAPLAN HECKER & FINK LLP
       350 Fifth Avenue, 63rd Floor
       New York, NY 10118
       212.763.0883
       gtenzer@kaplanhecker.com
       kmagun@kaplanhecker.com

       *Attorneys for Defendants*

---

[14] Although Plaintiff is seeking punitive damages, *see* ECF 12 at 30, courts are in agreement that such damages are not available under Title IX. *See Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 138 (E.D.N.Y. 2019) (collecting cases).