UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE,<br><br>                           *Plaintiff*,<br><br>               v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, KEVIN PITT, ALYSSA ANZALONE-NEWMAN, KRISTIN COLLADO, in their official capacities,<br><br>                       *Defendants*. | No. 1:21-cv-05839 (ER) |

### DECLARATION OF KYLA P.S. MAGUN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

I, KYLA P.S. MAGUN, declare as follows:

      1.    I am an associate of the law firm of Kaplan Hecker & Fink LLP and counsel for Defendants The Trustees of Columbia University in the City of New York, Kevin Pitt, Alyssa Anzalone-Newman, and Kristin Collado (collectively, "Defendants") in the above-captioned action.

      2.    I respectfully submit this declaration in support of Defendants' Motion to Dismiss the Amended Complaint.

      3.    Consistent with Defendants' letter motion to file the attached exhibit with redactions (ECF 48), the following document is being submitted with redactions to protect the privacy and identities of Plaintiff and non-party John Roe.

4. Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the Executive Summary and Procedural History from the Investigative Report for the Gender-Based Misconduct proceeding at issue in the above-captioned action.

In accordance with 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.


Executed at:   October 13, 2021
               New York, New York

*/s/ Kyla P.S. Magun*

Kyla P.S. Magun

# EXHIBIT 1

# GENDER-BASED MISCONDUCT INVESTIGATIVE REPORT

INV#20190200

# Table of Contents

Exhibits                                                                                    1
Executive Summary and Procedural History                                                    2
Interviews Conducted                                                                        7
Documents and Materials Examined                                                            8
Policy Definitions                                                                         11
Factual Summary                                                                            12
    Party A's Statement                                                12
    Party B's Statement                                                43
    Witness Statements                                                 71
    Party B's Response to Statements Made by Witness #2 and Witness #5 79
Findings and Analysis                                                                      83
    Credibility Assessments                                             86
    Recommended Findings                                               117
Conclusion                                                                                131

# Exhibits

1. Incident Report submitted by Student Conduct and Community Standards ("SCCS") Director Spencer Bennett (June 25, 2019)
2. Incident Report submitted by Advising Dean ▮▮▮▮▮▮▮ (August 1, 2019)
3. Incident Report submitted by Party A (August 3, 2019)
4. Incident Report submitted by Title IX Investigator Kristin Collado (February 7, 2020)
5. Incident Report submitted by Party B (February 28, 2020)
6. Screenshot of March 15, 2020 Instagram Message sent by Party A, provided by Party B
7. Screenshots of Instagram Messages between Party A and Party B, from January 8 - July 7, 2019, provided by Party B
8. Screenshots of Facebook Messages between Party A and Party B, from June 1 - 12, 2019, provided by Party B
9. Screenshots of Facebook Messages between Party A and Party B, from June 12 - 26, 2019, provided by Party B
10. Screenshots of Facebook Messages between Party A and Party B, from June 26 - July 4, 2019, provided by Party B
11. Screenshots of Facebook Messages between Party A and Party B, from July 4 - 22, 2019, provided by Party B
12. Party A's Gay Health Advocacy Project ("GHAP") Records, provided by Party A

13. Screenshots of Instagram and Facebook Messages between Party A and Student #2, provided by Party A
14. Screenshots of Instagram Notifications indicating that Party A had "Unsent" Instagram Messages she previously sent to Party B, provided by Party B
15. Party A's Written Statement – "Clarification" regarding Stalking Allegation
16. Blog Post regarding Trauma Bonding, provided by Party A (Source: https://blog.melanietoniaevans.com/trauma-bonding-is-it-love-or-something-else/)
17. Party B's Written Statement – "Follow-Up to Interview"
18. Screenshot of Party B's apology to Party A on Party A's Facebook wall, provided by Witness #2
19. Screenshot of Party B's family member's list of Instagram Followers, provided by Party B
20. Screenshot of Venmo[1] Notifications Party B received, indicating that Party A wanted to "be friends with" Party B on Venmo, provided by Party B
21. Screenshots of Group Text Messages between Party B's Mother, Witness #2, and Witness #5, provided by Witness #2
22. Screenshots of Facebook Messages between Party B and Witness #2 (August 9, 2019), provided by Witness #2
23. Screenshots of Notes Taken by Witness #5 in advance of witness interview, and referred to during interview, provided by Witness #5
24. Screenshots of Facebook Messages between Party B and Witness #2 (undated), provided by Witness #2
25. Screenshots of Group Facebook Messages #1 between Party B, Witness #2, and Witness #5, provided by Witness #2
26. Screenshots of January 8, 2019 Lyft and Uber Receipts, provided by Party A
27. Screenshot of Facebook Messages between Witness #2 and Party A, provided by Witness #2
28. Letter sent by Investigative Team to Party A Re: Initial Notice and Interim Measures, on August 6, 2019
29. "Statement: Exhibit A," submitted by Party B
30. Screenshots submitted with August 3, 2019 Incident Report, by Party A

