UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

JANE DOE                                                   :
                                                           :
                        *Pro Se* Plaintiff,                :
                                                           :
              -against-                                    :          Case No.: 21-CV-5839-ER
                                                           :
THE TRUSTEES OF COLUMBIA UNIVERSITY IN                     :
THE CITY OF NEW YORK, and KEVIN PITT,                      :
ALYSSA ANZALONE-NEWMAN, KRISTIN                            :
COLLADO, *in their official capacities*,                   :
                                                           :
                        Defendants,                        :
                                                           :
---------------------------------------------------------------------- x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>**


JANE DOE
*Pro Se for Plaintiff*
PO Box 297
Roosevelt Island, NY, 10044
646.920.4618
doe826499@gmail.com

**TABLE OF CONTENTS**

PAGE(S)

**TABLE OF AUTHORITIES** ...................................................................................iii-vi

**PRELIMINARY STATEMENT** ........................................................................1

**RELEVANT BACKGROUND**

I.      The January 8, 2019 Incident between *pro se* Plaintiff and John Roe ............5

II.     Plaintiff and Roe's Subsequent "Friendship" ...................................................7

III.    "Fawn" Response Is a Form of Retroflection ....................................................9

IV.     Columbia's Title IX Investigation, Criminal, Civil and OCR proceedings....11

V.      Title IX New Amendments August 14, 2020...................................................13

**LEGAL STANDARD**

I.      Rule 12(b)(6) - Motion to Dismiss...................................................................14

II.     Conversion under FRCP Rule 12(d)................................................................15

III.    Violation of Title IX with Bad Faith Multi-Procedures Approach .................17

IV.     Deliberate Indifference under Title IX.............................................................17

V.      Erroneous Outcome under Title IX ..................................................................18

**ARGUMENT**

I.      Defendants Conflates Pleading and Discovery which Invoked Conversion Under
        Rule 12(d).........................................................................................19

II.     Defendants Routinely Misstated Factual Allegations and Failed to Accept Them as
        True in Pleading Stage...........................................................................22

III.    Title IX Claims Against Three Individual Defendants…..................................25

IV.     Separation of Powers and *Stare Decisis* ………………….…………….…....26

V.      Plaintiff Has Adequately Alleged Deliberate Indifference Claim ...................27

        A. Loss of Education Opportunities or Benefits....................................................27

        B. Allegations of Being "Clearly Unreasonable" .................................................28

VI.     Plaintiff Has Adequately Alleged Erroneous Outcome Claim.........................32

        A. Plaintiff Has Adequately Alleged Procedural Irregularities.............................33

        B. Minimal Inference.............................................................................................39

**CONCLUSION**............................................................................................40

<u>**TABLE OF AUTHORITIES**</u>

**CASES**                                                                                              **PAGES(S)**

*Aetna Cos. & Surety Co, v. Aniero Concrete Co.,*
    404 F.3d 566, 573 (2d Cir.2005) ………………………………………….…….20

*Amaker v. Weiner,*
    179 F.3d 48, 50 (2d Cir.1999) ……………………………………………...…20

*Auer v. Robbins,*
    519 U.S. 452 (1997) …………………………………………………………...27

*B.B. v. New School.,*
    No. 17 Civ. 8347 (S.D.N.Y. Apr. 30, 2018) …………………………………15, 22

*Bailey v. New York Law School*
    (S.D.N.Y. Mar. 1, 2017) …………………………………………………….....26

*Cavalier v. Cath. Univ. of Am.,*
    513 F. Supp. 3d 30 (D.D.C. 2021) …………………………………….….….28

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) …………………………………………….…….20

*Davis v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629, 633, 648, 650, 651 (1999).………………………………..………18

*Doe v. Columbia University.,*
    831 F.3d 46, 48 (2d Cir. 2016).……………………..……..…1, 6, 14 32, 33, 39, 40

*Doe v. NYU,*
    438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020) ……………………………..……40

*Doe v. Rensselaer Polytechnic Institute,*
    No. 1:20-cv-1185 (N.D.N.Y, Oct 16, 2020) ……………………..……17, 26, 27

*Farmer v. Kansas State Univ.,*
    918 F.3d 1094 (10th Cir. 2019) ………………………………………...……...31

*Feibleman v. Columbia University*
    No. 1:19-cv-04327 (S.D.N.Y. Feb. 24, 2020) ……………………6, 12, 32, 33, 35

*Fitzgerald v. Barnstable School. Committee,*
    555 U.S. 246 (2009) …………………………………………………….....26

*Friedl v. City of New York,*
    No. 97 Civ. 5453 (JSM), WL 11551 (S.D.N.Y. Jan. 13, 1999*)* …………..……….20

*Gant v. Wallingford Bd. of Educ.,*
    69 F.3d 669 (2d Cir. 1995) ……………………………………………………….…..30

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998),
    96-1866 106 F.3d 1223……………………….……………………………………1, 29

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,*
    128 F.3d 59, 62 (2d Cir. 1997) …………………………………………..…...……15

*Hernandez v. Coffey,*
    582 F.3d 303 (2d Cir. 2009) …………………………………..………………..16

*Horsley v. Feldt,*
    304 F.3d 1125, 1134 (11th Cir. 2002) ……………..………………………………16

*Jackson v. Hanson,*
    No. 12 Civ. 654 DAB, WL 787820 (S.D.N.Y. Feb. 25, 2014) ………..……….17

*Karasek v. Regents of the Univ. of Cal.,*
    948 F.3d 1150 (9th Cir. 2020) …………………………………….…...……29, 30

*Kardovich v. Pfizer, Inc.,*
    97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) …………………………….……..40

*Kollaritsch v. Michigan State Univ. Bd. of Trs.,*
    944 F.3d 613 (6th Cir. 2019) ……………………………………………….……31

*Littlejohn v. City of New York,*
    795 F.3d 297 (2d Cir. 2015) …………………………………...…………………32

*Lively v. WAFRA Inv. Advisory Grp., Inc.,*
    6 F.4th 293 (2d Cir. 2021) ……………………………………………..……….16

*Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nigeria,*
    265 F.R.D. 106, 122 (S.D.N.Y.2010) …………………………..………………17

*Malaney v. Elal Israel Airlines,*
    331 F. App'x 772, 774 (2d Cir.2009) …………………………………………..21

*Menaker v. Hofstra Univ.*
    No. 18-3089 (2d Cir. 2019) …………………………………………….27, 39

*Mistretta v. United States,*
    488 U.S. 361 (1989*)* …………………………………………...…………17

*Morrison v. Olson,*
    487 U.S. 654 (1988) …………………………………………….……..17

*Palin v. N.Y. Times Co.,*
    940 F.3d 804, 810-11 (2d Cir. 2019) …………………..………………16

*Playboy Enterprises, Inc. v. Dumas,*
    960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) …………………...………………15

*PrecisionlR Inc. v. Clepper,*
    693 F. Supp. 2d 286, 291 (S.D.N.Y. 2010) …………………………………15

*Roe v. Pa. State Univ,*
    No. 18 Civ. 2142 (E.D. Pa. Feb. 15, 2019) ……………………………..……32

*Salahuddin v. Cuomo,*
    861 F.2d 40, 42 (2d Cir.1988) ………………………………………………..20

*Simpson v. Univ. of Colo. Boulder,*
    500 F.3d 1170 (10th Cir. 2007) ………………………………………………29

*U.S. v. Yousef,*
    327 F.3d 56, 115 (2d Cir. 2003) …………………………………….……15

*Yusuf v. Vassar College,*
    35 F. 3d 709, 715 (2d Cir. 1994) ……………………………………………18

## STATUTES AND RULES

Fed. R. Civ. P. 12(b)(6) ............................................................3, 14, 16, 20

Fed. R. Civ. P. 12(d) ............................................................1, 21, 40

Fed. R. Civ. P. 56(c)............................................................20

## NEW REGULATIONS

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) https://www.federalregister.gov/documents/2020/05/19/2020-10512/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal .................................................13

**OTHER AUTHORITIES**

*'Fight or Flight' Are Not the Only Ways People Respond to Sexual Assault* (January 13, 2020)
https://www.vice.com/en/article/v74eqj/fight-or-flight-and-harvey-weinstein-sexual-assault-trial-defense ................................................................................................................7


Frederick S. Perls, Ralph Hefferline, Paul Goodman, *Gestalt Therapy: Excitement and Growth in the Human Personality* (1951)
https://static1.squarespace.com/static/5d4ae1056a02d00001cbc927/t/5fcfce5df17429462e6e4f83/1607454303003/Perls%2C+Heffline%2C+and+Goodman.Gestalt+Therapy.+Manipulating+the+self.+CHP+6-8.pdf ................................................................................................................9


*Understanding And Treating Traumatic Bonds*
http://www.healing-arts.org/healing_trauma_therapy/traumabonding-traumaticbonds.htm#abuse_and_traumatic_bonds ..............................................................8


*What is Reactive Abuse?* (March 26, 2021)
https://yanahelps.com/blog/what-is-reactive-abuse/.............................................................9

*Pro se* Plaintiff Jane Doe opposes Defendant's motion to dismiss Complaint based upon Rule 12(b)(6), "Failure to state a claim upon which relief can be granted". The Court should convert the motion to dismiss to one for summary judgement under FRCP Rule 12(d) for conservation of judicial resources.

