UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                Plaintiff,

                v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK; KEVIN PITT;
ALYSSA ANZALONE-NEWMAN; KRISTIN
COLLADO,

                Defendants.

**OPINION AND ORDER**

21 Civ. 5839 (ER)

Ramos, D.J.:

      Jane Doe, proceeding *pro se*, brings this action against The Trustees of Columbia University ("Columbia"), Kevin Pitt, Alyssa Anzalone-Newman, and Kristin Collado (the "Individual Defendants," and collectively with Columbia, "Defendants"), alleging violations of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. 1681(a).

      Doe alleges that in January 2019, when she was a student at Columbia, she was sexually assaulted by John Roe, another Columbia student.  ¶¶ 6, 21, 34–39, 44–61.[1]  Seven months later, in August 2019, Doe reported the assault to Columbia's Gender-Based misconduct ("GBM") Office.  ¶ 85.  Following that report, and in accordance with its 2019 Gender-Based Misconduct Policy and Procedures for Students ("2019 GBM Policy"), Columbia appointed two investigators to evaluate Doe's allegations.  *See* Doc. 12-1 at 1–56, 62.[2]  In February 2020, while the

---

[1] References to "¶" are to paragraphs of the amended complaint, Doc. 12.

[2] Doe attaches only an excerpt of the Investigative Team's report ("Investigative Report") as Exhibit E to the amended complaint.  *See* Doc. 12-1 at 62–110.  Exhibit E includes only the Findings and Analysis section of the Investigative Report but not other sections, including, for example, the Procedural History and Factual Summary.  Still, throughout her amended complaint, Doe relies heavily on information that is only in those sections she does not attach.  *See, e.g.*, ¶¶ 110 (describing investigative interview); 115–116, 162–63, 203 (describing witness

investigation was ongoing, Roe filed a cross-complaint, alleging Doe had engaged in stalking. *Id.* at 62–63.  In May 2021, the Investigative Team released its analysis and findings, recommending that Roe be found not responsible for sexual assault and that Doe be found not responsible for stalking.  *Id.* at 96–110.

Doe argues that Defendants, in violation of Title IX, (1) applied the 2019 GBM Policy, rather than the 2020 GBM Policy, to her complaint; (2) acted with deliberate indifference in investigating her allegations; and (3) reached an erroneous outcome in recommending that Roe be found not responsible for sexual assault.

Before the Court is Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the motion is GRANTED.

## I.     BACKGROUND

### a.  January 8, 2019, Incident

---

interviews); 113, 158, 181, 191 (describing mental health evidence allegedly considered or excluded); 121 (describing points of emphasis "throughout the investigative report").  In light of this, the Court finds the entire Investigative Report—relevant portions of which Defendants provided in a 10-page excerpt, at Exhibit 1 to the Kyla Magun Declaration, *see* Doc. 50—is incorporated into the complaint by reference.  *See Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (for documents to be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite, and substantial reference to the documents") (internal quotation marks and citation omitted).  Any references to "Rep." are to portions of the Investigative Report not included in Exhibit E to Doe's amended complaint, Doc. 12-1.

In her opposition to Defendants' motion, Doe argues that in attaching and referencing the 10-page excerpt of the Investigative Report Defendants have "conflate[d] pleading and discovery" and as a result have "invoked conversion [to summary judgment] under Rule 12(d)."  Doc. 58 at 19.  The portion of the Investigative Report to her complaint Defendants submitted with their motion is not, as Doe argues, "extra-pleading material."  *Id.* at 3.  It is instead, as set out above, incorporated into the complaint.

Because the Investigative Report is incorporated into the complaint, Defendants' submission of certain pages of that Report does not trigger conversion to summary judgment.  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (documents incorporated by reference may be considered on a motion to dismiss without triggering conversion).

Doe alleges she suffers from a form of complex post-traumatic stress disorder ("PTSD") called reactive attachment disorder, and that on January 8, 2019, she experienced a depressive episode related to her inability to find treatment for her disorder.  ¶¶ 16–17, 19.  Shortly after midnight, she reached out to a number of students, including Roe, via Instagram, seeking someone to "confide in."  ¶ 20, 21.  According to Doe, she and Roe messaged for several hours and, throughout their conversation, Roe repeatedly suggested that she come to his dorm room. ¶¶ 21, 23.  Ultimately, Doe—under the impression that Roe would provide emotional support relating to her depressive episode and her disorder, as well as the "long-standing insufficiency of mental health services at Columbia"—agreed to come over; she arrived at Roe's dorm around 2:30am.  ¶¶ 28, 30, 31.

Doe alleges they engaged in conversation for 30 to 40 minutes and then began to watch a television show.  ¶¶ 32, 33.  Doe alleges she then asked Roe what he wanted to do and he told her he wanted to "do a lot of things" with her.  Doc. 58 at 6.[3]  She alleges he asked her if "cuddling" and "other non-sexual activities" were "okay," and she said "yes."  *Id.*  Ultimately, she asked him if they could "just sleep without having sex[.]"  *Id.*

Doe further alleges that Roe turned off the lights and began to touch her in "various places."  ¶ 34.  According to Doe, at this point, she told Roe she did not want to have sex with him, and that Roe did not respond, instead putting "his hand under [her] pants and start[ing to] finger[] [her] external genitalia."  ¶¶ 35, 36.  Doe alleges he asked her if this was "okay," but that she was "unable to speak and did not know how to react[.]"  ¶¶ 37, 38.  Doe then explains that

---

[3] "Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where, as here, those allegations are consistent with the complaint." *Mariama Amar v. N.Y.C. Health & Hosps. Corp.*, No. 14 Civ. 2503 (ER), 2015 WL 3754999, at *5 (S.D.N.Y. June 15, 2015) (internal citation and quotation marks omitted).  Here, the Court will consider the allegations in Doe's opposition papers, Doc. 58, where those allegations are not inconsistent with the complaint.

Roe "never verbally expressed that he wanted to have sex with [her] throughout their encounter," and that he never sought her permission for any sexual activity.  ¶ 39.

According to Doe, Roe then took off his clothes, began to kiss and caress her, and then "sexually penetrated [her]," without using a condom.  ¶¶ 44–46; Doc. 58 at 7.  Doe alleges she did not consent to any sexual activity; in particular, she explains she did not give Roe permission to touch her genitalia, to caress her, or to penetrate her, nor did he ask her for permission to do so.  ¶¶ 47–52.  Doe further alleges Roe forced her to perform oral sex on him and to have unprotected vaginal sex with him "against her will."  ¶¶ 53, 55.  Doe explains she was "frozen in fear, unable to move."  ¶¶ 57–59.  Doe alleges the "sexual encounter" lasted "more than three hours," from around 3:00am to 6:30am; throughout the encounter, she alleges, she was "dissociated and [un]responsive."  Doc. 58 at 6–7.  According to Doe, she fell asleep sometime in the early morning; she woke up and left Roe's dorm room around 10:00am.  *Id*. at 7.

According to Doe, all incoming Columbia students must complete a pre-orientation tutorial on sexual assault prevention; this tutorial, she explains, requires seeking affirmative consent before initiating any sexual activity.  ¶¶ 40–42.  Doe alleges Roe completed the pre-orientation tutorial and as a result was aware of his responsibility to seek affirmative consent from another person before engaging in any sexual activity with that person.  ¶ 43.  She reiterates that despite this, he did not at any point during their encounter on January 8 ask for or receive her consent to engage in sexual activity.

### b.  Communications Between Doe and Roe After the Incident

Doe alleges that in March 2019, she developed "uncomfortable symptoms," and in April 2019, tested positive for a sexually transmitted infection ("STI").  ¶¶ 62, 63.  Doe further alleges that she learned from peer support at Columbia's health center that this particular STI—she does

specify which one—can only be contracted through unprotected sex; Doe explains that Roe is the only person she had had unprotected sex with in six years and that she had never before tested positive for an STI.  ¶¶ 64–67.  As a result of Roe's actions, Doe explains, she "was caused to feel fear, depression, anxiety, shame, and self-guilt."  ¶ 70.

