UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x
: 
JANE DOE :
:
:
  *Pro Se* Plaintiff, :
: Case No.: 1:21-cv-05839-ER
:
  -against- :
:
: **EXTRA-PLEADING**
: **MATERIAL IN SUPPORT**
: **OF CONVERSION OF**
THE TRUSTEES OF COLUMBIA UNIVERSITY IN : **12(b)6 MOTION TO**
THE CITY OF NEW YORK : **MOTION FOR SUMMARY**
: **JUDGEMENT**
  Defendant :
:
-------------------------------------------------------------------------- x

Dear Judge Ramos,

    *Pro se* Plaintiff submits this letter under Rule 12(d) to present the Court evidentiary material directly related to defendant's defense in its opposition and reply brief. Specifically, parties disagree over what role did Dr. Rachel Efron play during her time at Columbia. Dr. Efron joined Columbia around 1991 and retired in September 2019. Since her departure, Dr. Efron and plaintiff's doctor-patient relation has ceased.

    The attached exhibit of this letter was written by Dr. Efron around 2006, as part of the training material presented to GBM office's hearing panelists for adjudicating campus sexual misconduct cases. Areas highlighted in red are Dr. Efron's explanation about trauma responses "fawn" and "freeze" that are typically exhibited in student survivors (when the offender is usually another community member); areas highlighted in purple (with plaintiff's annotations on the margin) bear on "clearly unreasonable" and "loss of educational benefits" of deliberate indifference claim.

    In this material, Dr. Efron repeatedly emphasized there is a "logic" in many victims' counter-intuitive reactions to sexual assault. This particular "logic" is actually "retroflection" under Gestalt theory[1], as plaintiff clearly explained in SAC at 166-172; and Exhibit A and B are in fact complementary to Dr. Efron's explanation. Exhibit A talks about what was happening with the victim when he/she react to the assault in a counter-intuitive way—that a part of his/her personality "temporarily went out of existence", "turning the destructive impulse against one part of his personality, and the ensuing dispersal of emotions, kept his anxiety in a latent state". Doc.73-2.

    Although Dr. Efron didn't address *why* certain victims react to trauma with counter-intuitive behaviors and *how* to treat those victims as plaintiff did in her pleading, she did illustrate how do victims with "fawn" and "freeze" response typically look like to GBM office's factfinders of sexual assault cases (way before Emma Sulkowicz's alleged incident in 2012 and

---

[1] As many other mental health professionals in U.S., Dr. Efron does not use Gestalt modality in psychotherapy. [1]

plaintiff's alleged incident in 2019). However, the counsel maintained in its recent briefs that GBM office's employees could not recognize plaintiff's trauma response— "fawn"[2] and "freeze" as evidence of her alleged assault, instead, her friendly and appeasing attitudes towards her offender proved her to be "not credible".

When defendant repeatedly argued that it has "considered" plaintiff's all submission of evidence during investigation, it actually meant that the Title IX Team only considered the *relevance* of plaintiff's medical records (produced by Dr. Efron)—which it determined to be "irrelevant" to her case; it never admitted/considered the contents of those records as evidence in determining plaintiff's credibility and making recommendation.

Determining GBM office's own expert testimonials on plaintiff's sexual assault case as irrelevant, is "clearly unreasonable".

Assuming the counsel never made deliberate false statements to the court, if defendant do not challenge the authenticity of the attached material by showing evidence, the court should admit this material as evidence in deciding the instant motion and/or motion for summary judgment at later stage.

Dated: January 3, 2023                                                                                         Respectfully,

/s/ JD
*Pro Se Plaintiff*
Jane Doe
PO Box 297
New York, NY 10044
646.920.4618

---

[2] '*Fight or Flight' Are Not the Only Ways People Respond to Sexual Assault* (January 13, 2020) https://www.vice.com/en/article/v74eqj/fight-or-flight-and-harvey-weinstein-sexual-assault-trial-defense

# Psychological Dynamics of Sexual Assault

Rachel Efron, Ph.D.
Counseling and Psychological Services
Health Services at Columbia
Columbia University
(re15@columbia.edu)

Note: This was written as part of the training of Sexual Misconduct Hearing Panelists.  Dr. Efron is a therapist with the campus counseling center with more than twenty years of working with survivors of sexual assault and childhood sexual abuse.  She is the clinical advisor to the campus rape crisis center and a sexual abuse specialist.