# Executive Summary and Procedural History

Title IX Investigators Alyssa Anzalone-Newman, Kristin Collado, Jennifer Kelly, and Benjamin Marzolf ("the Investigative Team")[2] conducted an investigation into a cross-complaint of allegations of gender-based misconduct made by Party A, ▮▮▮▮▮▮▮▮▮▮▮▮ student at the time of the allegations, and Party B, a ▮▮▮▮▮▮▮▮ student at the time of the allegations, in

---

[1] Venmo is a mobile payment application.
[2] Investigators Jennifer Kelly and Benjamin Marzolf left SCCS on November 22, 2019 and January 3, 2020, respectively. Investigators Anzalone-Newman and Collado subsequently replaced them for the remainder of the process.

2

violation of the Gender-Based Misconduct Policy and Procedures for Students ("the Policy")[3] of Columbia University ("the University").

On June 25, 2019, Student Conduct and Community Standards ("SCCS") Director Spencer Bennett answered a call made to the general phone number listed for SCCS. During this call, Party A identified herself by her first name only and would not provide her UNI. Party A inquired about meeting with someone from SCCS, and when asked what the meeting would be in reference to, she stated "sexual assault." She confirmed to Director Bennett that she felt safe where she was at the time, ███████████████. Director Bennett asked Party A if she would like to be transferred to a relevant SCCS staff member who could speak with her right away, and she said no. During their June 25 call, Director Bennett scheduled Party A to meet with an SCCS Case Manager on July 1, 2019. After Director Bennett and Party A hung up, Bennett was able to determine Party A's identity based on searching for her phone number in University databases. He also filed an Incident Report after completing this call with Party A. See Exhibit #1.

On July 1, 2019, Case Manager Adrienne Blount attempted to call Party A. Party A did not answer her phone, so Case Manager Blount left her a voicemail, asking her to call her back to address any questions or concerns she had related to gender-based misconduct.

On July 19 and 23, 2019, Party A visited SCCS's office in person. Investigator Kelly and Case Manager Blount met at length with Party A on both days, explaining how anonymous reporting and the investigative process work. Party A refused to provide any identifying information about herself or the other party during these conversations. She repeatedly mentioned she did not "feel safe" sharing her identity, and that this stemmed from concern about SCCS having anything other than her preferred first name and her personal email address. Out of concern for Party A's wellbeing, SCCS once again reverse-searched her phone number from the June 25 phone call with Director Bennett, comparing the identifying information linked to that phone number to recent swipe history from Watson Hall (where SCCS is located). By doing so, SCCS was able to confirm Party A's identity and reach out to her school, ███████████████████████████, so she could receive assistance and be connected to resources as needed.

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

---

[3] On May 6, 2020, the United States Department of Education released new Title IX regulations, which went into effect on August 14, 2020. However, in accordance with guidance issued by the Department of Education on October 7, 2020, this investigation has been and will be governed by the University's Gender-Based Misconduct Policy & Procedures for Students, dated August 23, 2019.