## PRELIMINARY STATEMENT

Title IX, 20 U.S.C.S. § 1681(a), "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist*, 524 U.S. 118 S. Ct. (1989) at 286-87. Because of Title IX's contractual nature, the Court decided that a funding recipient could be "liable in monetary damages for noncompliance with the condition." *Id*. In other words, the recipient needs to respond on campus sexual assault complaints in good faith to meet the condition of receiving federal funding. Defendants Columbia have broken this "promise" since 2014 as it politicized its Title IX process and perpetuated a system of sex discrimination at the expense of both genders' rights— "the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action." *Doe v. Columbia Uni*. 831 F.3d 46, 48 (2d Cir. 2016)

Defendants' Motion to Dismiss asserts: (1) the Complaint, including both factual allegations and causes of action, is contracted by its exhibits—specifically, the 2019 GBM Policy and the partial investigative report (credibility assessment); (2) the other part of the investigative report—i.e., procedural history (as attached to its motion to dismiss) should be considered as "integral" to Complaint since it relies on the "terms or effects" of this material; (3) and because this material/procedural history shows that Defendants reviewed plaintiff's GHAP records and blog post describing trauma bonding (but only attached documents that the

investigators relied on as exhibits to the report), this material therefore contradicts factual allegations for exclusion of plaintiff's medical records in Complaint. Defendants however chose not to attach those two documents under seal but expressed willingness to do so upon this Court's request; (4) the first cause of action should fail because: Department of Education announced that it will not enforce new Title IX amendments retroactively, and the Court can consider agency guidance for motion to dismiss; (5) plaintiff has not expressly alleged loss of educational benefits and "clearly unreasonable" for deliberate indifference claim; (6) plaintiff as an alleged victim of sexual assault is not afforded with erroneous outcome claim, even if she is, she has not alleged requisite "procedural irregularities" and "minimal inference". (7) Columbia has full discretion for every of its action/decision-making, therefore they can't be wrong.

The above assertions are simply untrue and unsound. None of Defendants' argument can prevail for the following reasons: (1) Every exhibit attached to Complaint is indeed a component of Complaint. The Court must accept all factual allegations as true unless the Complaint is self-contradictory. However, whether the Court should accept the exhibits as true depends on *what the corresponding factual allegation says*. In this action, Plaintiff contended the authenticity of the investigative report, integrity of the investigation, and inadequacy of Title IX policy. The contradictions between factual allegations and investigative report/2019 GBM Policy, are the very ground of this action and only support plaintiff's factual allegations. (2) Defendants' argument is self-contradictory: on one hand, it argues the *inconsistency* between factual allegations and exhibits as basis for dismissal; on the other hand, it argues the *consistency* between factual allegation 122[1] and the report as basis for dismissal. (3) regardless of what factual allegations say, the exhibits would always "contradict" each other, because plaintiff

---

[1] Except for paragraph 122, the rest of factual allegations should be accepted as true.

attached both Columbia's 2019 GBM Policy and 2020 GBM Policy to the Complaint.

Defendants Columbia should be responsible for such perceived contradiction in Complaint as it

implemented multi-procedure/policy after new amendments took effective, despite the clear

administrative headaches and legal complexities. (4) plaintiff did not need to rely on the

procedural history of the investigative report in drafting her Complaint. On the contrary, it was

Defendants relied on plaintiff (and other parties) disclosing their actual experience, submitting

evidence, and participating the investigation, to finish such report. Plaintiff/parties have never

disowned their personal stories and memories to Defendants just because Defendants completed

documenting their personal information and experiences. The procedural/factual history are

*logistical* in nature, which cannot show whether Defendants responded plaintiff's complaint in

good or bad faith, only the credibility assessment (the part plaintiff attached to Complaint) can

reflect its original opinions and decision-making; (5) the two specific documents Defendants

mentioned and relied on for dismissing deliberate indifference claim—GHAP records and blog

post describing trauma bonding, are simply not medical records produced by clinicians. Plaintiff

never referred to/implied those two documents in Complaint therefore those are extra-pleading

material, so is the procedural history of the report. Since Defendants attached/referred to three

extra-pleading materials in support of its motion to dismiss, conflating pleading and discovery.

And those material have involved substantial summary judgement issues and actually only

support plaintiff's deliberate indifference claim (exclusion of medical records), the Court should

convert the motion to dismiss to one for summary judgement under Rule 12 (d):

> "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings
> are presented to and not excluded by the court, the motion must be treated
> as one for summary judgment under Rule 56."

Furthermore, those extra-pleading materials are meant to be produced in discovery stage. In theory, in all civil cases the factual allegation of Complaint can be proved/disapproved by documents discovered in subsequent stage—that is different from claiming those documents to be "integral" to Complaint in pleading stage. Accepting such sophistry would result in dismissal in essentially every civil case in the pleading stage. (6) For the first cause of action, Department of Education does not have *jurisdiction* over Columbia's handling of plaintiff's Title IX case, as Defendants failed to follow DOE guidance—to implement the university policy in place at the time of incident occurred (January 8, 2019). Defendants however used a different policy—the one implemented on August 23, 2019. The federal court has become the one and only agency that has jurisdiction over plaintiff's Title IX complaint against Defendants; the Court remain free to consider any relevant information in deciding a motion to dismiss, including DOE's guidance. After consideration, the Court may find DOE's guidance meritorious and then follow it, or the Court finds such guidance is nonsense and decides to not follow. One thing the Court should refrain from doing is, to follow a legislative branch's enforcement of law without its own reasoning and judgement, because of Separation of Powers. (7) plaintiff has adequately alleged Defendants implemented a policy of deliberate indifference when there is an obvious need, among other forms of deliberate indifference; (8) plaintiff has clearly alleged she was erroneously found having "lied"[2] at the Title IX proceeding regarding her sexual assault complaint and identified a biased pattern of decision making as detailed further below; (9) Defendants has failed to comply with Title IX, its own 2019 GBM Policy, and DOE guidance for Plaintiff's Title IX case. As noted in Complaint, its sole purpose for conducting Title IX process since 2014 is to fulfill its administrative needs. (10) Defendants' motion routinely misstates and

---

[2] See ECF 12-1 at 69, 2nd paragraph; Paragraph 170 of Complaint

mischaracterize argument/fact to make it easier to depose of, and many precedents are quoted out of context; (11) the credibility determination of the report is overall logically incoherent, exemplified victim-blaming in a sexual assault case and stigmatized one's mental disability. (12) Defendants exhibited a pattern of two-way distortion: distorting every inculpatory evidence to be exculpatory; distorting every exculpatory evidence to be inculpatory as possible as they can When distortion is not possible, they then treat certain evidence with deliberate indifference. (13) Columbia failed to recognize the contractual nature of Title IX.

In pleading stage, neither Plaintiff nor the Court should engage in an effort to prove or disprove the facts, despite Defendants' conflation of pleading and discovery.

## RELEVANT BACKGROUND

### I.    The January 8, 2019, Incident between *pro se* Plaintiff and John Roe[3]

On January 8 early morning Plaintiff had a depressive episode after an unfruitful five years search for treatment for her Complex-PTSD[4] and reached out to several school mates on social media to confide. ¶[5]19-31 John Roe responded and engaged in conversation with her. Plaintiff told Roe she had only received frustrations for doing what's right [seeking treatments] Later, Roe repeatedly invited plaintiff to his place **"to keep each other company and have fun"**. Plaintiff first rejected because she had always lived a reclusive life and was nervous about meeting someone new in his residence at 2:30 a.m. However, plaintiff then changed her mind and agreed to meet because she wanted to try something new: to connect with others when in distress, instead of taking everything on her own. Although plaintiff could not whether Roe only wanted to provide emotional support, the fact that Roe and she went to the same school where

---

[3] Plaintiff respectively directs the Court to Complaint (ECF 12, Page 1-30) for a full recitation of events.
[4] Diagnosis of Complex-PTSD is only available to adults; Reactive Attachment Disorder is the infancy equivalent of C-PTSD.
[5] ¶ refers to paragraph number of factual allegations of Complaint.

each community member is required to finish the sexual assault prevention tutorial before enrollment, made her feel safe about the occasion. ¶ 39-43. Especially during a time[6] when male students at Columbia were allegedly treated more harshly and discriminatorily in Title IX proceeding. ¶31-59 Roe told plaintiff that he had had sex with at least eight females before and was more experienced than a mutual friends of theirs. Plaintiff asked what he wanted to do right now, Roe said he wanted to "do a lot of things [with plaintiff]" without specification. Roe asked, "is this[cuddling] okay?" Plaintiff said "yes". Roe then asked, "is this [other non-sexual activities] okay?" a few more times while he already doing those activities. Plaintiff asked, "are you able to control yourself?" Roe responded affirmatively "I can keep my dick in my pants." Plaintiff then believed Roe did not have to have sex with her. Plaintiff started talking about random stuff with Roe trying to distract him and Roe engaged conversation. Plaintiff eventually asked, "can we just sleep without having sex?". Roe didn't respond, instead, he put his hand under plaintiff's pants and started forcibly touching her outer genitalia. Roe continued and eventually sexually penetrated plaintiff ¶ 32-59. Because plaintiff never wanted sex that night and she started to "freeze" after Roe's initial sexual assault, her inner genitalia was never aroused, which made Roe's erection went away every time before finish. Roe complained "you are so dry". Then Roe needed to forcibly manipulate plaintiff's outer genitalia again and get her wet for him to continue. Throughout the night Roe forcibly touched plaintiff's outer genitalia at least three times.