Also in April 2019, Doe made use of various confidential resources at Columbia, including its Gay Health Advocacy Project ("GHAP") and Sexual Violence Response ("SVR"). ¶¶ 73, 75; Doc. 12-1 at 75.  While meeting with a peer advisor at GHAP, Doe explained what had happened with Roe in January and, according to Doe, this advisor informed her that what she had experienced was rape.[4]  ¶ 71.

Doe alleges that in May 2019, she confronted Roe about their encounter, and in response, he "begged" her not to report it to Columbia as, according to Doe, Roe had previously been sanctioned for sexual assault by Columbia in 2016.  ¶ 76.  Doe also alleges that two of Roe's friends encouraged him in to seek professional help for what she calls his "implied mental condition (Narcissistic Personality Disorder . . .)" as well as for his "several sexual misconducts during his time at [Columbia.]"  ¶ 78.

Doe alleges that in June 2019, Roe asked to meet with her to apologize; according to Doe, when they met, Roe told her that he had been falsely accused of sexual misconduct by another student and that he had been suspended from school for a year.  Doc. 58 at 8.  As a result

---

[4] With respect to her meeting with the GHAP peer advisor, Doe presents a different set of facts in her opposition papers:  she alleges that after she told the advisor about the incident with Roe, the advisor told her that "Roe's action was 'not okay[.]'"  Doc. 58 at 7.  According to Doe, she then asked, "are you saying I was raped?" but the advisor "didn't explicitly confirm or deny."  *Id.*  Instead, Doe alleges the advisor told her that even if she had been in a relationship with Roe or romantically interested in him, he "should not have sex with her without her consent[.]"  *Id.* at 8.  After this conversation, Doe alleges, she "understood her experience with Roe was sexual assault."  *Id.*

Because these allegations are inconsistent with those in the complaint—that she was told Roe's actions constituted rape, ¶ 71—the Court is not required to consider them.  *See supra* Note 3.

of this, Doe alleges, he told her he was "very fearful to go through the Title IX process again at Columbia."  *Id.*  According to Doe, Roe promised he would "be a good friend," and would "make amends and commit to behavioral change," including through seeking professional help. *Id.*  She then alleges he asked her to "hold him accountable in case he became impulsive again[.]"  *Id.*

Throughout June and July 2019, Doe and Roe continued to message via social media.  ¶¶ 77–80; Doc. 12-1 at 107.  During these conversations, Doe alleges, she encouraged Roe to "seek professional help" and "address his behavior."  ¶¶ 78, 82.  And she told Roe on multiple occasions that if he did not get help, she would report him to Columbia.  Doc. 12-1 at 76–77.  In response, Doe alleges, Roe promised he would get help, so long as she did not report him.  ¶ 79.  Doe explains she wanted to "give [Roe] a second chance," and was holding onto the hope that by not reporting Roe, she might "achieve restorative justice."  ¶¶ 80–81.  Doe alleges that at some point, she "trauma bonded" to Roe, and as a result "felt compelled to have a good outcome with him," including a "friendship and [by] help[ing] him with his behavioral change."  Doc. 58 at 8.

The longer she stayed friends with Roe, she alleges, the more attached to him she became. Doc. 58 at 8.  At one point, she alleges, she asked him to provide her with his social media passwords, "in case he continue[d] procuring sex through social media," and as his "next sexual conquest was just a [message] away."  *Id.*  Doe alleges she "believed it was imperative to monitor Roe given his history of multiple sexual assaults/harassments, and the mental condition he potentially has."  *Id.*

Doe explains her strong attachment to Roe is a "typical trauma response" called "fawn." Doc. 58 at 9.  According to Doe, there are "four types of known trauma response:  fight, flight, freeze, and fawn."  ¶ 129.  She alleges that "[b]ased on expert testimonials and belief, the

particular trauma responses [she] had during the [January 8] incident was 'freeze' and after the incident was 'fawn.'" ¶ 130.  In her complaint, Doe does not cite to expert testimonials, nor does she provide any further explanation of "freeze" and "fawn."

In her opposition papers, Doe alleges that as a result of her complex PTSD, she typically found it difficult to form attachments with people, but with Roe, she had the opposite experience, and "quickly became attached" and "dedicated" to him.  Doc. 58 at 9.  She attributes this to a "fawn" response.  *Id.*  Also in her opposition, she sets out to explain "fawn" by reference to what she calls the "Gestalt framework."  *Id.*  Here, she repeatedly quotes from a 1951 book, *Gestalt Therapy: Excitement and Growth in the Human Personality*, and suggests that "fawn" is a form of "retroflection," a type of behavioral response discussed in *Gestalt Therapy.  Id.* at 9–10.

Still, Doe alleges she had difficulty accepting the reality that she had been sexually assaulted by someone she trusted.  ¶ 81.  And, at the end of July 2019, Doe realized that Roe never meant to address his behavior, ¶ 82; she felt betrayed, angry, and "more unstable," Doc. 58 at 8, and she decided to report the January 8 incident.  ¶¶ 82, 85.

### c.  GBM Investigation and Investigative Report

On August 3, 2019, Doe submitted an incident report to Columbia's GBM Office, which is included within the school's Student Conduct and Community Standards ("SCCS"); Columbia's GBM Policy and Procedures are governed by SCCS.  ¶ 85; Doc. 12-1 at 1–3.[5]  That week, Doe also filed a report with the New York City Police Department ("NYPD").  ¶ 85.

Pursuant to Columbia's 2019 GBM Policy, which is the policy that was applied to Doe's GBM proceeding, a student who believes they have been the victim of a GBM Policy violation

---

[5] Doe attaches the 2019 GBM Policy as Exhibit B to the amended complaint.  *See* Doc. 12-1 at 1–56.  Because Doe's complaint relies on and makes clear reference to the Policy, the Policy is incorporated into the complaint.  *See Mosdos*, 815 F. Supp. 2d at 691.

can file a report with the GBM Office.  *See* Doc. 12-1 at 1–56; ¶ 13.  Then, the GBM Office

assesses the available information and determines whether to proceed with an investigation.

Doc. 12-1 at 30, 33–34.  When there is an investigation, the GBM Office notifies the complainant

and respondent of the alleged GBM Policy violations and appoints two investigators.  *Id.* at 34–

35.  Each party can have an advisor accompany them to any meeting or hearing, and that advisor

can be an attorney.  *Id.*  A student can request that the GBM Office arrange for an attorney-

advisor, in which case one will be provided at no cost to the student.  *Id.* at 25.

At the start of the investigation, the parties are interviewed by the Investigative Team and

can "provide a list of witnesses and/or any relevant documents or evidence to be considered." *Id.*

at 35.  With respect to experts, a "party may [] request that a topic be considered by an expert,

but a party is not permitted to retain their own expert to consider a topic or submit testimony

and/or reports as part of the investigation." *Id.* at 36.  "The Investigative Team has the discretion

to determine the relevance of any proffered witness and/or evidence and determine that certain

witnesses and/or evidence should be included or excluded in the investigative process." *Id.* at

35.

After completing the investigation, the Investigative Team produces an Investigative

Report based on interview summaries, witness statements, and other documents gathered during

the investigation.  *Id.* at 39.  The Investigative Report includes a factual summary, credibility

assessments, an analysis of the charges, and recommended findings.  *Id.* at 39–40.  After

reviewing the Investigative Team's recommended findings, a party can accept the

recommendations or have the matter referred to a Hearing Panel for adjudication.  *Id.* at 40.