I remember reading in an interview with Jody Foster, just after she played a rape victim in *The Accused*, that she made the movie to dramatize what she called "society's second assault."  By this she meant the disbelief, misunderstanding, judgment, and sometimes the blame that are part of the reactions to sexual assault victims of police, judges, juries, teachers, and even friends and family.  Someone who has already been brutalized, Foster said, can experience such attitudes as a second, devastating, attack.

As I remember it, Foster dismissed these attitudes as simple misogyny.  There is something to this: the misogynist tendency to devalue women's experiences -- to devalue women in our society -- makes it easier to diminish the pain and anguish felt by rape survivors.  But the real reasons why many people react to sexual assault skeptically or uncomprehendingly are more complicated than this.  We have all seen shows in which a woman who is raped is reduced to tears on the witness stand: Why didn't you run?  Why didn't you scream?  Why didn't you fight back?  What were you so scared of, if he didn't have a weapon?  Why were you alone with him in the first place?  Why were you friendly to him after he raped you?  Why didn't you "see the handwriting on the wall"?

These questions imply criticisms -- criticisms like "you should have run, you should have screamed," and criticisms like "you should stop obsessing about being raped already," and criticisms like "you're exaggerating what happened" -- but one need not be a stone-hearted lawyer or a misogynist to ask them.  For those of us who have not experienced sexual assault, or who are not otherwise intimately familiar with its psychological dynamics, the answers to these questions are not obvious.   The fact is, the psychological dynamics of sexual assault are more complex than we usually take them to be.  They are not simply intuitive.  It is easy to misunderstand sexual assault survivors, even if we are sympathetic, because sexual assault and its psychological effects are simply hard to understand from our normal workaday perspective.

In this essay, I want to begin to explain why this is so.  I will emphasize two things: (1) how gender and sex role socialization affect the dynamics of sexual assault, and (2) how the dynamics of trauma affect the reactions of survivors of sexual assault.  Together, these will begin to illustrate the context in which sexual assault takes place and in which victims react to it, and to illustrate the *logic* of sexual assault and victims reactions to it.  Together they begin to account for why victims behaved and continue to behave in ways that may seem to us counter-intuitive and confusing.

So let me begin by considering sex role socialization, and how it affects female victims in particular.  (Of course, though most sexual assault victims are women and most offenders are men, some victims are men and some offenders are women,  almost always in the context of same sex dyads, and in those cases the impact of socialization is different from what I am about to describe.)  Scientists these days differ about the degree to which biology influences sex roles, but everyone agrees that cultural attitudes, metaphors, language, and beliefs exert a great influence on how females and males see themselves, their relationships, and sexuality.   There is

overwhelming evidence -- I won't rehash the sources here -- that women learn to diminish or ignore their own judgment, especially when it contradicts with that of another – especially when that other is a male. They learn (far more than men) the importance of pleasing others, attending to the needs of others even to their own detriment, not hurting or embarrassing others, avoiding conflict, and not "making a scene" or embarrassing themselves. And they learn that in relation to men-- they are not powerful or perhaps often accurately, that they are not physically strong. And, they don't learn how to defend themselves physically.

All this socialization systematically affects how women act and react in situations that lead to sexual assault. Women often tell me that fear of conflict or social embarrassment prevented them from acting decisively after they had said no and were ignored. Reviewing after the fact the circumstances in which they were assaulted, many women report that they ignored their first feelings of discomfort or danger, and as a result maybe missed an opportunity to escape. Many women also explain that they felt overpowered by the implicit threat of force alone. Research suggests that most men do not need to use high levels of force or severe threat of force to obtain intercourse against a woman's will. In most cases, they simply ignore her protests and use their greater size and weight to continue until a sexual assault is completed.