3



On August 3, 2019, Party A submitted an Incident Report detailing allegations of a sexual assault. See generally Exhibit #3. In this Incident Report, Party A wrote that "over the last Winter Break [2019]," while staying in New York City, she contacted Party B on social media despite not personally knowing him prior to this time. See Exhibit #3 at p. 1. Party A said she did this because she was "rather deeply frustrated and exhausted after five years of seeking diagnosis and correct treatment for [her] mental health"[4] and "wanted to shift [her] attention[,] so [she] looked at [her] social media feeds" to see if she could connect with any Columbia students who were also in the area over break. See Exhibit #3 at p. 1. Party A went on to describe traveling to Party B's apartment in the early hours of January 8, 2019 and having sexual intercourse to which she did not consent. See Exhibit #3 at pp. 1-2.

On August 6, 2019, Investigator Kelly and Case Manager Blount met with Party A once again, this time for her brief initial intake session and to review her rights under the Policy. That same day, Investigator Kelly sent initial notice letters to both parties, indicating that an initial assessment would commence. This notice also included a No Contact Directive ("NCD"), instructing both parties to discontinue any and all contact with each other until further notice.

---

[4] With regard to mental health treatment/diagnosis, the Policy states: "Each party has the right to request that evidence regarding their mental health diagnosis and/or treatment be excluded from consideration when responsibility is being determined. However, if an individual wishes to present evidence of their own mental health diagnosis and treatment, he/she may do so in limited circumstances." See Policy at p. 35. On multiple occasions throughout this investigation, Party A offered information about her mental health to the Investigative Team in an effort to demonstrate how her "cognitive impairment" "impedes her decision making" and colored her interactions with Party B, as well as her understanding of what happened between them in the months that followed their sexual encounter. Party A also referenced multiple times how she had received ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which was largely when she and Party B were in touch with one another. Finally, Party A provided the Team with the following evidence: written records from her visits to GHAP, CPS, and a private mental health professional; a letter issued by the Law School Admission Council, indicating it had granted her a testing accommodation; and, a blog post describing the concept of "trauma bonding" (see p. 35 of this report for further explanation), which she said applied to her and her behavior with Party B. While the Investigative Team reviewed all of this evidence, only those documents which were relied upon in this report are attached to it as exhibits. Also, the Investigative Team proceeded cautiously whenever either party raised the topic of Party A's mental health, and avoided asking follow-up questions unless such inquiries were deemed necessary or relevant to this investigation.

4

See Exhibit #6. (Exhibit #6 indicates that Party B did not reply to these messages.)

Throughout the course of this investigation, both parties provided the Investigative Team with a significant volume of electronic communications (both between them and with others) as evidence. They also referenced several individuals who the Investigative Team decided to interview, and the Team conducted additional interviews of people they became aware of in the course of investigating.

## Interviews Conducted

The Investigative Team ultimately conducted interviews of seven people, including the two parties. Some interviews were conducted in person at SCCS, but others were conducted via video conference due to the COVID-19 pandemic and the subsequent remote operation of the University. The parties were given the opportunity to suggest witnesses to the Investigative Team during the investigative process, and again at the conclusion of the investigative process. The background of the individuals interviewed and the dates of each interview are detailed below.

**September 3, 2019**
- Party A's Investigative Interview
  - At the time of the alleged gender-based misconduct, Party A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**October 9, 2019**
- Party B's Investigative Interview
  - At the time of the alleged gender-based misconduct, Party B ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**November 19, 2019**
- Witness #1
  - Witness #1 is a detective in the Special Victims Squad of the New York City Police Department.

**February 5, 2020**
- Party B's Follow-Up Interview

**April 15, 2020**
- Party A's Follow-Up Interview and Interview regarding Stalking and NCD Violation Cross-Complaint - Part I of II (This interview was not completed on April 15, as the allotted scheduled time was not sufficient).

**April 23, 2020**
- Party A's Follow-Up Interview and Interview regarding Stalking and NCD Violation Cross-Complaint - Part II of II

**May 1, 2020**
- Witness #2
  - Witness #2 is a May 2019 graduate of Columbia College and used to be close friends with Party B.

**May 13, 2020**
- Witness #3
  - Witness #3 is a May 2019 graduate of Columbia College. She previously had a dating relationship with Party B and also had a friendship with him afterwards.