During the sex, Roe repeatedly asked plaintiff to "talk to him", stopped the sex and held her face with his hands while looking into her eyes [trying to get a response from her]. Plaintiff could hear Roe's asking but remain dissociated and irresponsive. On the other hand, she already

---

[6] *See* factual allegations in *Doe v. Columbia Uni*. (2d Cir. 2016) and *Feibleman v. Columbia Uni*. (S.D.N.Y. 2020)

told Roe she doesn't want sex in the beginning, but Roe ignored and continued, she didn't know what else could she do after the sex happened. Eventually Roe seemed to give up [on protected sex] and lied down on the bed after he threw away the condom. ¶53-56. Until Roe was ready again, he forcibly penetrated plaintiff's vagina with his penis without getting a new condom. On January 1, 2019, plaintiff's period came and was about to end on January 7. Having unprotected sex for female during or immediately after period is more likely to result in sexually transmitted infections including HIV; and unprotected sex in general may result in pregnancy. Plaintiff was concerned and reminded Roe that she might get pregnant, Roe promised that "he will put it out [before ejaculation]." ¶ 57-58. The sexual encounter lasted more than three hours (3 a.m. to 6:30 a.m.) since plaintiff could see morning twilight through the window in Roe's dorm before she fell asleep. She woke up and left Roe's place at around 10 a.m. (plaintiff later provided the receipt of rideshare service to the Title IX investigators) Roe walked plaintiff out his dorm and said goodbye with smile. "Good luck with your interview! You will look great in suit hhhh." [7]

## II.    Plaintiff and Roe's Subsequent "Friendship"

¶62-71. On April 29, the peer advocate plaintiff met after heard plaintiff's experience with Roe, indicated that Roe's action was "not okay". Specifically, the part where Roe touched plaintiff's outer genitalia after she said, "can we go to sleep without having sex?" was not okay. Plaintiff also told this peer advocate that after the January 8 incident, she kept running into Roe on campus on daily or weekly basis, but every time Roe acted like he didn't see her. This peer advocate then indicated that Roe must know exactly what he did that's why he didn't want to keep in contact with her. Halfway through the appointment, plaintiff then asked, "are you saying I was raped?" The peer advocate didn't explicitly confirm or deny. ¶72-74. Plaintiff then asked,

---

[7] *Fight or Flight' Are Not the Only Ways People Respond to Sexual Assault* (January 13, 2020)
https://www.vice.com/en/article/v74eqj/fight-or-flight-and-harvey-weinstein-sexual-assault-trial-defense

"what if she might have crush on Roe before sexual activities?", and "what if Roe is considered good-looking?" The peer advocate kindly explained to her that even if plaintiff was romantically interested in Roe or in a relationship with him, Roe should not have sex with her without consent; and even if one is an attractive super model, he/she cannot walk around sexually assaulting others. ¶ 75. After plaintiff understood her experience with Roe was sexual assault, she confronted him. On June 1, 2019, Roe asked to meet with plaintiff to apologize. When they met, Roe told her that he was "falsely accused" by a peer student before and suspended by the school for a year, his family also suffered because of this experience, and he was very fearful to go through the Title IX process again at Columbia. Roe promised to be a good friend to plaintiff to make amends and commit to behavioral change which includes seeking professional help, and asked plaintiff to hold him accountable in case he became impulsive again [to assault more people]. At some point, plaintiff trauma bonded[8] to Roe and felt compelled to have a good outcome with him, including a solid friendship and help with his behavioral change. Otherwise, not reporting him would be enabling him. From June 1, 2019 to July 15 2019, plaintiff and Roe almost communicate on daily basis and most of the time Roe initiated conversations. Somehow the longer plaintiff stayed friends with Roe, the more reactive she became and more attached to Roe. Whenever plaintiff perceived that Roe was not fully committed to change, she felt betrayed, angry and more unstable. ¶76-84 Plaintiff once asked Roe to give out his social media password in case he continues procuring sex through social media because that's what happened on her. Roe was trying to be a social media influencer and his next sexual conquest was just a text away. Plaintiff believed it was imperative to monitor Roe given his history of multiple sexual assaults/harassments, and the mental condition he potentially has. If Roe sexually assaults more

---

[8] *Understanding And Treating Traumatic Bonds*  http://www.healing-arts.org/healing_trauma_therapy/traumabonding-traumaticbonds.htm#abuse_and_traumatic_bonds

people, being friends with him and not reporting him would be enabling him. On another occasion, plaintiff gave Roe a verbal warning that if he does not seek professional help she will report him to GBM Office. She admittedly "threatened" him but her reaction was a result of Roe's prior abuse and provocative behaviors.[9]  Until late July 2019, plaintiff found out Roe had been passing misinformation about plaintiff to other students, and that he never meant to make change. Plaintiff then decided to report him.

### III.    "Fawn" Response Is a Form of Retroflection

Plaintiff's strong attachment to Roe is not related to her pre-existing condition, but a typical trauma response resulted from sexual assault—"fawn". Since her Complex-PTSD made her have difficulty forming attachment with people and being dismissive about interpersonal needs. Whenever a relationship with someone does not go as she expected she tend to withdraw for good. But things with Roe was the opposite of what she had before: she quickly became attached to Roe and very dedicated to Roe.

Plaintiff found it most helpful to explain the mechanism of "fawn" response by using Gestalt[10]framework. In fact, "fawn" was recognized 70 years ago under a different name: retroflection, literally means "turning back sharply against."[11]

"When a person retroflexes behavior, he treats himself as he originally wanted to treat other persons or objects.  He stops directing his energies outward in attempts to manipulate and bring about changes in the environment that will satisfy his needs; instead, he redirects his activity inwards and substitutes himself in place of the environment as the target for behavior.

---

[9] *What is Reactive Abuse?* (March 26, 2021) https://yanahelps.com/blog/what-is-reactive-abuse/

[10] Gestalt therapy is a modality of psychotherapy that studies the interplay between an organism and environment.

[11] Frederick S. Perls, Ralph Hefferline, Paul Goodman, *Gestalt Therapy: Excitement and Growth in the Human Personality* (1951) https://static1.squarespace.com/static/5d4ae1056a02d00001cbc927/t/5fcfce5df17429462e6e4f83/1607454303003/Perls%2C+Heffline%2C+and+Goodman.Gestalt+Therapy.+Manipulating+the+self.+CHP+6-8.pdf

To the extent that he does this, he splits his personality into doer and done to." (146, Perls, Hefferline, & Goodman) "the environment—mostly other persons—proved hostile to his efforts to satisfy his needs. They frustrated and punished him. In such an unequal contest—he was a child—he was sure to lose. Consequently, to avoid the pain and dangerous entailed in renewed attempts, he gave up." (146) "Punishment has the effect, not of annihilating the need to behave in the way that met with punishment, but of teaching the organism to *hold back* the punishable responses. The impulse or the wish remains as strong as ever and, since this is not satisfied, it is constantly organizing the motor apparatus—its posture, pattern of muscular tonus, and incipient movements—in the direction of overt expression. Since this is what brings punishment, the organism behaves toward its own impulse as did the environment—that is, it acts to suppress it. Its energy is thus divided." (146) "What started as conflict between organism and environment has come to be an 'inner conflict' between one part of the personality and another part—between one kind of behavior and its opposite." "in repression, on the contrary, we have lost awareness both of what is repressed and the process by which we do the repressing." (147) "In practice, however, the undoing of a retroflection is not so straightforward. Every part of the personality comes to its defense as if to head off catastrophe. The person is overcome with embarrassment, fear, guilt, and resentment. The attempt to reverse the self-aggression, to differentiate the clinch of the two parts of the personality, is responded to as if it were an attack on his body, his 'nature', on his very life." (148) This explains how traumatic bonding formed.

   "A main reason for the fear and guilt in reversing retroflection is that most retroflected impulses are aggressions, from the mildest to the cruelest, from persuasion to torture…reversing the retroflection does not manufacture aggression that was not already there. It was there-but applied against the self instead of against the environment." (148) "It is a doing of one thing and

also its opposite at the same time in such fashion s to achieve a net effect of zero. So long as the conflict endures, the use of the arm for other purposes is impaired, energies are squandered, and the state of affairs is the same as the military situation of a stabilized battleline. Here the battleline is within the personality." (162) "The only way that will work is an indirect one: become vividly aware of the symptoms, accept both sides of the conflict as *you*—this means to re-identify yourself with parts of your personality from which you have dis-identified, and then discover means by which both sides of the conflict, perhaps in modified form, can be expressed and satisfied." (166)

"Fawn" and "Freeze" response are much more commonly seen in interpersonal conflict from which the person cannot escape. The only responses are altering the reality (dissociate/freeze) so one won't have to fully realize what's happening or altering oneself/retroflection so the energy/impulse to counterattack that cannot be directed to external object can be divided and turn inward, therefore avoided such interpersonal conflict. The goal for fawners to recover from the sexual trauma is to reintegrate the dissociated selfies, to reverse the retroflection that comes with a release of repressed energy to external world. This is why some survivors choose to process their trauma in a way that's viewed as "performative" or radical by others.

### IV.    Columbia's Title IX Investigation, Criminal, Civil and OCR proceedings

In August 2019, plaintiff reported the incident to GBM office and NYPD ¶ 85. Defendants then voluntarily linked her to a pro bono counsel from Sanctuary for Families. This pro bono has only done plaintiff a disservice: she breached the client-attorney privilege in principle, discouraged her from pursuing a civil case, attempted to temper her testimonials, and jeopardized her criminal case—by doing all those she ended up jeopardizing her Title IX as well.

¶86-101 In December 2019, GBM office had a complete staff turnover in an effort to evade discovery for *Feibleman v. Columbia Uni.* In the meantime, a dozen of Title IX cases got delayed including plaintiff's. In January 2021, plaintiff filed a complaint with Office of Civil Rights, DOE against Columbia based on deliberate indifference In March 2021, Defendants resumed plaintiff's Title IX case as OCR was evaluating her complaint. In May 2021, plaintiff received the complete investigative report from investigators, which excluded significant inculpatory evidence and her response.

### Credibility Assessment

Defendants erroneously found plaintiff have "motive to lie" and "not credible" for the following grounds: (1) plaintiff's change of perception about the incident was "contradicted" by the notes from GHAP peer support; (2) Witness#1/NYPD statements of the sex being consensual (which is very likely falsified by Defendant Pitt himself); (3) plaintiff once "threaten" Roe [to seek therapy otherwise she will report him] and displayed "clear resentment ", therefore she have (unspecified) motive to cause harm and her allegation must be false; (4) plaintiff did not behave like a victim of sexual assault as she seemed to "enjoyed" being close with Roe, therefore she must have lingering romantic interest to Roe and the alleged sexual assault must never happened.

Plaintiff explained all the above doubts during her investigative interview, but Defendants excluded her response from the report. Plaintiff also has clarified these matters in Complaint and this memorandum.  On the other hand, Plaintiff subpoenaed the Title IX investigative report of Roe's old sexual assault case in ███ from Columbia and found: ███

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ this plaintiff's behavior towards to Roe both qualified as "reactive abuse"[12]—the victim's "fight" mode to prior abuse. Plaintiff also identified Roe had a pattern of tumultuous relationship with multiple peer students and all of them had similar dynamics with Roe including sexual assault/harassments. Defendants truncate plaintiff's response and deflected her characterization of Roe to herself.