Should either party request a hearing, a Hearing Panel is "tasked with evaluating and analyzing

all relevant information in the Investigative Report . . . as well as any relevant additional

submissions and information presented by the parties in the hearing process." *Id.* at 41.  During

the hearing, the parties have the opportunity to make opening and closing statements; the

Hearing Panel can pose questions to either party, each of whom appears separately before it, and

to the Investigative Team.  *Id.* Witnesses are not involved in the hearing process.  *Id.* at 42.

After the hearing, the Hearing Panel determines whether any violation of the GBM Policy

occurred using a preponderance of the evidence standard.  *Id.* at 43–44.  The parties can appeal

the decision of the Hearing Panel and any resulting sanction.  *Id.* at 47.[6]

Following Doe's report, on August 6, 2019, Adrienne Blount and Jennifer Kelly—who

were, at the time, case manager and Title IX investigator for SCCS—met with Doe for an initial

intake session and to review her rights under the 2019 GBM Policy.  Rep. at 4.  That same day,

Kelly sent Doe and Roe notice letters indicating that an investigation would commence; these

letters included a No-Contact Directive, instructing Doe and Roe to discontinue contact with

each other until further notice.  *Id.*  At the same time, the GBM Office connected Doe with *pro

bono* counsel from Sanctuary for Families. ¶ 86.

Doe alleges that she met with her *pro bono* counsel to discuss her case, and that, despite

having been told that her communications with her counsel would be confidential, she never

signed a retainer agreement and her counsel never explained to her "the complexities of attorney-

client privilege[.]" ¶¶ 87, 89.  At this meeting, she alleges, her counsel discouraged her from

bringing a civil case against Roe.  ¶¶ 88, 90.  She also alleges that, at one point, her counsel

advised her to exaggerate certain details of the incident involving Roe. ¶ 91.

---

[6] The Court also considers Exhibit I to the amended complaint as incorporated into the complaint, *see* Doc. 12-1 at
118–122.  Exhibit I is a copy of the letter Doe received from the GBM Office informing her of the Hearing Panel's
determinations and of the process for submitting an appeal.  Doe refers to this letter in her complaint, alleging it did
not provide her clear instructions for filing an appeal.  *See* ¶ 172.

At some point, Doe alleges, her counsel asked her for the contact information of the detective Doe met with when she filed an incident report with the NYPD; according to Doe, her counsel told her she could help her bring a criminal case against Roe.  ¶ 92, 93.  Doe provided the detective's contact information, but Roe was never criminally charged.  ¶ 94, 95.

Doe alleges that in September 2019, her counsel told her she had a "strong [Title IX] case," as Roe previously had been sanctioned for sexual assault by Columbia, and as a result she encouraged Doe to focus on the Title IX proceeding, and not on pursuing a civil or criminal case. ¶ 97.

Ultimately, Roe became concerned that her counsel was "collaborating with [Columbia]," and she decided to retain another attorney.  ¶ 101.  Doe alleges that her *pro bono* counsel had "only done [her] a disservice," and that she breached attorney-client privilege, discouraged her from pursuing a civil case, and jeopardized both her criminal case and her Title IX case.  Doc. 58 at 11.[7]

Doe alleges that from 2019 to 2020, while the investigation was ongoing, Columbia was accused of being anti-male/pro-female, as a result of another Title IX case, *Feibleman v. Trustees of Columbia University in City of New York*, No. 19 Civ. 4327 (VEC), 2020 WL 882429 (S.D.N.Y. July 9, 2020).  ¶ 102.  Specifically, Doe alleges that until *Feibleman*, Columbia tended to treat men accused of sexual misconduct "unfavorably and in a discriminatory manner," including by "depriving [them] due process rights," but that in 2020 Columbia tilted to favor accused men—and to disfavor and systemically discriminate against women accusers—in an attempt to dispel what Doe calls anti-male/pro-female doubt surrounding the *Feibleman* case,

---

[7] In October 2020, Doe filed a civil suit against Roe for sexual assault, battery, infliction of emotional distress, and tort.  ¶ 142.

and as part of its mission to combat anti-male criticism.  ¶¶ 197, 199, 202.  In other words, Doe

alleges, Columbia endeavored to tailor the outcomes in its Title IX cases—to be "pro-female or

pro-male"—in accordance with the political/legal climate at the time, so as to maintain its public

image and secure federal funding.  ¶¶ 206–208.

Doe further alleges that in January 2020, the GBM office had a complete staff turnover.  ¶

105.  According to the Investigative Report, investigators Kelly and Benjamin Marzolf—who

had made up the Investigative Team—left SCCS on November 22, 2019, and January 3, 2020,

respectively; thereafter they were replaced by investigators Anzalone-Newman and Collado, who

together took over as the Investigative Team for the remainder of the process.  Rep. at 2 n.2.  Doe

alleges that this staff turnover was part of an "effort to evade discovery" in the *Feibleman* case,

and that as a result of the turnover, dozens of Title IX cases got delayed, including her case.

Doc. 58 at 12.  Doe also alleges that the SVR advocates, with whom she had been meeting and

who had assured her that Roe would "most likely [be] expelled for being a two-time sex

offender," in January 2020 suddenly changed their belief that he would be expelled.  ¶¶ 106, 107.

In February 2020, while the investigation was ongoing, Roe filed a cross-complaint,

alleging that Doe had engaged in stalking, and that she had violated the No-Contact Directive.

Doc. 12-1 at 62–63.

As part of its investigation and in accordance with the 2019 GBM Policy, the

Investigative Team interviewed Doe, Roe, and five other witnesses, including other students and

the NYPD detective who interviewed Doe regarding her August 2019 report.  Rep. at 7–8.  The

Team also considered a wide range of evidence, including electronic communications between

Doe and Roe, as well as their electronic communications with others; social media posts;

medical records and GHAP records provided by Doe; written statements by Doe and Roe; and an explanatory blog post about "trauma bonding," provided by Roe.  Rep. at 8–11.

Pursuant to the 2019 GBM Policy, the Investigative Team asks each party to provide any relevant documents or evidence to be considered, and has the discretion to determine the relevance of any evidence and whether certain evidence should be included or excluded in the investigative process.  Doc. 12-1 at 35.  With respect to evidence relating to mental health treatment and diagnosis, the 2019 GBM Policy provides that each party "has the right to request that evidence regarding their mental health diagnosis and/or treatment be excluded from consideration when responsibility is being determined," but that if a party "wishes to present evidence of their *own* mental health diagnosis and treatment, he/she may do so in limited circumstances."  Doc. 12-1 at 37.

According to Doe, in March 2020, the Investigative Team requested her STI test results, but did not request STI test results from Roe.  ¶¶ 111, 112.  Doe also alleges that the Investigative Team requested her mental health records, but did not request any mental health records from Roe.  ¶¶ 113, 114.

### i.  2020 Title IX Rule Change

On May 19, 2020, as the investigation was ongoing, the United States Department of Education ("DOE") promulgated new Title IX regulations (the "2020 Title IX Rule"), specifying how institutions must respond to allegations of sexual misconduct.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. 106).  The new regulations approved use of the clear and convincing evidence standard for a finding of responsibility and

required schools to hold live disciplinary hearings involving cross-examination of parties and witnesses.

The 2020 Title IX Rule became effective on August 14, 2020.  *See* 85 Fed. Reg. at 30,026.  As the DOE has made clear:

> The 2020 amendments took effect on August 14, 2020, and are not retroactive.  This means a school must follow the requirements of the Title IX statute and the regulations that were in place at the time of the alleged incident; the 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020.  This is true even if the school's response was on or after this date.   In other words, if the conduct at issue in the complaint took place prior to August 14, 2020, the 2020 amendments do not apply even if the complaint was filed with a school on or after August 14, 2020.

Office of Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment* 10 (July 20, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf ("DOE Q&A").[8]  In light of the 2020 Title IX Rule change, Columbia adopted the GBM and Interim Title IX Policies and Procedures for Students (the "2020 GBM Policy") on August 14, 2020.