It is hard to grasp (and therefore easy to underestimate) the extent to which women – particularly bright, creative, ambitious, successful women like those we see at Columbia and Barnard – behave in accordance with the socialization I have just described. Not all women do, of course, but research suggests that most do. As a psychologist at the counseling service every day I talk to women who are afraid of hurting any one's feelings, of putting their needs above others, of trusting themselves. Though philosophically they do not believe that this is how they should behave as women (and in fact they often are embarrassed about acting in line with these beliefs), they nonetheless find it hard to behave differently. Exactly why this is so is a matter of some controversy, which need not concern us today. What is important, and not controversial, is the fact that many women have cognitive and behavioral tendencies or patterns that make it harder for them to conclude that they are in danger, and harder to act decisively to save themselves, and harder to cast blame, without ambivalence and guilt, on the person who sexually assaulted them.

Understanding these cognitive and behavior tendencies and patterns is crucial to understanding many instances of sexual assault. To many people, it sounds odd, almost unbelievable, when a woman explains that she let a man who frightened her, into her room simply because she didn't want to embarrass him or hurt his feelings. But, in light of the socialization I've been describing, this explanation makes perfect sense. And it might sound odd when she explains that she didn't kick him out of her room after she refused his advances because she didn't want to make him feel uncomfortable. But in light of the socialization I've been describing, this makes perfect sense. And when she explains that she believed him when he said he would just sleep over and not "do anything," it makes perfect sense. And when she explains that when she woke up and he was having intercourse with her, she told him to get a condom because she didn't think that she could make him stop but at least she hoped not to contract an STD or get pregnant while being raped, this makes perfect sense. And if she didn't scream because she didn't want to make a scene or because her younger cousin was next door and she didn't want to impose this on her, this makes perfect sense. And if she acted like nothing happened the next day because she didn't want to hurt his feelings or embarrass herself, this too makes perfect sense.

To the objective observer after the fact, each of these stages may seem like a terrible mistake in judgment. But what's crucial is, given how women in our culture see themselves, each stage has a certain irreducible logic, and each makes perfect sense.

At the same time, gender socialization encourages men to behave in sexually aggressive ways and helps rationalize this behavior after the fact. If an accused rapist says that he thought she had consented, he may have believed that consent is implied when a woman dresses in certain ways, drinks, goes to a man's room, shows that she likes the man, allows him to pay for her dinner, is affectionate, is sexual in any way or is known to have been sexual in the past. Such

notions have some cultural currency, and many men have been taught to embrace them. Even if an aggressor recognizes that a woman did not consent, he may still believe that consent is not really important for good sex. In books and movies, it is often taken for granted that it is the man's job to be dominant, and that women's protests should be ignored, and that knowing that "no" really means "yes" is all "part of the game." Such socialization cannot forgive the assault of women, of course. My point is only that you must take it into account if you are to understand, for example, how a man can assault a woman while at the same time believing that he did nothing wrong. This combination seems obviously illogical, but it makes sense in light of certain male socialization.

What I have been trying to say is this: Anthropologists long ago discovered that we cannot understand behavior without understanding the culture in which it takes place. A dance can be a celebration, a prayer, a warning, an expression of gratitude, hope, fear, depending upon its cultural circumstances. The behaviors surrounding sexual assault also depend upon their cultural context. As panelists, you may sometimes wonder why a woman did not act more quickly, more decisively, more forcefully. If you ignore gender socialization, your first intuition may be that she didn't do so because at some level she acquiesced to the sex. But if you take sex role socialization into account, a very different, more accurate picture will emerge.

There is much more to say about this, of course, but let me move now from my first large subject -- socialization -- to my second and last -- trauma. Here too attending to the context (the physiological and psychological context, in this instance) helps make sense of behavior that seems otherwise confusing and illogical. I will focus on two main topics:

First, what happens during a traumatic event like a sexual assault that makes people behave in some of the ways they do. And, second, what happens after an assault that makes survivors describe what they experience in the particular ways they do. That is, why might a person not look distressed, not be able to remember details, remember some things and not others, not be angry, choose to tell friends that they had a good time or choose to report only years after the incident occurred. Also, what kinds of distress does a survivor tend to report when they are at the stage when they can know and speak about their distress. What are the behaviors, feelings, thoughts, and experiences that survivors tend to report that are different from those of people who have had bad sexual experiences.

As was true in my discussion of socialization, my intent in describing the impact of trauma is to provide you with tools to better evaluate the content and presentation of the alleged survivor – to help with decisions about what happened, culpability, and appropriate sanctions.