**May 19, 2020**
- Witness #4
  - Witness #4 is a student in the School of General Studies. She previously had a dating relationship with Party B.

**June 3, 2020**
- Party B's Additional Follow-Up Interview and Interview regarding Stalking and NCD Violation Cross-Complaint

**June 11, 2020**
- Witness #5
  - Witness #5 is a May 2020 graduate of Columbia College and used to be close friends with Party B.

## Documents and Materials Examined[6]

1. Incident Report submitted by Student Conduct and Community Standards ("SCCS") Director Spencer Bennett (June 25, 2019)
2. Incident Report submitted by ▬▬▬▬▬▬▬▬▬▬▬▬ (August 1, 2019)
3. Incident Report submitted by Party A (August 3, 2019)
4. Incident Report submitted by Title IX Investigator Kristin Collado (February 7, 2020)
5. Incident Report submitted by Party B (February 28, 2020)
6. Screenshot of March 15, 2020 Instagram Message sent by Party A, provided by Party B
7. Screenshots of Instagram Messages between Party A and Party B, from January 8 - July 7, 2019, provided by Party B
8. Screenshots of Facebook Messages between Party A and Party B, from June 1 - 12, 2019, provided by Party B
9. Screenshots of Facebook Messages between Party A and Party B, from June 12 - 26, 2019, provided by Party B

---

[6] Documents and/or materials not relevant to the investigation or beyond the scope of what can be considered by the Hearing Panel were not included as Exhibits in this report.

8

10. Screenshots of Facebook Messages between Party A and Party B, from June 26 - July 4, 2019, provided by Party B
11. Screenshots of Facebook Messages between Party A and Party B, from July 4 - 22, 2019, provided by Party B
12. Party A's Gay Health Advocacy Project ("GHAP") Records, provided by Party A
13. Screenshots of Instagram and Facebook Messages between Party A and Student #2, provided by Party A
14. Screenshots of Instagram Notifications indicating that Party A had "Unsent" Instagram Messages she previously sent to Party B, provided by Party B
15. Party A's Written Statement – "Clarification" regarding Stalking Allegation
16. Blog Post regarding Trauma Bonding, provided by Party A (Source: https://blog.melanietoniaevans.com/trauma-bonding-is-it-love-or-something-else/)
17. Party B's Written Statement – "Follow-Up to Interview"
18. Screenshot of Party B's apology to Party A on Party A's Facebook wall, provided by Witness #2
19. Screenshot of Party B's family member's list of Instagram Followers, provided by Party B
20. Screenshot of Venmo Notifications Party B received, indicating that Party A wanted to "be friends with" Party B on Venmo, provided by Party B
21. Screenshots of Group Text Messages between Party B's Mother, Witness #2, and Witness #5, provided by Witness #2
22. Screenshots of Facebook Messages between Party B and Witness #2 (August 9, 2019), provided by Witness #2
23. Screenshots of Notes Taken by Witness #5 in advance of witness interview, and referred to during interview, provided by Witness #5
24. Screenshots of Facebook Messages between Party B and Witness #2 (undated), provided by Witness #2
25. Screenshots of Group Facebook Messages #1 between Party B, Witness #2, and Witness #5, provided by Witness #2
26. Screenshots of January 8, 2019 Lyft and Uber Receipts, provided by Party A
27. Screenshot of Facebook Messages between Witness #2 and Party A, provided by Witness #2
28. Letter sent by Investigative Team to Party A Re: Initial Notice and Interim Measures, on August 6, 2019
29. "Statement: Exhibit A," submitted by Party B
30. Screenshots submitted with August 3, 2019 Incident Report, by Party A
31. Screenshots of Deleted Instagram Communications between Party A and Party B, provided by Party B
32. Screenshots of Excerpted Facebook Messages between Party B and Party A, provided by Party B
33. Party A's Neurofeedback Records, provided by Party A
34. Party A's Counseling and Psychological Services Records, provided by Party A
35. Screenshots of Facebook Messages between Party A and Party B, provided by Party A