### *Hearing*

In June 2021, Defendant Pitt told Plaintiff that no additional evidence (e.g. her medical records) could be submitted to hearing panel, none of the witness could participate the hearing, neither of the investigators would participate the hearing, and plaintiff are not allowed to ask the questions she wanted to ask Roe—i.e. why Roe did not file a cross-complaint of any sort at federal court as he did for Title IX proceeding, with the same person as his counsel at both proceeding, etc., and there will be no cross-examination.

Such hearing proved to be a mere formality and Plaintiff's participation would not have any material effect. Moreover, it's within her Title IX rights to not submit to a bad faith, discriminatory proceeding; participating this unlawful proceeding is in a sense affirming such unlawful proceeding.

### V.    Title IX New Amendments August 14, 2020

Because of the counter-intuitiveness of sexual trauma, "victimhood" of sexual assault sometimes can be misused or weaponized for others' personal agenda—which will lead to the true victims of sexual assault less believable. Therefore, it's important to guarantee the rights of the accused of sexual assault in any proceeding (especially in political setting when a male candidate is targeted), since anyone can come forward claiming to be victim and "fawned". It

---

[12] *What is Reactive Abuse?* (March 26, 2021)
https://yanahelps.com/blog/what-is-reactive-abuse/

will have chilling effect for true victims if the public's perception to sexual assault is tainted by increasing number of false accusations. It's *equally* concerning when true victims' decision to come forward are not made by themselves, since recovery from sexual assault essentially means reclaiming your personal autonomy (deprived of during the assault)—obviously, by practicing your personal autonomy in every decision making after the assault.

Emphasis on rights of the accused can ultimately protect legitimate victims of sexual assault, by preventing or minimizing false accusations. This is exactly what the Title IX New Amendments meant to achieve: to advance rights of both legitimate victims and the accused of sexual assault.135¶ Department of Education announced that it only has jurisdiction over cases where the school use the university policy in place at the time of incident. Defendants did not follow DOE's guidance, but it has full autonomy to decide which GBM Policy to use.

## LEGAL STANDARD

### I.      Rule 12(b)(6) - Motion to Dismiss

"On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive." *Doe v. Columbia Univ.,* 831 F.3d 46, 48 (2d Cir. 2016). "At the motion to dismiss stage, a court "is not engaged in an effort to determine the true facts." *Id*. "Thus, a court "must accept the facts alleged and construe ambiguities in the light most favorable to upholding the plaintiff's claim." *Id*. "To the extent that a movant asserts that documents incorporated by reference contradict the allegations contained in a complaint, a plaintiff states a plausible allegation sufficient to overcome a motion to dismiss when he offers an "explanation in his complaint or opposition brief that reconciles the conflict between his allegations and the

[documents]" or "cast[s] doubt on the authenticity or veracity of these documents." *Cf B.B. v. New Sch*., (S.D.N.Y. Apr. 30, 2018, No. 17 Civ. 8347) (finding allegations in complaint contradicted by exhibits to complaint implausible and insufficient to defeat a motion to dismiss where plaintiff failed to provide explanation or dispute the authenticity or veracity of the exhibits).

As noted in *B.B. v. New Sch*., "a court's job does not end just because a movant asserts a document incorporated by reference contradicts the allegations contained in the complaint. Instead, a court must review the plaintiff's complaint and opposition papers to determine whether an explanation for the contradiction exists or whether the plaintiff has cast doubt on the authenticity or veracity of the documents."

See *PrecisionIR Inc. v. Clepper,* 693 F. Supp. 2d 286,291 n.2 (S.D.N.Y. 2010) ("The Court will not consider Defendants' expanded, procedurally-improper arguments" raised for the first time in their reply brief); *U.S. v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief."); *Playboy Enterprises, Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("arguments made for the first time in a reply brief need not be considered by a court").

"The issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 62 (2d Cir. 1997).

## II.    Conversion under FRCP Rule 12(d)

"A district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule governing such conversion requires that the court give sufficient notice to an opposing party

and an opportunity for that party to respond."*ld.* "Ordinarily, formal notice that a motion for judgment on the pleadings will be treated as one for summary judgment is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment and was neither taken by surprise nor deprived of a reasonable opportunity to meet facts outside the pleadings." Fed.Rules Civ.Proc.Rule 12(d), 28 U.S.C.A; *Hernandez v. Coffey*, 582 F.3d 303 (2d Cir. 2009)

"Whether a party moves under Rule 12(b)(6) or Rule 12(c), the conversion provision of Rule 12(d) "serve[s] the identical purpose of preventing the circumvention of ... Rule 56." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); see *Palin v. N.Y. Times Co.*, 940 F.3d 804, 810-11 (2d Cir. 2019) ("Rule 12(d) ... presents district courts with only two options: (1) the court may exclude the additional material and decide the motion on the complaint alone or (2) it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." (internal quotation marks omitted)). Thus, as the Eleventh Circuit has clarified in *Horsley*, when a defendant moves for judgment on the pleadings, the court may review only those documents that would be appropriate to consider on a motion to dismiss.  See 304 F.3d at 1134–35 (holding that the doctrine of "incorporation by reference" applies to motions under Rule 12(c) just as it applies to motions under Rule 12(b)(6) because, if it were otherwise, "the conversion clause of [Rule 12(d)] would be too easily circumvented and disputed documents attached to an answer would have to be taken as true at the pleadings stage")". *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293 (2d Cir. 2021)

"Pursuant to Rule 12(d), the Court must determine whether the newly presented documents are (1) part of the pleadings such that the Court may consider them as part of the instant motion; (2) not part of the pleadings such that the documents should be excluded in

deciding [the] motion to dismiss; or (3) not part of the pleadings but should be considered by converting the instant motion to dismiss to one for summary judgment." *Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nigeria*, 265 F.R.D. 106, 122 (S.D.N.Y.2010); *Jackson v. Hanson*, No. 12 CIV. 654 DAB, 2014 WL 787820 (S.D.N.Y. Feb. 25, 2014)

### III.    Violation of Title IX with Bad Faith Multi-Procedures Approach

Separation of Powers doctrine of connotational law set forth that, legislative, executive, and judicial branches have separate powers, and generally each branch is not allowed to exercise the powers of the other branches. Legislative branch such as Department of Education, Office for Civil Rights, and federal courts, should not exercise powers over each other.

In *Morrison v. Olson*, 487 U.S. 654 (1988), Justice Scalia dissented the Court's opinion as "a revolution in constitutional law" and said "without Separation of Powers, the Bill of Rights is worthless." Justice Scalia dissented again in *Mistretta v U. S.* (1989), a decision upholding legislation which delegated to the seven-member United States Sentencing Commission (a commission which included three federal judges) the power to promulgate sentencing guidelines.

In *Doe v. Rensselaer Polytechnic Institute*, (N.D.N.Y, 2020) the Court held that "a school's conscious and voluntary choice to afford the plaintiff, over his objection, a lesser standard of due process. protections when that school has in place a process which affords greater protections, qualifies as an adverse action." moreover, "Such disregard for the inevitable administrative headaches of a multi-procedure approach certainly qualifies as evidence of an irregular adjudicative process.

### IV.    Deliberate Indifference under Title IX

To establish deliberate indifference under Title IX, a plaintiff must plead: (1) the harassment was "sexual" in nature; (2) the harassment was "so severe, pervasive, and objectively

offensive," and "so undermine[d]" and "detract[ed]" from the student's educational experience

that it effectively "bar[red]" the student from access to educational opportunities or benefits; (3)

the school had actual knowledge of the harassment; and (4) its response was "clearly

unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S.

629, 633, 648, 650, 651 (1999).

"The clearly unreasonable standard requires more than mere negligence; "it is a high

standard that seeks to eliminate any risk that an educational institution 'would be liable

in damages not for its own official decision but instead for [another individual's] independent

actions.' " *Id.*  (citing *Davis*, 526 U.S. at 649, 119 S.Ct. 1661). "If a funding recipient does not

engage in harassment directly, it may not be liable for damages under Title IX unless its

deliberate indifference subjects its students to harassment; that is, the deliberate indifference

must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to

it." *ld.*

## V.    Erroneous Outcome under Title IX – Defendant incorrectly found that Plaintiff had strong motive to lie regarding her sexual assault allegation.

An erroneous outcome claim rests on allegations that the "plaintiff was innocent and

wrongly found to have committed an offense" as a result of gender discrimination. *Yusuf v.*

*Vassar College,* 35 F .3d 709, 715 (2d Cir. 1994). To properly plead an erroneous outcome

claim, a plaintiff must "allege particular facts sufficient to cast some articulable doubt on the

accuracy of the outcome of the disciplinary proceeding." *Id*. Notably, "the pleading burden in

this regard is not heavy." *Id*. A plaintiff can assert a successful erroneous outcome claim by

alleging "particular evidentiary weaknesses" or "particular procedural flaws." *Id*. Allegations that

"go well beyond the surmises of the plaintiff as to what was in the minds of others and involve

provable events that in the aggregate would allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding" are sufficient to plead an erroneous outcome claim. *Id.* at 716.

## ARGUMENT

### I.    Defendants Conflates Pleading and Discovery which Invoked Conversion Under Rule 12(d)

Defendants' arguments that the rest of investigative report plaintiff didn't attach to complaint should be "integral" to the Complaint is to conflate pleading with discovery. Moreover, defendants attached extra-pleading materials[13] to support its motion when such material should be presented by Plaintiff in its anticipated motion for Summary Judgement to prove the claims. Defendants should have filed those referenced documents under seal for the Court to decide the instant motion because the Court is not obligated to carry the burden of proof for Defendants by requesting specific documents for the purpose of disproving factual allegations. However, if both parties are offered the same opportunity to file potentially extra-pleading materials to prove/disprove the claims, such process will inevitably become conversion to summary judgement stage.