Because the conduct at issue in Doe's complaint occurred on January 8, 2019, Columbia did not apply the 2020 GBM Policy to her proceeding, and instead continued to apply the 2019 GBM Policy, as it had since she filed her incident report.

Doe concedes in her complaint that, according to the DOE, the 2020 Title IX Rule would not be applied retroactively to incidents occurring prior to August 14, 2020.  ¶ 136.  She nonetheless alleges that although the Office of Civil Rights ("OCR") will only enforce the Title IX policy in place at time of the incident, universities have "full autonomy" to determine which policy to implement for pending cases, including her case.  ¶ 138.  She further alleges that the

---

[8] As Defendants note, courts routinely consider agency guidance at the motion to dismiss stage.  *See, e.g.*, *Salazar v. King*, 822 F.3d 61, 67–68, 76–77 (2d Cir. 2016) (considering DOE "Dear Colleague Letters" at 12(b)(6) stage); *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 79–80 (2d Cir. 2015) (considering agency letter at 12(b)(6) stage).  In any event, the Court can take judicial notice of the DOE Q&A because it is a publicly available document.  *See, e.g.*, *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881, 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012).

DOE's definition of retroactivity is ambiguous for cases where the hearing has not taken place, and that federal courts have the ultimate decision to interpret the scope of retroactivity of Title IX regulations.  ¶ 140, 141.

According to Doe, Columbia autonomously chose to apply the rescinded and outdated Title IX policy over the new Title IX policy in an attempt to deprive her of her due process rights, namely the use of expert witnesses and cross-examination.  ¶¶ 139, 173.

In January 2021, Doe explains, she filed a complaint with the OCR against Columbia, based on its "procedural irregularities and untimeliness" in handling her complaint.  ¶ 154.

### ii.  The Findings

The Investigative Team produced its 131-page Investigative Report on May 27, 2021.  ¶ 166.  At the outset, the Investigative Team determined the credibility of both parties.  To do so, pursuant to the 2019 GBM Policy, the Team considered "the consistency or inconsistency of their accounts over time; their motive to lie; the presence or absence of any corroborating evidence; and, whether their statements included specific details that indicated their accounts were reasonable and logical."  Doc. 12-1 at 65 (footnote omitted).  Based on these factors, the Investigative Team found that neither Doe nor Roe was "fully credible or reliable."  *Id.* at 89.

With respect to Doe, the Investigative Team determined that while her story remained relatively consistent over time and some of her statements were corroborated by the evidence, her "anger, sense of betrayal, and resentment" of Roe negatively impacted her credibility, *id.* at 70, as did the lack of corroboration of certain of her statements regarding whether she consented to sexual activity, *id.* at 73, 76, and whether she threatened Roe during her conversations after the incident, *id.* at 77–78.  The Investigative Team also determined that while some of her statements were logical and reasonable, others were not.  *Id.*

14

With respect to Roe, the Investigative Team found that his narrative, too, was consistent and that while he may have had motive to lie, including because of his "frequent references to his involvement in a prior gender-based misconduct investigation, and his repeated statements reiterating how fearful he was of potential consequences if he were found responsible for the current allegations," *id.* at 81, his "candor and frankness" positively impacted his credibility. *Id.* at 81–82.  Nevertheless, the Investigative Team found that while some of his statements were corroborated by the evidence, others were not, including that his account of the incident and whether he had affirmative consent to proceed differed widely from certain witnesses. *Id.* at 84– 86.  The Investigative Team also found that Roe's continued engagement with Doe in the months following the incident was not completely logical, especially after the investigation had commenced, and his failure to provide certain evidence demonstrated a lack of forthrightness that did not support his credibility. *Id.* at 86–88.

As to the sexual assault allegations against Roe, the Investigative Team first determined by a preponderance of the evidence that Doe was not incapacitated on January 8, 2019, including that her mental health issues did not impede her ability to consent, and that even if she had been incapacitated, Roe would not have known based on her actions and statements at the time. *Id.* at 98–100.  The Investigative Team determined that due largely to the fact that Doe's and Roe's statements about the evening were "irreconcilable" and neither party was particularly reliable, they could not conclude by a preponderance of the evidence that affirmative consent was absent, and ultimately recommended that Roe be found not responsible for sexual assault. *Id.* at 100– 106.  With respect to Roe's cross-complaint against Doe for alleged stalking and violation of the No-Contact Directive, the Investigative Team recommended that she be found not responsible as well. *Id.* at 110.

Doe alleges that the Investigative Team improperly excluded certain evidence from its Report.  In particular, she alleges the Investigative Team excluded her medical records as well as "[a]ll evidence from expert witness[es] regarding [her] cognitive/mental impairment, proof of disability, and sexual trauma," and information relating to various types of trauma responses, namely "fawn" and "freeze;" Roe's alleged response to the NYPD detective; information concerning Roe's mental condition which she alleges "potentially predisposed him to commit multiple sex offenses;" her discussions with Roe, as well as his discussions with friends, relating to his plan to seek professional help; and original documents from the NYPD investigation.  ¶¶ 113, 115–117, 118, 120, 159.  She also alleges the Investigative Team excluded Roe's alleged violation of the No-Contact Directive, which she had reported to the Team in March 2021.[9]  ¶ 119.

Doe also alleges that while the Investigative Team excluded certain evidence relating to Roe—his alleged communications with the NYPD detective as well as her report that he had violated the No-Contact Directive—it did include comparable evidence relating to her—her communications with the NYPD detective, and Roe's allegation that she violated the No-Contact Directive.  She suggests these disparities are the result of gender bias, noting the Investigative Team excluded certain information "when [] Roe is male" and included certain information "when [she] is female."  ¶¶ 115–117, 119, 120.

Doe also alleges that the Investigative Team, despite not having any clinical background, improperly concluded it was her mental condition that "subjected her to abuse," and improperly

---

[9] On March 24, 2021, Doe emailed Collado to report an alleged violation of the No-Contact Directive.  Specifically, Doe alleged that during a meeting with her lawyer on March 19—as part of her separate civil litigation against Roe—her lawyer told her that Roe's lawyer reached out to Doe's lawyer to negotiate settlement.  *See* Doc. 12-1 at Exhibit H, 116.  In other words, Doe argues that settlement negotiations between her lawyer and Roe's lawyer, in which she was not involved, constituted a violation, on Roe's part, of the No-Contact Directive.

emphasized her involuntary bodily reaction to non-consensual sexual activities.  ¶¶ 118, 121.  In addition, Doe alleges the Investigative Team wrongly deemed her not credible, despite having knowledge of her "pre-assault cognitive disability" and "post-assault sexual trauma that," Doe alleges, were "substantiated by experts." ¶ 128.  She also alleges that the Investigative Team emphasized that she reported the incident seven months later, thus giving a false and misleading impression of her.  ¶¶ 121–122.

These allegations are unsupported by the Investigative Report, which contains no indication that the Investigative Team (1) concluded Doe's mental condition "subjected her to abuse;" (2) disregarded her mental health issues or responses to trauma in considering her credibility, *see* 12-1 at 65–80; or (3) was influenced by the timing of Doe's reporting in reaching its outcome.

### iii.  The Hearing Panel

After the release of the Investigative Report, Doe requested a hearing.  ¶ 167.  On June 15, 2021, Doe was informed the hearing had been scheduled for June 29, 2021, and she was told that no witnesses would be involved in the hearing process and that there would be no cross examination.  ¶ 167–68; Doc. 12-1 at 113.  She also alleges she was told she would not be allowed to submit any additional evidence, including medical records, to the hearing panel.  Doc. 58 at 13.