Before I begin with the first of these things, I have to make a disclaimer and in some ways the disclaimer is as important as anything else I'll say.

That is, that trying to accurately describe, with its full force, what this experience is like – both parts, being assaulted and then trying to speak about it, perhaps especially to people with your jobs as hearing panelists, is almost impossible. At least I have not been able to find ways to convey it. Generally in an attempt to understand, all of us begin with our own experiences and approximate how another person's experience is similar or different from this. What makes understanding trauma so hard and in fact, so easy to not even know that one has misunderstood the experience, if you have not been traumatized or have been close to traumatized people, is that it is distinctive from other human experiences. It is not just an extreme version of what happens in every day life, the small and not so small ways we are all victimized to some extent by every day life. The difference is not quantitative – it is a qualitatively different experience – a different country. As I alluded to initially, it has a logic and dynamics that is different from normal day to day logic. It is, by definition, for the victims – an experience that does not fit into their existing conceptual schemata and thus it overwhelms them – and for us as listeners it does not fit in our conceptual framework and can overwhelm us or maybe more likely, it can escape us (a luxury of course the victims don't have), and we may not even know it.

Now what does this gap between "normal" and traumatic experience mean, and why is it important?  For one thing, it means that it is very easy to misunderstand someone who has been sexually assaulted: The behavior of someone who has been raped or assaulted sometimes seems utterly mysterious.  Why didn't she stop it?  Why didn't she just leave?  Why was he so frightened when he didn't use a weapon?  Why is she so devastated when she wasn't physically hurt? Why did he talk to him afterwards?  Why didn't she report earlier?  Why can't he talk about it? Why can't he stop thinking about it? These are all good questions in the logic of everyday life, but they often fundamentally misunderstand something about the nature of sexual assault. It means that it is easy to become impatient with survivors.  Sometimes it's just not obvious – using the logic of every day life – why survivors behave as they do, and this can be frustrating.  It means that it is easy to become skeptical about their version of events.  Sometimes the pieces just don't seem to fit together or pieces seem to get added as time goes on and this leads some people to conclude, wrongly, that a victim is exaggerating, or remembering wrong, or making a big deal out of something small.  For all these reasons, the persistent gap between "normal" and traumatic experience means that it is very easy to make logical judgments that may be inaccurate-- to conclude that a survivor consented when she didn't, that there was an unfortunate honest misunderstanding, or that he has not been terribly hurt, when he has.

Now this gap between the logics of "normal" and traumatic experience is not unbridgeable.   In the remainder of this paper I will sketch in rough detail some key features of the trauma of sexual assault and its impacts.  Just like it's possible to learn another language or to come to understand a foreign culture, it is possible, with effort, to better understand the experience of someone who has been sexually assaulted (and I hope that what I write will help build that understanding).  But it remains important to remember and acknowledge the gap between our experiences and theirs, if we are not survivors.   It is important precisely because, try as we might, there will be times for all of us when we'll be sitting face to face with a victim, and the pieces won't all fit together.  We won't understand why she did or didn't do this or that, why he's reacting in this way and not the other, why she seems to be ignoring some things and obsessing about others.  At this moment, it is crucial for all of us to remember that we may simply not understand the logic and syntax of a traumatized victim, a logic and syntax that might be very different from our own.

With that disclaimer in mind, let me try to explain a little about the experience of sexual assault. Sexual assault involves the violation of the victim's body in its most intimate places, of her/his sense of safety, sense of power and control, and sense of how the world and human interactions are supposed to function.  In the situation when an assault is perpetrated by a date or friend or acquaintance or a member of the same community, there is the additional violation of trust.

During the past 30 years much research has been conducted about the impact of all kinds of traumatic events and clear findings emerge from this.  Within the literature, traumatic events are defined as ones that evoke intense fear, helplessness, and feelings of loss of control.  They violate the autonomy of the person at the most basic level.   They are events during which there comes a time when the victim realizes that the perpetrator is intent on doing something that she or he doesn't want and the perpetrator doesn't care. It involves being taken by surprise and feeling trapped.  This can happen even when there is no severe force or threat of force as I mentioned earlier.  It is the knowledge that what will happen is not under the victim's control at all that terrifies.  At times it is hard for outsiders to really understand the level of terror – most rape victims report being afraid for their lives even if there was no weapon or violence other than the sexual assault.   Victims realize that their point of views, needs, desires count for nothing and they realize how powerless and helpless they are.   Extreme powerlessness, is one of the most deadly and devastating feelings, one to which people go to all kinds of extremes to avoid recognizing.