36. Screenshots of Deleted Instagram Messages between Party A and Party B, provided by Party A
37. Screenshots of Photos, provided by Party A
38. Video #1 and Video #2, provided by Party A
39. Screenshots of Facebook Posts about Student #4, provided by Party A
40. Screenshots of Facebook Messages between Party A and Witness #2, provided by Party A
41. Screenshots of Instagram Messages #1 between Party A and Student #5, provided by Party A
42. Screenshots of Instagram Messages #2 between Party A and Student #5, provided by Party A
43. Screenshots of Facebook Messages between Party B and Student #5, provided by Party B
44. Email between Party B and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, provided by Party B
45. Screenshots of Excerpted Facebook Messages #1 between Party A and Party B, provided by Party A
46. Screenshots of Excerpted Facebook Messages #2 between Party A and Party B, provided by Party A
47. Screenshots of Excerpted Facebook Messages #3 between Party A and Party B, provided by Party A
48. Screenshots of Excerpted Facebook Messages #4 between Party A and Party B, provided by Party A
49. Letter from Law School Admission Council, stating that Party A was granted a testing accommodation, provided by Party A
50. Screenshots of Instagram Stories made by another student, regarding Party B, provided by Party A
51. Screenshot of Facebook Messages #1 between Party B and Witness #2, provided by Party B
52. Screenshot of Facebook Messages #2 between Party B and Witness #2, provided by Party B
53. Screenshot of Facebook Messages #3 between Party B and Witness #2, provided by Party B
54. Screenshot of Facebook Messages #1 between Witness #2 and Witness #5, provided by Witness #2
55. Screenshot of Facebook Messages #2 between Witness #2 and Witness #5, provided by Witness #2
56. Screenshot of Facebook Messages #2 between Party B, Witness #2 and Witness #5, provided by Witness #2
57. Screenshot of Facebook Messages #3 between Witness #2 and Party B, provided by Witness #2
58. Screenshot of Facebook Messages #4 between Witness #2 and Party B, provided by Witness #2
59. Letter written by Witness #2 to Party B, provided by Witness #2
60. List/Description of Evidence, provided by Witness #2
61. TikTok Video posted by Party B, provided by Witness #2
62. TikTok Video posted by Party B, provided by Witness #3

10

63. Screenshots of Text Messages between Witness #3 and Party B, provided by Witness #3
64. Screenshots of Tumblr Post by Witness #3, provided by Witness #3

# Policy Definitions[7]

**Sexual Assault: Penetration**
Any form of vaginal, anal, or oral penetration, however slight, by a penis, object, tongue, or finger without a person's affirmative consent.

**Sexual Assault: Contact**
Any sexual contact, including sexual touching for the purpose of sexual gratification of either party, without a person's affirmative consent. Sexual touching includes contact under or over clothing with the breasts, buttocks, genitals, groin or inner thigh, or touching another with any of these body parts; making another person touch any of these body parts under or over clothing; or the emission of ejaculate on the clothing or body of another person without that person's consent.

**Affirmative Consent**
Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity.
- Consent can be given by words or actions, as long as those words or actions clearly communicate willingness to engage in the sexual activity. It is important not to make assumptions about consent. If there is confusion or ambiguity, participants need to stop sexual activity and talk about each person's willingness to continue.
- Consent cannot be procured by the use of physical force, compulsion, threats, intimidating behavior, or coercion.
- Consent cannot be obtained from, or given by, a person who is incapacitated.
- Silence or the lack of resistance, in and of itself, does not demonstrate consent.
- Consent can be withdrawn at any time, including after it is initially given. When consent is withdrawn or can no longer be given, sexual activity must stop.

**Stalking**
A course of unwanted attention that is repeated or obsessive, directed toward an individual or a group and that is reasonably likely to cause alarm, fear or substantial emotional distress. Stalking may take many forms, including but not limited to lying in wait for, monitoring, or pursuing contact. Stalking may occur in person or through telephone calls, text messages, unwanted gifts, letters, e-mails, surveillance, or other types of observation and communication.

---

[7] As explained in Footnote 3, these policy definitions are those included in the University's Gender-Based Misconduct Policy & Procedures for Students, dated August 23, 2019.

11