Defendant's argument that the factual allegation of Complaint heavily relies on factual summary/procedural history of Title IX investigative report (instead of plaintiff's own experience), is simply false.  "We do not, however, consider extrinsic materials referenced in the Kaplan Letter (e.g., screenshots of Facebook postings and Youtube videos), despite their inclusion in the Appendix. As we have explained, 'a plaintiff's reliance on the terms and effect

---

[13] ECF 50 at 5-13, Lists of 64 documents received and 30 documents selected/relied on as exhibits of the investigative report. Defendant however has not carried the burden of proof for its arguments as it failed to explain what information contained in each referenced document and who produced those documents.

of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.' See *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) *Id*. (emphasis in original) Plaintiff drafted the Complaint without relying on the factual summary/procedural history of investigative report but based on her actual experience and memory. The Finding and Analysis of the investigative report is the only part that reflects the investigative team's own considerations in credibility assessment for parties. If the Court decides to consider extra-pleading materials (whether submitted or referred by defendant) in determining motion to dismiss, the court must convert such motion to one for summary judgement. "Therefore, the court erred by receiving and reviewing the Codes, an option barred by Rule 12(b).  This conversion requirement is "strictly enforced" whenever a district court considers extra-pleading material in ruling on a motion to dismiss. *Friedl v. City of New York,* No. 97 CIV. 5453 (JSM), WL 11551 (S.D.N Y Jan. 13, 1999*)* at 83 (quoting *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir.1999))." *Chambers v. Time Warner, Inc*., 282 F.3d 147 (2d Cir. 2002) "When a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record. In contrast, on summary judgment the court is required to consider all relevant, admissible evidence submitted by the parties and contained in "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits...." Fed.R.Civ.P. 56(c); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) "As long as the notice requirements are satisfied and "all parties have been given a reasonable opportunity to present materials pertinent to the motion's disposition," it is within the Court's "discretion ... to convert a motion filed under Fed.R.Civ.P. 12(b)(6) into one seeking summary judgment." *Aetna Cos. & Surety Co, v. Aniero Concrete Co*., 404 F.3d 566, 573 (2d Cir.2005) (internal quotation marks and citation omitted).

"The essential inquiry is whether the [*pro se* party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Malaney v. Elal Israel Airlines*, 331 F. App'x 772, 774 (2d Cir.2009)

Defendants has attached extra-pleading material (list of evidence it received and selected to be exhibits) in support of its central argument. As a *logistic* matter, reviewing each document upon receipt (64 items) is not the same with considering those documents as a factor in parties' credibility determination regarding the sexual assault complaint. The fact-finding stage of Title IX process is comparable to discovery in a civil proceeding; drafting investigation report and deciding which evidence to be attached as exhibits is comparable to the summary judgement stage during which parties needs to which evidence are admissible. Plaintiff clearly alleged that Defendants excluded admissible and meaningful evidence to be exhibits of the report while drafting the report and making determination about the case. Most importantly, the consequence of not including her medical records produced by her clinician is that she won't be able to rely on such document in appeal stage, because the only evidence the hearing panel will consider is those attached to the report. Plaintiff also did not rely on such document in drafting her Complaint but her own experience and memory; it was Defendants relied on plaintiff and other students' cooperation and disclosure for them to be able to write the report.

If the Court decides to consider defendant' extra-pleading material in determining the motion to dismiss, the Court must convert the motion to one for summary judgement under Rule 12(d).

## II.    Defendants Routinely Misstated Factual Allegations and Failed to Accept Them as True in Pleading Stage

(a) Columbia's arguments for dismissal are based on two assumptions: (1) Columbia's Title IX investigative report is a reliable narrative of the process; (2) complying with the 2019 GBM Policy is compliance with Title IX.  However, both the integrity of Columbia's Title IX investigation and the authenticity of the investigative report ¶162-165, 203, 206-209 are currently being disputed in this action, defendants failed to accept all facts to be true by relying on the investigative report(exhibit) instead of plaintiff's factual allegations in Complaint in recounting the events. Plaintiff attached the investigative report to Complaint for the Court to see what exactly she contends about. The inconsistency between the factual allegation of Complaint and attached investigative report should be reasonably expected.

(b)  "Peer advisor wrote that Party A said she asked Party B outright to stop what he was doing….the peer advisor's notes also contradicted another aspect of Party A's narrative, which was that the peer advisor told Party A that Party B had sexually assaulted her…on the contrary, as the above notes demonstrated, the peer advisor wrote clearly and specifically that it was Party A who first used the word "rape" during their session. "  (ECF 12-1 at 75) Plaintiff explained this perceived contradiction in Paragraph 72-74 of Complaint. See *B.B. v. New Sch*., "a court's job does not end just because a movant asserts a document incorporated by reference contradicts the allegations contained in the complaint. Instead, a court must review the plaintiff's complaint and opposition papers to determine whether an explanation for the contradiction exists or whether the plaintiff has cast doubt on the authenticity or veracity of the documents." In determining Columbia's Motion to Dismiss, the Court must consider Plaintiff's allegations as pled, not Columbia's approximations in its motion to dismiss

(c) Defendants mischaracterized this lawsuit as result of plaintiff's preference to an alternative policy/procedure and disagreement with the investigative outcome, without explaining how any of its action/decision-making demonstrated slightest good faith required by Title IX.

(d) "Investigators excluded "[a]ny and all original documents from the NYPD detective investigation." (ECF 27 at 29) Defendants) is saying because Plaintiff has not proved those allegations in Complaint, it must be untrue. At pleading stage, a plaintiff does not need to engage in proving any factual allegation to survive a motion to dismiss.

(e) "Both Plaintiff's GHAP records and the blog post were attached as exhibits to the final Investigative Report. See id. at 1–2 (Exs. 12 & 16)." (ECF 47 at 24). Defendant are misleading the Court to think those two documents are material from clinical expert. GHAP records are produced by peer students who only advocate for sexual health. GHAP advocates are all undergraduate and graduate students at Columbia whose studies range from creative writing to pre-med. Technically, the GHAP records serve as material from "fact witness", but in Complaint Plaintiff specifically alleged exclusion of material from "expert witness". The blog post "describing the concept of 'trauma bonding'" is in no way can be confused with medical record produced by mental health professional. The author of the blog post was a random online blogger who never met Plaintiff. This blog post and GHAP records were never referenced or indicated in Complaint and therefore are irrelevant. Defendant also failed to file those two documents under seal, making it impossible for the Court to see whether those contradict the Complaint.

(f) "Furthermore, as the 2019 GBM Policy explains, "if the Investigative Team determines that expertise on a topic will assist the Hearing Panel in making its determination(s),

23

the Investigative Team may include in the investigative record medical . . . expert testimony and materials." ECF 12-1 at 36. While Plaintiff had the option to "request that a topic be considered by an expert," the 2019 GBM Policy explicitly states that the Investigative Team only grants such requests in "limited circumstances." *Id*. (ECF 47at 24) "And under no circumstance does the 2019 GBM Policy "permit[ Plaintiff] to retain [her] own expert to consider a topic or submit testimony and/or reports as part of the investigation." *Id*. This provision does not necessarily refer to medical expert, and the clinician recognized plaintiff's trauma was not privately retained, but actually a clinician who had worked at Columbia's Columbia's Counseling and Psychological Services for 28 years specializing in sexual trauma. Defendants rejected evidence produced by its own employee. Defendants drafted the 2019 GBM Policy itself and had option for multiple policies for plaintiff's case. There is no rules prohibited them from including plaintiff's medical records showing her trauma response as part of the report.

(g) Defendant's above two arguments are contradictory: on one hand, it refers to the 2019 GBM Policy that says parties are not allowed to submit material from its own expert, on the other hand, Defendant indicates that it included plaintiff's expert evidence as part of investigation (GHAP records and blog post describing trauma bonding). If defendant truly included plaintiff's medical records as exhibits to the investigative report and make determination based on those, it would be unlikely to found John Roe "not responsible" for the sexual assault allegation by a preponderance evidentiary standard.

(h) "It was not "clearly unreasonable" for the Investigative Team, after reviewing all of the evidence Plaintiff provided, to use its expertise and discretion to include and rely upon only some of that evidence in the Investigative Report. In fact, to do so was completely consistent with the 2019 GBM Policy, which explicitly states that the Investigative Team has the

"discretion to determine the relevance of any . . . evidence and determinate that certain . . . evidence should be included or excluded in the investigative process." ECF 12-1 at 35." (Dkt. 47, Page 24) Defendant failed to cite any case law to support this argument, and it was never Plaintiff's allegation that Defendant failed to follow its 2019 GBM Policy. Plaintiff was alleging Defendant violated Title IX by voluntarily choosing an inadequate policy which constitutes bad faith given plaintiff's circumstance.

      (i) There are 30 documents (ECF 50 at 5-6) selected as exhibits of the report (out of 64 documents received in total), which excluded Plaintiff's medical records produced by her clinicians regarding her sexual trauma from the incident and her mental disability as alleged in Complaint. Those two documents are Counseling and Psychological Service record (Item 33, ECF 50 at 11) and Neurofeedback report (Item 34, ECF 50 at 11) produced by clinicians. Item 33 is plaintiff's medical record produced by a clinician who got Ph.D. in clinical psychology and had been working at Columbia's Counseling and Psychological Service for 28 years with specialty in sexual violence. Item 34 is plaintiff's diagnostic report regarding her mental disability. Item 33 and item 34 are the only two materials produced by experts in those 64 documents investigators had received, and according to the 2019 GBM Policy and Defendant's above argument, those material from a party's expert cannot be included as part of the investigation. Plaintiff has specified that the information in the excluded evidence showing her trauma trauma("fawn"), the Court should be able to infer that plaintiff's health care providers produced those evidence. It's commonsensical that medical records are produced by medical professionals.

**III.**    **Title IX Claims Against Three Individual Defendants**

In both *Bailey v. New York Law School* (S.D.N.Y. Mar. 1, 2017) and *Fitzgerald v. Barnstable School. Committee*, 555 U.S. 246 (2009), the individual defendants were sued in their individual capacities. Plaintiff has specified in Complaint that she is suing those individuals in their *official capacities*. Technically, this action has only one defendant, Columbia.