Doe did not attend the hearing. Doc. 12-1 at 118.  And Roe subsequently chose to proceed without one.  *Id.*  Accordingly, the Hearing Panel deliberated using the Investigative Report and any additional materials provided by the Investigative Team.  *Id.* According to Doe, the hearing would have been "a mere formality," her "participation would not have had any

material effect," and it is within her Title IX rights not to submit to a "bad faith, discriminatory, proceeding."  Doc. 58 at 13.

On July 1, 2021, Doe was informed via letter that the Hearing Panel had affirmed the findings in the Investigative Report, concluding that she was able to consent to sex and that there was insufficient information to conclude by a preponderance of the evidence that affirmative consent was denied or withdrawn.  Doc. 12-1 at 119.  She was told she could appeal the decision and was informed that any such appeal had to be submitted by July 14, 2021.  ¶ 172; Doc. 12-1 at 120.  Doe alleges the letter did not specify to whom she should address her appeal.[10]  ¶ 172. Ultimately, she did not submit an appeal.

Doe alleges that she "would have [had] a significant chance at success in her Title IX claim if she had been able to present evidence from expert witnesses, and to cross-examine Roe and witnesses, as allowed under the 2020 Title IX Rule.  ¶ 174.  In other words, she argues that Defendants, in "cho[osing] [to apply] the rescinded and outdated Title IX policy," deprived Doe of the "due process rights and . . . protections afforded under the [2020] Title IX" policy.  ¶¶ 168, 169, 173.

### iv.  This Action

On July 1, 2021, Doe filed her initial complaint as well as an order to show cause why Columbia should not be enjoined from concluding her GBM proceeding.  Docs. 1, 4.  On July 13, 2021, the Court denied her application for preliminary injunctive relief, and on July 20, 2021, she filed and served an amended complaint.  Docs. 8, 12.

---

[10] This is refuted by Doe's Exhibit I, attached to her amended complaint at Doc. 12-1, 118–120, *see supra* Note 6, which provides, as relevant here, that Doe "may request an appeal," and details instructions for doing so:  "For more information about filing an appeal, please review the 'Appeals' section of the Gender-Based Misconduct Policies for Students, which can be found at http://studentconduct.columbia.edu.  Your request for appeal *should be addressed to 'Appellate Panel,' and must be filed electronically at http://bitly.com/scgbmappeal* within seven business days of the date of this letter, July 14, 2021."  Doc. 12-1 at 120 (emphasis added).

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).  Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it

19

strikes a savvy judge that actual proof of those facts is improbable[.]").  "For purposes of this

rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any

statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282

F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

   The same standard applies to motions to dismiss in cases brought by *pro se* plaintiffs.

*Davis v. Goodwill Indus. of Greater New York & New Jersey, Inc.*, 2017 WL 1194686, at *5

(S.D.N.Y. 2017) (citing *Zapolski v. Fed. Repub. of Germany*, 425 F. App'x 5, 6 (2d Cir. 2011)).

The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se*

plaintiff's claims as "rais[ing] the strongest arguments that they suggest."  *Triestman v. Fed.*

*Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006) (citing *Pabon v. Wright*, 459 F.3d 241, 248

(2d Cir. 2006)).  The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies

with particular force when the plaintiff's civil rights are at issue."  *Jackson v. N.Y.S. Dep't of*

*Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197,

200 (2d Cir. 2004)).  Nevertheless, "*pro se* status 'does not exempt a party from compliance with

relevant rules of procedural and substantive law.'"  *Triestman*, 470 F.3d at 477 (quoting *Traguth*

*v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  To survive a motion to dismiss pursuant to Rule

12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the

defendant-unlawfully-harmed me accusation."  *Iqbal*, 556 U.S. at 678.  A *pro se* complaint that

"tenders naked assertion[s] devoid of further enhancement" will not suffice.  *Id.* (internal

quotations omitted) (quoting *Twombly*, 550 U.S. at 557).

## III.   DISCUSSION

   Title IX prohibits discrimination on the basis of gender in educational programs and

activities receiving federal financial assistance, providing, with certain exceptions, that "[n]o

person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  It is well settled that an aggrieved individual has an implied right of action under Title IX for injunctive relief and monetary damages.  *Fitzgerald v. Barnstable School Committee et al.*, 555 U.S. 246, 255 (2009).

### a.  Claims Against the Individual Defendants

Doe brings her Title IX claims against Columbia and the Individual Defendants alike. However, the statute "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals," since they do not personally receive federal education funding.  *Fitzgerald*, 555 U.S. at 257; *see also Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06 Civ. 15509 (WWE), 2011 WL 1079944, at *5 (S.D.N.Y. Mar. 24, 2011) (dismissing Title IX claims against individual defendants).  Accordingly, Doe's Title IX claims against the Individual Defendants must be dismissed.

### b.  Columbia's Decision to Apply the 2019 GBM Policy

Doe's first cause of action, what she calls a "systemic violation of Title IX," arises from Columbia's application of the 2019 GBM Policy, rather than the 2020 GBM Policy.  ¶ 185.  In particular, Doe alleges that Columbia had "full autonomy to choose which Title IX policy to implement" and chose to apply the "rescinded" 2019 GBM Policy despite the "obvious inadequacy" of that policy.  ¶ 180.  This choice, Doe argues, allowed Columbia to deny her the use of expert witnesses and the ability to cross examine Roe and witnesses, and thereby resulted in a deprivation of her rights under Title IX.

But, as Doe concedes, the 2020 Title IX Rule, which went into effect on August 14, 2020, plainly is not retroactive.  As the Department of Education made clear, and as set out

above, a school must follow the requirements of the Title IX statute and the regulations that were in place *at the time of the alleged incident*; the 2020 Title IX Rule does not apply to alleged sexual harassment occurring before August 14, 2020, and this is true even if the school's response was on or after this date.  Accordingly, it is clear Columbia acted in compliance with Department of Education regulations when it applied its 2019 GBM Policy to Doe's complaint, which arose from a sexual assault she alleges took place on January 8, 2019.

In any event, Doe does not allege that gender played any role in Columbia's decision to apply the 2019 GBM Policy to her complaint, which is a required element of any Title IX claim. Because Title IX prohibits subjecting a person to discrimination on the basis of sex, "it is understood to 'bar[] the imposition of university discipline *where gender is a motivating factor* in the decision to discipline.'"  *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (emphasis added) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714, (2d Cir. 1994)).

As Doe does not, and cannot, show that Columbia's application of the 2019 GBM Policy to her GBM proceeding had anything to do with her gender—indeed, she acknowledges that Columbia decided to apply "the old Title IX policy [to] *all* pending cases," including hers, ¶ 137 (emphasis added)—her "systemic violation" claim is dismissed.

### c.  Deliberate Indifference

Under Title IX, an educational institution can be held liable for deliberate indifference to known acts of sexual harassment in its programs or activities.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).  To survive a motion to dismiss, a plaintiff alleging deliberate indifference must plead that the school had "actual knowledge" of the harassment; that the harassment was "so severe, pervasive, and objectively offensive" that it deprived the plaintiff of

"access to the educational opportunities or benefits provided by the school;" and that the school's response was "clearly unreasonable in light of the known circumstances." *Id.* at 648, 650.

Here, Doe fails to allege she was denied educational opportunities or benefits as a result of Roe's harassment. Indeed, as Defendants point out, Doe's complaint contains no references to her education. While she alleges that "[a]s a result of Roe's actions, [she] was caused to feel fear, depression, anxiety, shame, and self-guilt," she does not allege that these feelings impacted her education. ¶ 70. In her opposition papers, Doe argues that while her complaint contains no "express allegation of loss of education[al]" opportunities or benefits, the Court nonetheless should infer that the "physical and emotional harm [that] resulted from the sexual assault" altered the conditions of her educational environment. Doc. 58 at 28. She further argues it is "inconceivable" that a student who experienced sexual assault and was diagnosed with an STI could "feel comfortable attending school as before." *Id.* at 27.