When a person realizes (or perceives because the other person is stronger or so gone emotionally that she can't make contact with him and then anything is possible), that neither resistance or escape will work, terror and helplessness take over.  This results in the victim's

physiological and psychological systems of self-defense becoming overwhelmed and disorganized.  Perceptions become inaccurate and pervaded with panic, sense organs may stop functioning (e.g., she may feel no pain), the autonomic nervous system may become disorganized, she may go into a state of surrender, he may escape from the real world by altering his state of consciousness – freezing, numbing, dissociating.  She may not even know what's happening.  As one rape survivor explained, "I left my body at that point.  I was next to the bed, watching this happen.  I dissociated from the helplessness.  I was standing next to me and there was just this shell on the bed".

Sometimes situations of inescapable danger may evoke not only terror but paradoxically a state of detached calm in which terror and pain dissolve.  Events continue to register in awareness, but it is as though these events are disconnected from their ordinary meaning.  Perceptions may be numbed or distant, resulting in partial amnesia or loss of particular sensations or affect.  Sense of time may be altered (the victim may feel that every thing is moving in slow motion or she may temporarily lose touch with reality).  She may feel like the event is not really happening or like he is in a bad dream from which he'll wake up.  These perceptual changes combine with a feeling of indifference, emotional detachment, and profound passivity so the victim gives up all initiative and struggle.   As one rape survivor put it "I couldn't scream.  I couldn't move.  I was paralyzed like a rag doll".

I will now briefly discuss some of the aftereffects of an assault, those with particular relevance for reporting and presentation with reporting.  Some of these happen right away and some after time.  Some are intermittent and some are constant.

**Shock, Denial, Confusion, Selective Memory**

Especially immediately and often for months after an assault but for some people for years or forever, survivors don't believe that anything really bad happened to them.  Bodies are wired to, at times, block out or distort what is too overwhelming so survivors may remember nothing or only parts of what happened. They may experience intense emotion but without clear memories of events or they may remember something and not others but with no affect.    As I mentioned earlier, it is a horrendous thing to truly feel the powerlessness that comes with labeling oneself as a sexual assault or rape survivor.  Even though they lived through the event, because of denial and shock, they not consciously have experienced the powerlessness.  Naming, even for themselves, much less for anyone else, what happened is usually one of hardest tasks faced by a survivor.  Often only with distance from the assault and with dealing with it over time can they do this.

<u>Implications:</u>
- Survivors may not report for a long time.
- When they do tell you what happened, they may appear confused.  They may fill details that they didn't initially have.  They may present with inconsistencies.  This may make you wonder if they are making things up.  But in fact it is not an indication that they are embellishing or creating what happened.  Rather, as the pain and feelings of being overwhelmed decrease as the assault is more distant or as the victim works it through (or sometimes the denial just stops working), the unconscious need to repress and deny decreases and more details become consciously available.

**Shut down/Minimization**

Even when survivors are past denying or repressing, in order to not be overwhelmed and devastated, there is a strong need to act as if what happened was not such a big deal.   People try to get on with their lives -- "put it behind them".  So they shut down, they have few symptoms or they ignore the ones they have.  They try to be as functional as they have always been.  In fact one of the hallmarks of Posttraumatic stress disorder/Acute stress disorder is vacillating between

shutting down and being flooded by emotions. Survivors often use inaccurate cultural beliefs – such as nothing happened because there was no intercourse, there were no bruises etc, to justify their minimization and numbness.

Implications:
- They may present as cold, detached, feeling nothing – this may make it hard to believe that the person was really affected by what happened and therefore one may wonder if anything happened or if it was serious enough to warrant much sanctions.
- They may remember everything in detail but without any emotion – again making you question their credibility or how much they were impacted.
- Again, they may wait to report (sometimes in response to no symptoms or in an attempt to ignore the symptoms).
- They may have symptoms but don't want to tell anyone else because that it makes the devastation feel more real when it is spoken out loud. So they may report but not tell you what is really going on for them.
- They may try to protect the offender (also helps make the trauma less real).