## IV.    **Separation of Powers and *Stare Decisis***

The Court must have already considered DOE's guidance since plaintiff attached its August 5 blog post to the Complaint. It's inevitable that the Court need to consider the Complaint in its entirety for deciding any motion, that does not mean the Court should follow such guidance in deciding a motion without its own reasoning and judgement—that would be letting legislative branch exercise power over it. The Court is bound by *stare decisis* and applicable precedents such as Doe v. Rensselaer Polytechnic Institute for this action, where the similar fact pattern presented.

DOE's August 5, 2020 blog post and July 20, 2021 Q&A clarification regarding retroactivity only defined what kind of case it has *jurisdiction* over should a complainant contend university's Title IX process—cases where the universities use the policy in place at the time of alleged incident. However, Columbia did not comply with OCR's guidance as it used a policy revised and implemented on August 23, 2019. Columbia has three available policies to choose for Plaintiff's GBM proceeding after August 14, 2020: i. the policy that were in place at the time of incident—January 8, 2019 (according to OCR's definition on its scope of jurisdiction); ii. the policy revised and implemented on August 23, 2019 (the policy Columbia chose for Plaintiff's case at its discretion); iii. new Title IX regulation effective since August 14, 2020 Columbia is not required to apply any specific policy above, but Columbia is required by Title IX to respond sexual harassment complaints in good faith. By August 14, 2020, Defendant Columbia only

finished all the investigative interviews with all parties, and the investigative reporting was being initially drafted. The major changes of new regulations only apply to the steps after interviews, such as selection of evidence, mediation option, cross-examination at a live hearing, allowing expert witness at hearing, etc. Even take into consideration of the principle known as "Auer deference" due to its origins in the Supreme Court case of *Auer v. Robbins*, 519 U.S. 452 (1997), the judge in *Doe v. Rensselaer Polytechnic Institute* (N.D.N.Y. Oct. 16, 2020) held that OCR's blog post on retroactivity was not the kind of "authoritative statement" entitled to "Auer deference".

### V.    Plaintiff Has Adequately Alleged Deliberate Indifference Claim

#### A.  Loss of Education Opportunities or Benefits

In the second element of this claim, the federal definition of harassment ("so severe, pervasive, and objectively offensive,") is the antecedent, and the "deprivation of educational benefits" is the expected effects of such harassment--it's inconceivable that a student who experienced first degree rape and the consequential physical harm (STI) but still feel comfortable attending school as before. For Title VII suits, a plaintiff needs to establish a *prima facie* case based on burden-shifting framework. Unlike Title VII claims where the cause of action needs to be definitely stated, not merely implied, Title IX rely on a contractual framework. Plaintiff is not required to expressly allege "loss of educational opportunities or benefits" in order to for the Court to "link between [Plaintiff's] education and [the alleged] misconduct." *Davis*, 526 U.S. at 652.  "the district court erred in drawing an affirmative conclusion--absence of hostility by Hofstra officials, just because plaintiff did not expressly allege so in complaint." See *Menaker v. Hofstra Univ.* No. 18-3089 (2d Cir. 2019) This reasoning also applies for this action, that the absence of plaintiff's express allegation of loss of education does not enable the court to draw an

affirmative inference that her educational benefits was not lost or compromised as a result of incident. Plaintiff's alleged physical and emotional harm resulted from the sexual assault should be reasonably expected to alter the condition of her educational environment (¶70,75).

### B. Allegations of Being "Clearly Unreasonable"

Plaintiff plausibly alleged which procedures are "clearly unreasonable" ¶186-194. In *Cavalier v. Cath. Univ. of Am.*, 513 F. Supp. 3d 30 (D.D.C. 2021), "the Court agrees with Cavalier's bottom line: a reasonable jury could find that the University's meaningful consideration of Cavalier's incapacitation was untimely, insufficient, and thus "clearly unreasonable." And "because a reasonable jury could also find that the failure of the University to look beyond the allegations of the eighteen-year-old (initially inebriated) victim, who acknowledged that she could not even recall much of what had happened, was clearly unreasonable."

It's clearly unreasonable that Defendants excluded plaintiff's medical records proving her trauma response following the January 8 incident to be exhibits of the report, which likewise deprived her of opportunity to challenge the finding based on her medical records in later stage. It's clearly unreasonable that Defendants failed to consider possibilities beyond how plaintiff framed the events, because plaintiff's memory of event/her perception might have been impaired due to the stress. It's clearly unreasonable that Defendants consider the possibility that Roe is innocent even after they saw significant inculpatory evidence, justified all his suspicious behaviors for him, attributed those behaviors to Roe's fear. It's clearly unreasonable to conclude *Roe's fear of Title IX process indicated more of his innocence than his culpability.* If he is innocent but is still so fearful of the Title IX process, that indicates there must have been anti-male practice within Defendants Columbia.

"A federal funding recipient can be said to have intentionally acted in clear violation of Title IX when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient, and, implementation of an official policy can certainly be a circumstance in which the recipient exercises significant control over the harasser and the environment in which the harassment occurs." Education Amendments of 1972, § 901(a) 20 U.S.C.A. § 1681(a). *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007**)** In *Simpson*, the university's football coach had "general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts," he "knew that such assaults had indeed occurred," but he "nevertheless maintained an unsupervised player-host program to show high-school recruits a 'good time.' " *Id*. at 1184. The court found those allegations to be adequate for a jury to infer that the inadequacy of the policy, and the risk of an assault, was "so obvious" as to amount to deliberate indifference. *Id*.at 1184-85.

"Damages are available if the "official policy" of the funding recipient discriminates on the basis of sex." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). "The plaintiff must demonstrate that the school's actions amounted to 'an official decision ... not to remedy' the discrimination. *Id*. (quoting *Gebser* , 524 U.S. at 290, 118 S.Ct. 1989 ) (alteration in original).

In *Karasek v. Regents of the Univ. of Cal.,* 948 F.3d 1150 (9th Cir. 2020) "the Court finds [*Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007)] and Karasek persuasive for the premise that a university can certainly be liable under Title IX for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context, and possibly beyond that." Magistrate Roemer continued, "a cognizable pre-assault

claim may even be found to extend campus-wide, beyond a particular group or program...."[I]t will not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus." "Doe-2 has alleged that her assailant was a part of a "particular group that had a known history of sexual harassment, akin to the situation in *Simpson ."Id. "*Judge Roemer found that because "two coaches, the athletics department director and assistant director, the Dean of Students, and the Title IX  Coordinator" knew about the inappropriate behavior but failed to "take[ action] to prevent further harm, ... a reasonable jury could conclude that Niagara's response to these incidents was 'clearly unreasonable in light of the known circumstances.' " *Id*.  at 15-16 (citing *Gant*, 195 F.3d at 141).  For that reason, he found that the "plaintiffs have adequately pleaded that [Niagara] had 'actual knowledge of a heightened risk that is specific enough to allow it to remedy' its policy of deliberate indifference to sexual harassment perpetrated by male swimmers." *Id*.  at 16 The Tenth Circuit ultimately found that because the risk of sexual assault in the recruiting program was "obvious," the university's failure to remedy the risk amounted to a policy of deliberate indifference that violated Title IX." *Id*. at 1178, 1180.

In *Karasek v. Regents of the Univ. of Cal.,* 948 F.3d 1150 (9th Cir. 2020), the appellate court found that a plaintiff can state a Title IX claim based on a university's conduct occurring prior to the misconduct at issue if the plaintiff alleges that: (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment (3) in a context subject to the school's control, and (4) the plaintiff was harassed as a result.

"University's "deliberate indifference must, at a minimum, cause [a student or students] to undergo harassment or make them liable or vulnerable to it." *Davis,* 526 U.S. at 645, 119 S.Ct.

1661.  Plaintiff has established the requisite causal link between Defendant's modifying Roe's sanction from expulsion to suspension for his old case, and the injury she suffered. Defendant's decision to allow him to return school subjected Plaintiff underwent sexual assault, as well as additional two female students who never reported. ¶171

The Second Circuit has not addressed this standard in the post-assault context, and the circuits that have are split on whether a university's deliberate indifference must lead to the plaintiff's subsequent harassment or whether it is sufficient that the deliberate indifference made the plaintiff "vulnerable to" further harassment. See *Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019) (requiring further incident of actionable sexual harassment); *Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) (allowing post-assault claim where the plaintiffs alleged deliberate indifference caused them to be vulnerable to further harassment).

This plaintiff has alleged *both pre-assault and post assault liabilities* in Complaint— Columbia allowing John Roe return to campus after his prior assault case, and the university made the community more vulnerable to future harassment with (1) an unjustified delay (two-year long) of the process (¶142, 154, 171) and (2) Defendant Pitt's official decision to deliberately use an outdated Title IX Policy, when there is an obvious need, is very likely to result in Title IX violation (¶186-187, 210-212).

There is an obvious need to: (1) interview the GHAP peer support who changed plaintiff's perception of the incident; (2) allow the NYPD detective/witness's participation in the hearing based on the contradiction between original incident report and his testimonial ¶162-163 168; (3) inclusion of her medical records produced by actual clinicians recognizing the sexual trauma she had ¶192; (4) facilitate cross-examination with investigators' participation at a live hearing, since Defendants refuse to ask John Roe questions that indicated his culpability—i.e.

why he did not file any cross-complaint as he did at Title IX proceeding regarding the incident.

(5) to adequately sanction those who found responsible for both sexual and physical violence.

### VI.    Plaintiff Has Adequately Alleged Erroneous Outcome Claim

*Roe v. Pa. State Univ*, No. 18 Civ. 2142 (E.D. Pa. Feb. 15, 2019) is from Third Circuit.