These conclusory allegations are not enough. Doe does not point to any facts showing how her education was altered, and while she speculates that any student who experienced sexual assault surely would feel uncomfortable at school, she does not put forth any allegations relating to her own discomfort and, in any event, does not show how any discomfort she felt—or, indeed, any other physical or emotional harm she suffered—was "so severe, pervasive, and . . . offensive" as to deprive her of access to educational opportunities or benefits. Because she does not allege any link between her education and the alleged misconduct, her deliberate indifference claim fails. *See Davis*, 526 U.S. at 652.

Doe's deliberate indifference claim also fails for a separate reason: she cannot show that Columbia's response to the alleged harassment was "clearly unreasonable." This is not a "mere 'reasonableness' standard." *Id.* at 649. Title IX does not require schools to "'remedy' peer

harassment" or to "ensure that students conform their conduct to certain rules." *Id.* at 648 (internal quotation marks omitted). On the contrary, a school "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49. In other words, it is a "high standard that seeks to eliminate any risk that an educational institution would be liable . . . not for its own official decision but instead for [another individual's] independent actions." *Davis*, 526 U.S. at 643 (internal quotation marks omitted). Indeed, for a court to find that a school acted with deliberate indifference, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred. *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 Civ. 2200 (ER), 2013 WL 177911, at *6 (S.D.N.Y. Jan. 16, 2013), *aff'd*, 531 F. App'x 132 (2d Cir. 2013). Liability under Title IX attaches where a school, "either through grossly inadequate action or no action at all . . . effectively causes the student to encounter discrimination." *Id.*

Here, Doe puts forth several theories in support of her argument that Columbia was "clearly unreasonable." First, she alleges in a conclusory fashion that Columbia failed to provide adequate policies, training, and supervision, where "there is an obvious need." ¶ 187. But Doe does not proffer any specifics with respect to this alleged failure; indeed, she does not point to a single deficit in Columbia's approach to sexual misconduct beyond her general complaint that its policies were inadequate. And, in any event, her allegation is contradicted by Columbia's 2019 GBM Policy and by the Investigative Report, which together reveal that at the time it investigated Doe's complaint, Columbia had in place a comprehensive and considered GBM policy, and adhered to it in adjudicating Doe's claims. *See* Doc. 12-1 at 1–56, 62–110. As such, this general and unsupported allegation cannot sustain a claim of deliberate indifference.

Second, Doe alleges Columbia was "clearly unreasonable" by purportedly excluding evidence from her GBM proceeding.  In particular, Doe alleges that Columbia excluded evidence of her mental disability as well as her response to trauma, including alleged expert evidence of these.  But Doe does not explain how the Investigative Team's process, which, consistent with the 2019 GBM Policy, involved reviewing all the records Doe submitted, determining which evidence was relevant to its investigation, and attaching as exhibits to its Report those documents explicitly relied upon in drafting the Investigative Report, was in any way "clearly unreasonable."

As provided in the 2019 GBM Policy, at the outset of any investigation into alleged GBM Policy violations,

> The Investigative Team will . . . ask each party to provide a list of witnesses and/or any relevant documents or evidence to be considered.  The Investigative Team has the *discretion to determine the relevance of any proffered witness and/or evidence and determine that certain witnesses and/or evidence should be included or excluded in the investigative process*[.]

Doc. 12-1 at 35 (emphasis added).  And, as the Investigative Report makes clear:

> On multiple occasions throughout this investigation, [Doe] offered information about her mental health to the Investigative Team[.]  [Doe] provided the Team with the following evidence:  written records from her visits to GHAP, CPS [Counseling and Psychological Services], and a private mental health professional; a letter issued by the Law School Admission Council, indicating it had granted her a testing accommodation; and, a blog post describing the concept of "trauma bonding . . . . While the Investigative Team *reviewed all of this evidence, only those documents which were relied upon in this report are attached to it as exhibits*.

Rep. at 4 n.4 (emphasis added).  Both Doe's GHAP records and the blog post were attached as exhibits to the final Investigative Report.  *See id.* at 1–2.  Beyond this, the Investigative Report demonstrates that the Investigative Team considered evidence of Doe's mental health both in its credibility findings and in its analysis of the alleged violations.  *See* Doc. 12-1 at 69, 98.

25

Doe's claim, then, that the Investigative Team excluded evidence of her mental health, including by failing to attach certain of those records as exhibits, is flatly contradicted by the Investigative Report—portions of which Doe attached to her amended complained—which reveals that the Investigative Team *did* consider all the mental health records Doe submitted and *did* attach as exhibits to the Report those records it relied upon—in its discretion—in drafting the Report.  In other words, the Investigative Team evaluated Doe's proffered evidence in compliance with the 2019 GBM Policy, using its discretion to include and rely upon only some of that evidence in its Investigative Report.[11]

As to her allegations that Columbia "prohibited/excluded evidence from expert witness[es] showing [her] mental disability and possible incapacity," Doe does not explain who these experts were or what evidence from these purported experts was excluded.  Indeed, as Defendants note, she does not plausibly allege that any such evidence was excluded at all.  At any rate, the 2019 GBM Policy is clear on experts and expert testimony:

> [I]f the Investigative Team determines that expertise on a topic will assist the Hearing Panel in making its determination(s), the Investigative Team may include in the investigative record medical . . . expert testimony and materials . . . that it deems relevant and reliable.  A party may also request that a topic be considered by an expert, but a party is not permitted to retain their own expert to consider a topic or submit testimony and/or records as part of the investigation.  In the limited circumstance that the Investigative Team grants a party's request for an expert to consider a topic, then the Investigative Team will retain an appropriate expert.

Doc. 12-1 at 36.  Doe does not show that Columbia deviated from its policy on experts, nor can she show that Columbia's compliance with this policy is in any way unreasonable.

---

[11] Doe also alleges, in her opposition, that Columbia's purported exclusion of her medical records as exhibits to the Investigative Report "deprived her of [the] opportunity to challenge the finding based on her medical records in [a] later stage."  Doc. 58 at 28.  But this ignores the fact that Doe *did* have the opportunity to challenge the Investigative Team's process and outcome as part of the appeal process afforded by the 2019 GBM Policy.  *See* Doc. 12-1 at 47.  Doe was told she could submit an appeal and was provided with instructions for doing so, but she did not submit an appeal.  *See supra* Section I(c)(iii).

In any event, any argument that Columbia was "clearly unreasonable" in complying with its own GBM policy—with respect to the use of evidence and experts, or otherwise—is unavailing. *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751–53 (finding school's response to a complaint was adequate where conducted "in accordance with all applicable procedures"); *Roskin-Frazee v. Columbia Univ.*, No. 17 Civ. 2032 (GBD), 2018 WL 6523721, at *8 (S.D.N.Y. Nov. 26, 2018) (school's response was not clearly unreasonable where the school "complied with [its] sexual misconduct policies and guidelines").