**Depression**

Long after the event, many traumatized people feel a part of them has died. Sexual assault survivors tend to be more depressed and for longer periods of time than even other trauma survivors – often for many many years. Research suggests that 1 in 5 rape survivors make a suicide attempt after a rape. When people are clinically depressed, they report feeling sad and empty most of the time, they have little interest in anything, they have trouble eating and sleeping, they are agitated, have little energy, they feel worthless, inappropriate guilt, they can't think or concentrate, are indecisive, and they think about suicide.

Implications:
- They may not have the energy to report for a long time or to do it effectively.
- They may be shut down, inarticulate, may not show affect (sometimes depressed people look really sad and other times they just look flat).
- They may seem ambivalent, confused, spacey, and have difficulties making decisions.
- They present as helpless or passive. The assault taught them that it matters not at all what they want. As protection from profound disappointment and/or as a result of the depression, they may not want to invest in anything, even the disciplinary procedure that they initiated (e.g., they may not return calls or give requested information in timely way, or seem uninterested or not invested).

**Anxiety/Intrusion**

Hyperarousal is a major symptom of PTSD. Survivors alternate between spaciness and hypervigilance. They often have poor tolerance for arousal and difficulty modulating emotion. Subsequent stress may be processed with actions, not words or by feeling overwhelmed.

Implications:
- They may be inattentive, forgetful, seem very disturbed, paranoid, or misperceive things easily.
- They may seem untrustworthy, unreliable, unstable. (It is often hard to remember that you are seeing the person after the trauma. Because trauma wipes out so much of person's normal ways of coping, you really can't tell what a person was like before the trauma if you didn't have prior experience with her/him).
- They may become stressed by reasonable requests.

**Shame, feeling dirty**

When shameful acts are committed against someone, the victim feels shame.  When the arena is sexual, there is lots of shame. As we've discussed, we have a culture that blames victims and offenders blame victims. This leads to shame.  The multitude of what can feel like contradictory aftereffects – liability, not being able to cope as accustomed to, difficulties functioning, numbness, being overwhelmed by feelings can make people feel out of control or crazy which leads to feeling ashamed.

Implications:
- They may be slow to report.  When ashamed (the feeling that something is inherently bad or damaged about you), it is extremely difficult to come and tell someone (especially someone in authority).  Survivors feel ashamed to talk about what happened; often feel they have no right to talk.
- They may blame themselves too much and/or not be able to advocate for themselves.
- They may not show panelists how bad they really feel, how severe the symptoms really are.  Columbia students are particularly good at looking together, functional.
- They may try to protect the offender (even while reporting them).

**Guilt**

Culture blames the victims.  Also survivors may have done things to survive, and to try to minimize harm once they felt there was no escape – like going along, like talking to offender after the assault – all the things I discussed initially.  Just like many observers don't know what trauma does to people, survivors often don't understand why they reacted in the ways they did and initially they too may blame themselves. Perhaps most importantly, self-blame is an essential coping strategy to deal with powerlessness and helplessness.  "If it's my fault, it I hadn't done this, it wouldn't have happened to me, it won't happen again."

Implications:
- They take too much responsibility.
- They may not be able to name what happened for a long time.
- They may have initially told someone that what happened was their fault.
- They may try to protect the offender.

**Mistrust of self and others, Disconnection, Alienation**

Because of the extreme violation and betrayal perpetrated against them, survivors generally feel that the world is no longer safe, that they always have to be prepared for danger, the unexpected, and that there is no protection.

Implications:
- They won't trust you or the system to understand or to not hurt them.  They may not seem responsive to you even though you are trying so hard to understand.
- Because they learned that nothing is as it appears to be, they may appear paranoid which may make you question their judgment.

**Anger/rage**

They may be filled with anger and rage for obvious reasons

Implications:
- They may come across as uncooperative or hostile.
- They may in fact be uncooperative.

- You may dislike them, distrust them.