The Second Circuit has established what it describes as a "low standard" for pleading the

existence of gender bias in Title IX cases. *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016)

(citing *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)). Adopting the pleading

standard from Title VII discrimination cases, the Second Circuit has held that a plaintiff need

only "alleg[e] facts giving rise to a plausible minimal inference of bias [] to survive a motion to

dismiss. Specifically, procedural irregularities or preferential treatment during the disciplinary

proceeding, combined with a concrete motive to discriminate on the basis of gender, is sufficient

to create at least a "minimal inference" that a student was subjected to gender bias.

Defendant Columbia has a motive to combat anti-male doubt resulted from *Feibleman v.*

*Columbia Uni.* during the pendency of plaintiff's Title ix process (August 2019-July 2021).

Consequently, Plaintiff "was innocent and wrongly found to have committed an offense." *Yusuf*

*v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) when "the investigative team found that when

considered together, Party A's statements and the messages she sent Party B evinced a strong

motive to lie."[14] The August 14, 2020 new Title IX regulation require schools to take

"presumption of innocence" for those accused of sexual assault until proven guilty, that means

the accuser will be more likely treated as false accusers until evidence says otherwise. And

during the fact-finding process only the accuser is likely to be discriminated against, therefore

the scope of applicability for erroneous outcome should be expanded to both accuser and the

---

[14] See ECF 12-1 at 69, 2nd paragraph; ECF 12 Paragraph 170 of Complaint

accused after August 14, 2020. When the accuser is being evaluated of her credibility for her allegation, they deserve effective assistance of counsel covered under due process rights. If an accuser is actually being sexually assaulted, he/she has very likely suffered from symptoms of trauma, which may not be understood by investigators. Allowing the accuser's medical records related to the incident at question is necessary to adequately investigate sexual assault complaint—which essentially is a personal injury case, emotional or physical injury, regardless of at which proceeding it's adjudicated.

**Plaintiff Has Adequately Alleged Procedural Irregularities/Evidentiary Weakness**

Defendants exhibited a pattern of two-way distortion: distorting every inculpatory evidence to be exculpatory; distorting every exculpatory evidence to be inculpatory as possible as they can. Defendants' finding is obviously predetermined: whenever plaintiff and Roe had good dynamic in their communication, Defendants determined that plaintiff must "have lingering romantic interest" in him so the sexual assault must not have happened; whenever she had bad dynamic with Roe such as urged him to seek professional help in exchange of not reporting him, Defendants likely determined plaintiff had motive to cause harm to Roe so her sexual assault allegation must be false and only intended to cause harm. When distortion is not possible, they then treat certain evidence with deliberate indifference. This pattern is also identified by plaintiffs from *Doe v. Columbia Univ.* (2d Cir. 2016) and *Feibleman v. Columbia Uni*—i.e. the audiotape provided by Mr. Feibleman got distorted to be inculpatory evidence by Defendants' misleading and unfound characterization. From 2014 to 2021, it's the same individual who dictated all Title IX adjudication at Columbia, despite the multiple staff turnover resulted from external lawsuits/public criticism—James Valentini.

| Compl. ¶ | Procedural irregularities and "Patterns of decision-making that also tend to show the influence of gender" *Yusuf,* 35 F.3d at 715 |
|---|---|

| | |
|---|---|
| 12 at 86-101, 145-146, | The pro bono counsel Columbia assigned to Plaintiff in September 2019 has done plaintiff nothing but a disservice, vicariously aiding John Roe to be found "not responsible" at Title IX process. Moreover, this counsel breached attorney-client privileges in principle with plaintiff, attempted to temper witnesses, and helped Columbia avoiding public exposure of the sexual assaults cases on campus by jeopardizing her sexual assault case at criminal process and discouraging her from filing a civil complaint. |
| 12-1, page 76 | (a)Assuming Columbia did not falsify the witness/NYPD detective's testimonial, this pro bono counsel then should not have provided this detective's contact information to the investigators because she was supposed to act in plaintiff's best interest by only giving out evidence (with plaintiff's consent of course) that would help establish plaintiff's sexual assault case. |
| | (b)Or, assuming this counsel did not jeopardize plaintiff's Title IX case and only provided this detective's contact info to Columbia because she believed his testimonials could help plaintiff's case (although never sought plaintiff's permission), that means Columbia must have later altered/falsified this detective's testimonial. |
| | Whichever of the above possibilities is the case, it's undoubtedly that this pro bono counsel disclosed plaintiff's information without her consent and highly likely had been *the extension of Columbia's Title IX Investigative Team* |
| | The fact that the NYPD detective (to whom plaintiff consciously reported her sexual assault case) would become the witness testify against plaintiff regarding the alleged incident is odd on its face. According to Columbia, plaintiff first told a peer counsel at GHAP and made false accusation against John Roe; she then went to the police to tell the detective that she had consensual sex with John Roe but a school counsel said it was non-consensual and asked her to report it to the police. It's clearly implausible and logically incoherent that plaintiff would tell the detective the sex was consensual if she intended to make false accusation, there was also no need to mention the school counsel at all because she could just tell the detective a less complicated and more "convincing" version of story. |
| 12 at 71-74, 168 | On the other hand, it's against Columbia's own internal policy and code of ethics that employees within Columbia Health give direct advice to visitors regarding their sexual experience. It was Plaintiff's informed decision to report the incident to police of her own volition. |
| 12-1 at 114 | When plaintiff received the full investigative report in April 2021 and saw this detective's witness testimonial, she told Defendant Pitt that it's unlikely that this detective would say plaintiff told him the sex was consensual, because she clearly remembered after she recounted the incident, the detective identified the sex was non-consensual to her based on specific sexual acts. |
| | Defendant Pitt then notified Plaintiff that a hearing will be scheduled for appeal, but no witness is not allowed to participate. Despite the "obvious need" to hold a cross-examination with all witness's participation at a live hearing. |
| 12 at 145-146, 147-149 | John Roe did not file any cross-complaint at federal court—i.e., defamation, assault, staling, emotional distress in response to plaintiff's civil complaint as he did at the Title IX proceeding (cross-complaint of online stalking), with the same individual as his counsel at both proceedings. |
| 12-1, page 80 | |

| | Columbia voluntarily reached out the detective from the criminal proceeding and produced exculpatory statements (contradicted to plaintiff's actual experience) as exhibits to the report; but Defendants did not voluntarily retrieve the public civil litigation regarding the same incident and refused to do so when plaintiff provided them such inculpatory evidence. |
|---|---|
| 12 at 102-105, 106-107<br><br>Case 1:19-cv-04327-VEC | The pace/timeline of plaintiff's Title IX process from August 2019 to July 2021 was contingent with the case update of *Feibleman v. Columbia Uni.*: when the opposition to motion to dismiss was filed on 8/30/2019, Columbia immediately started to evade discovery from replacing then-AVP of the GBM office, Jeri Henry, in Sep 2019 and other employees later. The complete staff turnover wasn't until Dec 2019. (This is why Plaintiff had to name Kevin Pitt as Defendant)<br>Also, the Policy in place at the time of January 8 incident was supposed to be used for plaintiff's case if Columbia intended to follow OCR guidance, but that January 8 Policy was permanently removed shortly after initiation of *Feibleman*. |
| 12 at 110-112 | Investigators "requested from Plaintiff' STI test results but "failed to request such STI testing results from John Roe." |
| 12-1 at 104 | The integrity and authenticity of the investigative report is currently being disputed as the ground for this action, therefore this matter should be determined during discovery, not at pleading stage.<br>Notwithstanding, there was an "obvious need" that they should request John Roe's STI results because he said he got tested negative and STI can be an indication of non-consensual unprotected sex, but the team never required such corroboration. (John Roe lied to the investigator on this matter because in the parallel civil litigation, Plaintiff subpoenaed John Roe's medical records six months before the incident, which showed he never underwent any STI test. If the unprotected sex was consensual he would not have motive to lie.) |
| 12 at 113-114 | Investigators requested "Plaintiff's all available mental health records [sic]," but "never requested any mental health records from John Roe" and "excluded information concerning John Roe's mental condition." |
| | The integrity and authenticity of the investigative report is currently being disputed as the ground for this action, therefore this matter should be determined during discovery, not at pleading stage. |
| 12 at 115-116 | Investigators included "Plaintiff's response to the New York City Police Department ("NYPD") detective in the regarding the alleged sexual assault [sic]" but "excluded John Roe or his attorney's response." |
| | The NYPD detective interviewed John Roe's attorney multiple times after one time interview with plaintiff in August 2019. However, Columbia excluded John Roe's responses to plaintiff's allegation at criminal proceeding. John Roe's response is important because no matter how plaintiff presented herself during the NYPD interview, John Roe's response to her allegation could shed light on her credibility. |
| 12 at 117-118, 159 | The investigators excluded the specification (contained in parties 'submission) of the mental health condition John Roe "plan to seek professional help with", a mental condition that predisposes one to sexual recidivism. |