Even if Doe would have preferred "a different type of investigation, or a more expansive one," schools are "not required [under Title IX to proceed in any particular manner," *Martinetti v. Mangan*, No. 17 Civ. 5485 (KMK), 2019 WL 1255955, at *5 (S.D.N.Y. Mar. 19, 2019) (internal citations and quotation marks omitted), and students "do not have a [Title IX] right to specific remedial measures," *Bailey v. New York L. Sch.*, No. 19-3474, 2021 WL 5500078, at *3 (2d Cir. Nov. 24, 2021), *cert. denied*, 142 S. Ct. 1685 (2022). While Doe might have wanted a different response from Columbia, with regard to its use of evidence, "the standard is not whether the [school] responded in a particular manner, but whether their response was clearly unreasonable in light of all the known circumstances." *Soriano ex rel. Garcia v. Board of Educ. of City of New York*, No. 01 Civ. 4961 (JG), 2004 WL 2397610, at *4 (E.D.N.Y. Oct. 27, 2004). And Columbia's consideration and use of evidence was not, by any measure, clearly unreasonable.[12]

---

[12] Doe also suggests, for the first time in her opposition, that Columbia was clearly unreasonable by (1) not interviewing her GHAP peer advisor, (2) not permitting the NYPD detective to participate in the hearing, and (3) not permitting cross examination at the hearing. First, the GBM Policy is clear that the Investigative Team has the discretion to determine whether certain witnesses should be included and excluded; in this case, the Team chose not to interview the peer advisor, in part as that advisor is a confidential resource. *See* Doc. 12-1 at 74–75 n. 48. Second, with respect to the NYPD detective, pursuant to the GBM Policy, "[w]itnesses are not involved in the hearing process." *Id.* at 42. And third, also pursuant to the GBM Policy, only the Hearing Panel may ask questions of the parties or Investigative Team; the parties are not allowed to submit questions. *Id.* In any event, there was no

Third, Doe argues for the first time in her opposition that it was clearly unreasonable for Columbia not to have "consider[ed] possibilities beyond how [she] framed the events," such as that her "memory [or] perception might have been impaired due to [] stress."  Doc. 58 at 28.  But, as Defendants note, it cannot be "clearly unreasonable" for them to refrain from speculation, and as set out above, a plaintiff's preference for a different or more expansive investigation is not a basis for a deliberate indifference claim.  *Martinetti*¸ 2019 WL 1255955, at *4–5; *KF*, 2013 WL 177911, at *7.  Doe also alleges that it was clearly unreasonable for Columbia to have considered the possibility that Roe is innocent and to have concluded that his "fear of [the] Title IX process indicated more of his innocence than his culpability."  Doc. 58 at 28.  At the outset, the Court notes that the Investigative Team considered Roe's fear of the Title IX process with respect to his *credibility*, not his "culpability."  *See* 12-1 at 80–81.  In any event, Doe does not show how this amounts to a clearly unreasonable response, and her dissatisfaction with the Team's investigation and outcome does not give rise to a deliberate indifference claim.

Fourth, Doe alleges Columbia acted with deliberate indifference in permitting Roe to return to campus after he was previously found responsible for sexual misconduct in 2016.  In particular, Doe alleges that Roe's return to campus "made the community more vulnerable to future harassment."  Doc. 58 at 31.  But Doe cannot show that Columbia acted clearly unreasonably merely by proceeding with a disciplinary decision in accordance with its own policies and procedures.  *See* Doc. 12-1 at 44–46.

The Supreme Court has rejected the notion that Title IX requires particular disciplinary action, *Davis*, 562 U.S. at 648.  Rather, courts are pointedly cautioned to refrain from second-

---

hearing in Doe's case because she failed to attend the hearing she requested, and as a result, Roe opted to proceed without one.  *See supra* Section I(c)(iii).

guessing the disciplinary decisions of school administrators. *KF*, 2013 WL 177911, at *7–8. And courts afford substantial deference to such disciplinary decisions. *See, e.g.*, *Davis*, 526 U.S. at 648; *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012). As *Davis* makes clear, and as set out above, Title IX does not require schools to "purg[e] their schools of actionable peer harassment" or to take "particular disciplinary action;" nor does Title IX grant students the right to make particular remedial demands." *Id.* at 648.

At bottom, Doe's deliberate indifference claim is little more than a complaint that she was in some way deprived access to other, different procedures that she would have preferred, but, as Defendants note, a mere preference for different procedures or, indeed, dissatisfaction or disagreement with the procedures used is insufficient to state a claim for deliberate indifference. *Martinetti*¸ 2019 WL 1255955, at *4–5; *KF*, 2013 WL 177911, at *6. As such, Doe's deliberate indifference claim is dismissed.

### d.  Erroneous Outcome

Erroneous outcome claims rest on allegations that the "plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F. 3d at 715. Accordingly, erroneous outcome cases "[t]ypically [are] . . . brought by individuals who have been accused of and found responsible for committing misconduct." *Roe v. Pa. State Univ.*, No. 18 Civ. 2142, 2019 WL 652527, at *10 (E.D. Pa. Feb. 15, 2019) (collecting cases). In light of this, Defendants argue an erroneous outcome claim should not be available to Doe as a matter of law. Even if such a claim were available to her, however, as Defendants further argue, she has failed to plead it.

To plead an erroneous outcome claim, a plaintiff must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) that "gender bias was a motivating factor behind the erroneous outcome."

*Yusuf*, 35 F.3d at 715.  Put another way, a plaintiff must plead "the existence of gender bias, an incorrect outcome, and a 'causal connection' between the bias and the error." *Feibleman v. Trustees of Columbia Univ. in City of New York*, No. 19 Civ. 4327 (VEC), 2020 WL 882429, at *8–9 (S.D.N.Y. Feb. 24, 2020).

Absent direct evidence of gender bias, a plaintiff may allege facts supporting a "minimal plausible inference of discriminatory intent." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016).  Specifically, "clear procedural irregularities in a university's response to allegations of sexual misconduct," *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019), combined with a "concrete motive to discriminate on the basis of gender," is sufficient to create such a "minimal inference." *Feibleman*, 2020 WL 882429, at *9 (citing *Doe*, 831 F.3d at 57).

The Second Circuit has made plain the robust showing required to plead a "clearly irregular" process for purposes of an erroneous outcome claim under Title IX:  "we emphasize that our standard requires *clear* irregularities to raise an inference of bias," and "minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.3d at 34 n.50.  As an example, the plaintiff in *Menaker* plausibly pled "clear irregularities" where Hofstra University allegedly "completely disregarded" the process set forth in its own harassment policy, including failing to interview witnesses, not allowing the plaintiff to respond in writing, and not producing a written determination.  *Id.* at 34–37.

Here, Doe attempts to allege various irregularities with her GBM proceeding, and suggests these are the result of Columbia's broader scheme to redress accusations of anti-male bias.  In other words, Doe argues that Columbia, in an attempt to refute criticisms that it had been improperly favoring women in handling sexual misconduct proceedings, skewed her proceeding so as to find in favor of Roe.

Doe's purported irregularities generally fall into three categories:  first, Doe objects to the Investigative Team's use of evidence, namely its exclusion or inclusion of evidence, as well as its failure to consider certain evidence; second, Doe objects to the Investigative Team's findings, which she alleges resulted from assumptions and speculation, as well as improper interpretations; and third, Doe objects to the investigative process—that the Investigative Team wrongly applied the 2019 GBM Policy to her proceeding and that it took "708 days" to complete its investigation.

As to the irregularities relating to the Investigative Team's use of evidence, Doe alleges in particular that the Investigative Team:  requested her STI results and mental health records, but not Roe's; excluded evidence of Roe's mental condition, as well as evidence that he planned to seek help; excluded Doe's explanation of "reactive abuse," information relating to Roe's alleged history of sexual misconduct, and information relating to Doe's civil suit against Roe; included Roe's reporting of Doe's violation of the No-Contact Directive, but did not include Doe's reporting of Roe's alleged violation; included Doe's communications with the NYPD detective, but not Roe's attorney's communications with the detective; and excluded original documents from the NYPD.  She also alleges that the NYPD incident report differs from the NYPD detective's testimony, and that the NYPD detective "testified against" her.

But Doe cannot explain how any of these is clearly irregular, given the fact that, for each of its decisions regarding whether or how to consider evidence, the Investigative Team—pursuant to the 2019 GBM policy—has the discretion to determine the relevance of any proffered evidence and also to determine whether such evidence should be included or excluded in the investigative process.  As discussed above with respect to Doe's deliberate indifference claim, it is clear the Investigative Team considered all the evidence both parties submitted and then, using its discretion and in compliance with the GBM Policy, made determinations as to

relevance.  *See supra* Section III(c).  Doe does not and cannot allege that the Investigative

Team's exclusion of certain evidence—of, for example, her explanation of so-called "reactive

abuse" or the civil suit she separately filed against Roe—evinces some "clearly irregular"

process and is not, instead, the result of its discretion, as prescribed by the GBM Policy.