Until now I have emphasized the effects of trauma that lead victims to act in a way that, at first blush, seems confusing or illogical. Trauma has other effects, as well, of course, which deserve at least a quick mention because they too are helpful in understanding the impact of assault in making judgments about what happened and what should be consequences. These include overwhelming psychic pain, flashbacks, night terrors sometimes during which they wake up screaming or crying, recurrent and persistent replaying events, inability to concentrate, restriction of social activity, poor school performance, anxiety, panic attacks and phobias (of such every day things as brushing one's teeth, getting on the subway, cab, elevator, of taking off one's clothes to take a shower), isolation, increased alcohol and drug use, poor sleep and eating habits, difficulty modulating mood, inability to use existing coping strategies, acute medical problems such as physical injuries, pregnancy, STD and chronic medical conditions such as pelvic pain, headaches. Self injurious behavior like cutting and burning are not uncommon as are thoughts and plans to kill oneself as I've discussed. In general, thoughts and feelings about the assault and the behaviors used to cope with them often take over the survivor's life and identity, much to their shock and horror.

We find these consequences if assault was technically a rape or not, if a penis was used or not, if weapon – other than body—was used or not, if the person was in relationship with offender or not, if the person had been sexual before with that person or someone else or not, if person had been victimized before or not.

It is crucial to recognize that these things do not happen after people have "bad sexual experiences" – when they have been sexual and they wished they hadn't been. When I see people who have had a sexual experiences that didn't feel good or ones they wished they hadn't had but to which they consented, they may feel sad, confused, guilty or even ashamed, but they are not overwhelmed by the kinds or intensity or breadth of symptoms I have just described. They don't feel like they have lost themselves and their lives. Many people who deal with sexual assault in small communities like ours approach each case with skepticism. This owes, I think, to the essentially humane principle that everyone is innocent until proven guilty, and that – since in most sexual assault cases on campus there is little independent evidence aside from the word of the people involved – one must subject the complaint and the complainant to critical scrutiny. This makes sense, but it overlooks one very important fact. Trauma leaves tracks on its victims. It is very difficult to fake or "act" the sorts of symptoms that I have been describing. When someone displays these symptoms, this alone is evidence that they have been victimized.

There is much more to say, but not enough time to say it all. The crucial points are that (1) sexual assault is a trauma, (2) that people react differently in the midst of and after trauma than they do in other situations, (3) that it can be confusing for people who haven't experienced it or studied it closely.

And this leads me to my larger point, which is what I hope you will take away with you from this paper. In cases of sexual assault, people do not always behave as you might expect. A woman terrified by a rapist may not struggle and may not scream. A survivor devastated by an attack may describe it with odd, unfeeling detachment. A survivor could have functioned well for years after an assault and then may become overwhelmed by flashbacks and suicidal ideation in response to memories of the assault. A man who sexually assaulted a woman may be convinced that deep-down she really wanted it. These apparent disparities can be confusing, and correctly interpreting them may be the hardest part of your job. To do so, you need to pay close attention not just to what the students are saying, but also to the various contexts from which they speak. You need to be aware of the sex role socialization of women and men, and how this affected their behaviors in the cases you consider. And you need to be aware of the psychological context of trauma, and how this affects one's reactions to sexual assault.

Not long ago, I gave a presentation in which I presented these things, and at the end a woman

i.e."declining grades" or "missing school" cannot be the only indictor of "loss of educational benefits"

i.e.Columbia failed to consider the possibility that plaintiff might have been assaulted during investigative interview.The counsel called such possibility "speculation" in this action.

raised her hand and said, "So if I understand you correctly, you're saying that trauma makes people irrational, and that we need to try to understand rationally their irrational experience." I knew then that I had failed to make my point.  What I am really trying to say is that trauma, like the influence of our sex role socialization, does *not* make people irrational, but makes them rational in a different way.  There is logic to their actions and their accounts, but it is not always identical to the psychological logic of people in other, less fraught, circumstances.

You have the very important, and very difficult, job of reconstructing and assessing what transpired between two people behind closed doors.  This demands a rare kind of wisdom, the wisdom to understand not just dry facts, but what these facts meant and mean to the people involved.  I hope that I have shed some light on what you need to consider to do this, and I wish you every success in doing so.