| | |
|---|---|
| 12-1, page 69 of 123, 2nd and 3rd paragraph, footnote 43 | They also erred in concluding how plaintiff's pre-existing condition manifested in her interaction with John Roe, that she only had difficulty understanding John Roe's intention after the incident. It's improper to conclude one has difficulty forming healthy relationships in general without knowing one's social life, because the same mental illness can affect individuals differently. These charlatans never even asked plaintiff about her sexual relationships with people other than John Roe. |
| 12 at 193 | In plaintiff's testimonials submitted to Defendant Pitt, she identified other peer students who once romantically and sexually involved with John Roe and all ended up emotionally traumatized and unstable, as a result, John Roe was advised by his male friends and his female ex to seek professional help for his implied NPD-a mental condition commonly seen in domestic abusers and sexual recidivists.  However, Defendant Pitt deflected this characterization onto plaintiff and concluded it was plaintiff's mental condition subjected her to abuse others/John Roe. |
| 12-1 at 69-70, 78 | Defendant Pitt's finding of plaintiff being "not credible" heavily relied on her correspondence with John Roe after the incident.<br>For those positive dynamics she had with John Roe, Defendant Pitt concluded that plaintiff must have "lingering romantic interest" to John Roe therefore the alleged incident can't be sexual assault.<br>However, for those negative dynamic between her and John Roe, such as plaintiff urged him *one time* to seek professional help for his implied NPD [in case he rapes additional people] otherwise plaintiff would report him to school, Defendant Pitt concluded that plaintiff's "clear resentment" showed motive to cause John Roe harm and thus the sexual assault allegation must be false.<br>Defendants' finding [of plaintiff being 'not credible'] is predetermined and clearly biased. |
| 12 at 119-120, 204-205<br><br>12-1 at 116, 110 | Plaintiff never contended that settlement in civil litigation constitutes violation of No-Contact Directive. She was alleging Columbia's discriminatory treatment of parties' reporting each other of No-Contact Directive, that it failed to include plaintiff's reporting but only include John Roe's reporting of her. Another thing is, although Columbia told plaintiff settlement (in whatever condition) does not constitute violation of No-Contact, but John Roe's attorney was refrained from bringing the pending Title IX case to settlement discussion in the civil litigation. |
| 12 at 121, 124<br><br>12-1, page 83 | Defendant Pitt sycophantically used language like "candor, frankness, upfront" for John Roe's blatant recounting his pervious assault case, although such information was already available to them (GBM office retains all records of past Title IX cases and John Roe knew this), "positively impacted their view of John Roe's credibility"<br>However, Defendant Pitt didn't acknowledge plaintiff's candor for sharing her involuntary bodily reaction to the non-consensual sexual acts by John Roe, or for sharing her ambivalent feeling to John Roe after the incident. That information would not be available to them if plaintiff chose not to disclose, despite the anticipated confusion and common misconception of sexual assault. Instead, the investigators chose to rely on common misconception and used plaintiff's honesty |

| | |
|---|---|
| | against her. Its own 2019 GBM Policy also clearly defined that physical reaction is irrelevant in determining sexual assault. |
| 12 at 203, 206, 181 iii, iv | Columbia potentially fabricated and excluded those specified inculpatory evidence. Whether they received those documents in the first place is a matter to be determined during discovery, not in pleading stage. |
| 12 at 154 | This Title IX investigation took 708 days to finish (after plaintiff filed a complaint with OCR in January 2021) without justification. |
| 12-1, page 69-70 | "In the view of the investigative team, the clear anger, sense of betrayal, and resentment Party A felt towards Party B after their sexual encounter negatively impacted its assessment of her credibility significantly." |
| | It's clearly irregular that the Team excluded or circumvented the possibility that plaintiff's those emotions were resulted from the alleged sexual assault by John Roe. Instead, these charlatans concluded that it was plaintiff's pre-existing condition subjected her to abuse others. |
| 12-1,  page 73, 78  

12-1, page 63 | "the investigative team believed, based on the above exchange, that Party A seemed to project that she was in fact interested in having some sort of physical or sexual encounter with Party B on the night in questions, even if she did not want to engage in the behaviors in which they ultimately engaged. This lack of collaboration for Party A's statement negatively impacted the investigative team's view of her credibility"  
"The Team did not find it logical or reasonable that a college student responding to an invitation to 'have some fun and keep each other company' at 2:30 in the morning had no expectation that physical or sexual activity might occur and had no desire to engage in it. Furthermore, the investigative team also found it unreasonable that simply because party B asked Party A if she had depression (which their deceased classmate had suffered from), she jumped to the conclusion that Party B was one of the students offering general emotional support to her and other classmate."  
"Which the investigative Team believed could reasonably be understood as an *innuendo* about his desire to engage in some sort of sexual activity" |
| | Columbia's its own 2019 GBM Policy clearly defined what constitutes "affirmative consent" and importance of not "making assumption". However, the investigators improperly speculated and interpreted plaintiff's behavior of seeking emotional support at late night as "innuendo" for consenting sexual activities when there was no sexually suggestive contents or affirmative consent. Plaintiff also told the Team it's not just because John Roe asked her whether she had depression, it also because (1) plaintiff had been confiding to John Roe about her unfruitful search of treatment and (2) a fellow student committed suicide because of depression a couple of months before the January 8 incident. Columbia's outdated victim-blaming arguments is how rape culture looks like. |

| | |
|---|---|
| 12-1, page 78 | "Witness#1's statement that she said she had reactive attachment disorder…However, the investigative team had difficulty accepting that any of these reasons offered a full explanation as to why Party A wanted to remain in touch and in some form of a relationship with Party B from the beginning of June to almost the end of July 2019, if she was a victim of sexual assault."[15]<br>"The Team believed Party A instead had a lingering romantic interest in Party…the fact that there were many instances throughout the parties' written communication in which Party A seemed to actively be enjoying herself, rather than feeling a sense of obligation to help "better" Party B" |
| | If Plaintiff had romantic interest in John Roe after the incident, she could have asked John Roe to be his romantic partner when Roe said he would "do anything" as long as she does not report him to school, but she didn't. Defendants' own GBM Policy clearly states sexual violence can happen between romantic couples. Whether plaintiff had romantic interest to Roe not is irrelevant. |
| 12-1, page 78 | Defendants failed to address the likelihood of the unprotected sex being non-consensual, and the STI plaintiff contracted may be the result of such non-consensual unprotected sex. Since females take more risk when engage in unprotected sex than males. Even if plaintiff romantically interested in John Roe, that does not mean she would risk her own well-being/pregnancy when unprotected sex does not bring female more physical pleasure.<br>Defendants failed to address how John Roe put his own well-being at risk when he initiated the unprotected sex, if plaintiff had some serious infection disease. Plaintiff's fear of STI/pregnancy was corroborated by her medical records of many visits and exam/records provided. |
| 12-1, page 80-81, 86-87 | "this behavior gave the Team the impression tht Party B had a script of sorts that he wanted to adhere to throughout the investigation. However, the team also recognize that Party B was very fearful of both the investigative process and the potential outcome, and as a result, was making a strong effort to be prepared for anything the investigative Team might ask of him." |
| | Whenever there is suspicious behavior by Roe, Defendants would rather exonerate him than incriminate for him—concluding Roe's fear indicates more of his innocence than culpability. |
| 12-1 at 93 | Witness#2 provided evidence which intended to be inculpatory evidence, defendants again distorted it to be exculpatory for Roe. And conclude Roe is credible based on insubstantial details.<br>the probability of witness 2 giving false testimonial is no greater than that of having actual knowledge of the nature of incident. |
| 12-1 | It's clearly irregular that Defendants conflate the concept of revictimization and recidivism as it stigmatized plaintiff's disability, when other university resources like SVR and CPS have a correct understanding of those concept and regularly advocate for victim of sexual violence university-wide with a series of event. |

---

[15] *Fight or Flight' Are Not the Only Ways People Respond to Sexual Assault.*
https://www.vice.com/en/article/v74eqj/fight-or-flight-and-harvey-weinstein-sexual-assault-trial-defense '

| 12-1 at 73 | It's clearly irregular that Defendants assume that every college student conform to or should be aware of the "hookup" culture when university policy explicitly defined what constitute consent. The investigators rely on common misconception and victim-blaming theory that is strictly forbidden by its own GBM policy. |
|---|---|
| 12-1 at 77 | The investigators plaintiff's reaction to Roe's prior abuse into being abusive/motive to threaten. If reporting Roe's sexual assault on plaintiff to GBM office is considered "harmful" action, then the GBM office who carried out the two-year Title IX process has inflicted more harm on Roe than anyone has; They also excluded plaintiff's explanation regarding reactive abuse and actual abuse during interview;[16] excluded plaintiff's response that Roe had a history of provoking three of his intimate partners to act out of their character and then accusing them of being abusive to him.<br>In Roe's old case adjudicated ███████████████████████████████ ███████████████████████████████████████████ however in 2020, plaintiff only gave Roe a verbal warning for him to get professional help[before he assault more people] otherwise she will report him, Defendants found plaintiff "not credible" for her allegation because the "threatening" showed her motive to cause harm. |

     *Doe v. Columbia* (2d Cir. 2016) offers some guidance on this issue, for instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." *Menaker v. Hofstra Univ.* No. 18-3089 (2d Cir. 2019) is a Title VII suit where the plaintiff is a university employee accused by student for harassment. Title VII uses a different standard from that of Title IX (student on student harassments).

     **Minimal Inference**

     Plaintiff has clearly showed a "minimal inference" of gender bias and an "articulable doubt" as to the accuracy of investigative outcome in the above chart. Litigation exposure regarding anti-male allegation can certainly have more impact than "public criticism" which is

---

[16] *What is Reactive Abuse?* (March 26, 2021) https://yanahelps.com/blog/what-is-reactive-abuse/

required in *Doe v. NYU*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020). Defendant was not only

aware of *Feibleman*, but even responded to this contemporaneous public lawsuit by having a

complete staff turnover for the GBM office right before *Feibleman* proceeded to discovery and

revision of its GBM policy in August 23rd, 2019—which is the policy used for Plaintiff's Title

IX case. See *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of

fact, credibility, and the weight of the evidence are not properly considered on a motion to

dismiss[.]"). As the Second Circuit held in *Doe v. Columbia Univ.*, "the Court's obligation at this

stage is not to determine the "most plausible" inference." 831 F.3d at 57 (emphasis original).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should convert Defendants' motion to dismiss to one

for summary judgement under 12(d) as to first cause of action and certain deliberate indifference

claims (¶187-192); deny defendants' motion as to the remaining deliberate indifference claim

(¶193) and third cause of action[17].

Dated:  Roosevelt Island, New York

      January 7, 2022

                                                   Respectfully,

                                                   /s/ Jane Doe

                                                   _____

                                                   *Pro Se for Plaintiff*

                                                         PO Box 297

                                         New York, NY, 10044

                                                 646.920.4618

---

[17] This Court seemed to have recognized the merits/grounds of the claims in its July 13 ruling on plaintiff's application for preliminary injunction. The Court specified that it was because "plaintiff has not carried her burden of showing that she will suffer 'irreparable harm' if she is not awarded the extraordinary and drastic remedy of preliminary injunctive relief." --the first requirement for granting a TRO, not because plaintiff didn't meet the second requirement--"(a) to show likelihood of success on the merits of her case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in her favor." ECF 8