As to the purported asymmetry with respect to requests for mental health records and STI

test results, the 2019 GBM Policy makes clear that while the Team will ask each party to provide

any relevant documents or evidence to be considered, a party is not required to provide any

particular evidence for an investigation to proceed.  Doc. 12-1 at 35.  In any case, there is no

discussion of any party's STI test results in the Investigative Report's Findings and Analysis; and

as to evidence relating to Doe's mental health, the Investigative Report is clear that Doe *offered*

evidence of her mental condition—the Team did not request it.  Rep. at 4 n.4.  And as to Doe's

complaint that the Team excluded evidence relating to Roe's alleged mental condition, the 2019

GBM Policy is explicit that "[e]ach party has the right to request that evidence regarding their

mental health diagnosis and/or treatment be excluded from consideration when responsibility is

being determined."  Doc. 12-1 at 37.

As to any evidence of Roe's alleged past sexual misconduct, the 2019 GBM Policy is

clear that "[p]rior reports or determinations of responsibility for gender-based misconduct will

not be considered in determinations of responsibility . . . and will therefore not be addressed in

an Investigative Report."  Doc. 12-1 at 37.  And as to alleged violations of the No-Contact

Directive, the 2019 GBM Policy is also clear that these can be "investigated separately through

the Dean's Discipline process *and/or* folded into the pending investigation, based on the

circumstances of the allegations."  Doc. 12-1 at 11 (emphasis added).  Doe does not allege how

the Team's choice to exclude her report of a violation—namely, that Roe violated the No-

Contact Directive when his lawyer reached out to Doe's lawyer to discuss settlement of a civil suit she brought—reflects any deviation from the GBM Policy.

As to Doe's allegations with respect to the NYPD, these too do not reveal any irregularities in Columbia's process.  As background, the Investigative Team, as part of its investigation, interviewed the NYPD detective who had interviewed Doe regarding her August 2019 report.  Rep. at 7–8.  According to the Investigative Report, the Team found the detective "consistent throughout his sole interview" and determined he "did not present a bias for either party."  Doc. 12-1 at 89.  Doe alleges the Investigative Team included her "response to the . . . detective," but excluded Roe's "response;" but Doe does not detail what her "response" is, and while she alleges that the NYPD detective interviewed Roe's attorney—not Roe—several times, she does not explain why the Investigative Team would include any such conversations in its Report.  As to her allegations that the Team excluded "original documents" from the NYPD investigation, she does not allege what these documents are or that the Team ever received any such documents.

Last, Doe objects that there are discrepancies between her NYDP report, which she attaches to her amended complaint, *see* Doc. 12-1 at Exhibit D, 59–61, and the NYPD detective's testimony, *see* Doc. 12-1 at 89.  But, as Defendants point out, Doe at no point indicates that the person who completed the NYPD report is the same person who met with and interviewed her and who was subsequently interviewed by the Investigative Team.

Next, as to the irregularities relating to the Investigative Team's findings—and, in particular, Doe's contention that the Team wrongly found her not credible—Doe alleges the Investigative Team considered Roe's candor in determining his credibility, but did not consider Doe's candor; and that it wrongly interpreted her emotional responses to Roe, by failing to

33

properly consider the effects of her PTSD and her fear of the risks associated with unprotected sex.

As set out above, after considering a wide range of evidence and engaging in an in-depth assessment of that evidence in a section spanning nearly 15 pages in length, the Investigative Team found neither party wholly credible.  At the outset, Doe's allegation that the Team credited Roe for his "candor," but did not do the same with respect to her candor, is refuted by the Investigative Report.  *See*, *e.g.,* Doc. 12-1 at 67–68 (recognizing Doe as "forthcoming").  And Doe's allegation that the Team wrongly interpreted her feelings of anger and resentment is no more than a disagreement with the Investigative Team's credibility determinations; that alone does not amount to an irregularity in process, clear or otherwise.  *See, e.g.*, *Doe v. Vassar Coll.*, No. 19 Civ. 9601, 2019 WL 6222918, at *8 (S.D.N.Y. Nov. 21, 2019).  The same is true for Doe's allegations that the Team's conclusions with respect to her relationship with Roe were improperly informed by assumptions, speculation, and "victim-blaming" theories, and that they did not fully or appropriately consider her PTSD or the risks associated with unprotected sex: these are indicative of her dissatisfaction with the Team's determinations, but ultimately are conclusory, and unsupported by the findings in the Investigative Report.

And, finally, as to her complaints about process, neither the use of the 2019 GBM Policy nor the length of her GBM proceeding amounts to a clear irregularity.  As discussed above, Columbia did not err in applying the 2019 GBM Policy to Doe's complaint, and there is no evidence that any delay—the investigation took just over a year and a half—was unjustified.  *See* Doc. 69 at 11 (explaining length of investigation as resulting from, among other things, a cross-complaint filed by Roe; numerous interviews of multiple witnesses, a substantial record, and a pandemic requiring that the Team conduct portions of the investigation remotely).

Ultimately, Doe does not allege any facts showing how Columbia's compliance with its own policy amounts to a "clearly irregular" process.  In other words, she has not plausibly alleged any clear irregularity in the investigation or adjudication of her complaint sufficient to show an interference of gender bias or to cast some doubt on the accuracy of the outcome of her proceeding.[13]

In any event, Doe's erroneous outcome claim fails for another reason:  she is unable to allege a minimal plausible inference of gender bias.  As Defendants note, Doe's allegations that gender was a motivating factor in the investigative process are entirely conclusory:  she generally alleges that Columbia skewed its investigation as a means to rebut public criticism of purported anti-male bias, but does not cite to any facts supporting this claim.  *See Doe v. New York Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020), *appeal dismissed* (June 8, 2020) ("Plaintiffs' allegations are conclusory and insufficient to establish a plausible inference of sex discrimination considering he neither establishes that NYU was under public criticism during the pendency of the underlying investigations and proceedings nor does he establish Defendants' knowledge of the purported criticisms.") (internal quotation marks omitted); *see also B.B. v. The New School*, 2018 WL 2316342, at *8 (Apr. 30, 2018 S.D.N.Y) (Plaintiff failed to allege gender bias in part because he failed to allege anything specific to suggest defendants held anti-male biases.).

## IV.    CONCLUSION

---

[13] Beyond these, with respect to "clear irregularities," Doe also puts forth a number of allegations that are entirely unsupported.  In particular, Doe alleges that her assigned *pro bono* counsel helped Roe evade liability and helped Columbia "avoid[] public exposure" of its sexual assault proceedings, Doc. 58 at 34; that Columbia "must have . . . altered/falsified" testimony, *id.*; that Columbia "evade[d] discovery," *id.* at 35; that Columbia "fabricated and excluded . . . inculpatory evidence," *id.*; that Columbia, whenever confronted with "suspicious behavior by Roe . . . would rather exonerate him than incriminate him;" *id.* at 38; that Columbia "conflate[d] the concept of revictimization and recidivism," and "stigmatized [her] disability; *id.*; and that Columbia "assume[s] that every college student conform[s] to . . . 'hookup' culture[.]"  *Id.* at 39.  On each of these points, Doe does not provide any factual basis, beyond speculation.  Because these are conclusory, the Court declines to consider them.

For the reasons set forth above, Defendants' motion to dismiss the amended complaint is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 46.  Doe may file an amended complaint, consistent with this opinion, by September 22, 2022.  If she does not file an amended complaint by that date, the case will be closed.

It is SO ORDERED.

Dated:    August 25, 2022
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.