UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

               Plaintiff,

               v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK; KEVIN PITT;
ALYSSA ANZALONE-NEWMAN; KRISTIN
COLLADO,

               Defendants.

**OPINION AND ORDER**

21-cv-5839 (ER)

Ramos, D.J.:

     Jane Doe, proceeding *pro se*, initially brought this action against The Trustees of Columbia University ("Columbia"), Kevin Pitt, Alyssa Anzalone-Newman, and Kristin Collado (the "Individual Defendants"),[1] alleging violations of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a).  In short, Doe alleged that the Defendants failed to properly consider her sexual assault allegations against another Columbia student.

     The Court previously dismissed Doe's First Amended Complaint ("FAC") in its entirety on August 25, 2022 (the "August 2022 Opinion").  *See Doe v. Trustees of Columbia Univ. in City of New York et al.*, No. 21 Civ. 5839 (ER), 2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022); Doc. 71.  In the August 2022 Opinion, the Court granted Doe limited leave to file an amended complaint, and Plaintiff filed a second amended complaint ("SAC") on September 27, 2022.  Doc. 73.

---

[1] The Court dismissed Doe's claims against the Individual Defendants because Title IX does not authorize such suits. *See Doe v. Trustees of Columbia Univ. in City of New York et al.*, No. 21 Civ. 5839 (ER), 2022 WL 3666997, *11 (S.D.N.Y. Aug. 25, 2022) (quoting *Fitzgerald v. Barnstable School Committee et al.*, 555 U.S. 246, 257 (2009)).

Now pending before the Court is Columbia's motion to dismiss the SAC with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 76.  For the reasons set forth below, the motion is GRANTED.

## I.     BACKGROUND

The Court presumes familiarity with the facts and procedural history of this case, which are detailed in the August 2022 Opinion.  Doc. 71.  It discusses here only those facts necessary for the disposition of the instant motion.

### A.  Factual Background

The following facts are based on the allegations in the SAC, Doc. 73, which the Court accepts as true for purposes of the instant motion.[2]  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

---

[2] When considering a motion to dismiss for failure to state a claim, the Court may consider documents attached to the complaint as exhibits, as well as documents incorporated by reference in the complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  Here, the Court considers facts contained within:  (1) Columbia's Gender-Based Misconduct Policy & Procedures for Student ("2019 GBM Policy"), Doc. 12-1 at 1–51; (2) the complaint filed by Doe with the New York City Police Department ("NYPD Complaint"), Doc. 12-1 at 59–61; (3) the Gender-Based Misconduct Investigative Report ("Report"), Docs. 12-1, 49; (4) the June 15, 2021 Letter from Columbia ("Hearing Schedule Letter"), Doc. 12-1 at 113–14; and (5) the July 2, 2021 Letter from Columbia ("Hearing Decision Letter"), Doc. 12-1 at 118–121.

These documents were appended to the original complaint and the FAC, or they otherwise form the complete version of the documents that Doe appended to her prior pleadings.  In Doe's initial complaint, Doc. 1, she attached a portion of the Report issued by Columbia.  On October 12, 2021, Columbia moved to include and seal additional pages of the Report which it wished to have considered.  *See* Doc. 49.  The Court granted Columbia's motion on December 6, 2021.  Doc. 53.  Since Doe relied on the Report in drafting her SAC, and previously appended portions of it to her complaint, the Report is accordingly incorporated by reference.  *See Kamholtz v. Yates Cnty.*, 350 F. App'x. 589, 592 (2d Cir. 2009) ("Documents plaintiffs either possessed or knew about and upon which they relied in bringing the suit may be incorporated. When a plaintiff chooses not to attach to the complaint or incorporate by reference a document which is integral to the complaint, the defendant may produce it when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.") (quotations, citations, brackets, and ellipses omitted).

Doe, a former Columbia student, alleges that she was sexually assaulted by another student, John Roe, in a University dormitory on January 8, 2019.  SAC ¶¶ 6, 14, 24, 42–56. Approximately seven months later, on August 3, 2019, Doe formally reported the assault to Columbia's Gender-Based Misconduct ("GBM") Office.[3]  *Id.* ¶ 94.  And two days after her initial report to the GBM Office, on August 5, 2019, Doe reported the incident to the New York City Police Department ("NYPD").  NYPD Complaint, Doc. 12-1 at 59.  Following her report, Columbia appointed investigators to evaluate Doe's allegations.[4]  SAC ¶ 102.

On August 6, 2019, three days after Doe initially reported the alleged incident to Columbia, GBM case manager Adrienne Blount and investigator Jennifer Kelly met with Doe. Rep. at 4.  During this meeting, Blount and Kelly reviewed with Doe her rights under the 2019 GBM Policy.  *Id.*  That same day, Kelly sent Doe and Roe initial notice letters indicating that an investigation would commence, and also issued a no-contact directive, which instructed Doe and

---

[3] Prior to filing a formal report to the GBM office, Doe made a call to the Student Conduct and Community Standards ("SCCS") general telephone number on June 25, 2019 to schedule a meeting with an SCCS case manager in reference to the assault.  Rep. at 3.  During the call, Doe identified herself by her first name only.  *Id.*  The SCCS Director, Spencer Bennett, traced the phone number in the University's database and was able to associate the call with Doe.  *Id.*  That same day, Bennett filed an incident report.  *Id.*  The following week, on July 1, 2019, a case manager left a voicemail for Doe to call back to discuss questions or concerns related to the assault.  *Id.*  On July 19 and 23, 2019, Doe visited the SCCS office in person but refused to provide identifying information because she did not feel safe.  *Id.*  After conducting another database search, the SCCS office reached out to Doe's school of study to connect her with appropriate University resources.  *Id.*  Upon Doe's request, she was referred to Counseling and Psychological Services where she began working with clinical psychologist, Dr. Rachel Efron, from July 2019 to September 2019.  SAC ¶ 95.  According to Doe, Dr. Efron specializes in sexual and developmental trauma, and has been working at Columbia for over 28 years.  *Id.* at 96.

[4] The initial Title IX investigators were Jennifer Kelly and Benjamin Marzolf; they were subsequently replaced by Alyssa Anzalone-Newman and Kristin Collado (collectively the "investigators").  *See* Rep. at 2.

Roe to discontinue all contact with each other until further notice.[5]  *Id.*  Soon thereafter, the

GBM Office connected Doe with *pro bono* counsel from Sanctuary for Families.[6]  SAC ¶ 106.

As part of their investigation, the investigators interviewed Doe, Roe, and five other

witnesses, including other students and the NYPD detective who interviewed Doe regarding the

NYPD complaint.  Rep. at 7–8.  In addition, the investigators also considered a wide range of

evidence, including electronic communications between Doe and Roe, as well as their electronic

communications with others; social media posts; medical records and Gay Health Advocacy

Project ("GHAP") records provided by Doe; written statements by Doe and Roe; and an

explanatory blog post about "trauma bonding," provided by Doe, entitled "Trauma Bonding – Is

It Love Or Something Else?"[7]  *See id.* at 2–11.

In February 2020, while the investigation was ongoing, Roe filed a cross-complaint with

the University, alleging that Doe had stalked him, and that she had violated the no-contact

directive.  *See* SAC ¶ 128; Rep. at 83–84.  The investigators examined the evidence and

subsequently interviewed Roe and Doe multiple times on February 5, April 15, April 23, and

June 3 of 2020.  Rep. at 7–8.

In May 2021, the investigators issued its 131-page Report ("Report"), recommending that

Roe be found not responsible for sexual assault and that Doe be found not responsible for

stalking.  Rep. at 131.  Pursuant to the 2019 GBM Policy, the investigators first considered "the

---

[5] The 2019 GBM Policy provided that, when there was an investigation, the GBM Office was to notify the complainant and respondent of the alleged violations and appoint two investigators.  Doc. 12-1 at 34–35.

[6] Pursuant to the 2019 GBM Policy, each party was permitted to have an advisor accompany them to any meeting or hearing, and that advisor could be an attorney.  *Id.* at 37.  A student could request that the GBM Office arrange for an attorney-advisor, in which case one would be provided at no cost to the student.  Doc. 12-1 at 24–25.

[7] The investigators requested that each party provide any relevant documents or evidence to be considered pursuant to the 2019 GBM Policy, and the team of investigators had the discretion to determine the relevance of any evidence.  Doc. 12-1 at 35.

consistency or inconsistency of their accounts over time; their motive to lie; the presence or absence of any corroborating evidence; and, whether their statements included specific details that indicated their accounts were reasonable and logical." *Id.* at 86.  Based on these factors, the Report concluded that neither Doe nor Roe was "fully credible or reliable." *Id.* at 110.

With respect to Doe, the Report determined that while her story remained relatively consistent over time and some of her statements were corroborated by the evidence, her "anger, sense of betrayal, and resentment" of Roe negatively impacted her credibility, *id.* at 91, as did the lack of corroboration of certain statements regarding whether she consented to sexual activity, *id.* at 94, 97, and whether she threatened Roe during her conversations after the incident, *id.* at 98–99.  Ultimately, the Report concluded that while some of her statements were logical and reasonable, others were not.  *Id.* at 99.

With respect to Roe, the Report found that his narrative was also consistent and that, while he may have had motive to lie, his "candor and frankness" positively impacted his credibility.  *Id.* at 104.  Yet, the investigators acknowledged that some of his statements were not corroborated by the evidence, including his account of the incident and his statements about whether he had affirmative consent to proceed, which differed widely from certain witnesses.[8] *Id.* at 105–06.  Further, the Report found that Roe's continued engagement with Doe in the months following the incident was not completely logical, especially after the investigation had commenced, and his failure to provide certain evidence demonstrated a lack of candor that did not support his credibility.  *Id.* at 107–09.

---

[8] The Report states that Witness #2 and Witness #5 told the investigators that on July 27, 2019, Roe had confessed to them that he had sexually assaulted Doe.  *See* Rep. at 126.  Witness #2, a student and close friend of Roe, told the investigators that Roe said, "I did it, there are no excuses."  *See id.*  Witness #5, a student and close friend of Roe, stated that while he said he didn't remember explicitly whether Roe confessed, he recalled the assumption being that Roe did.  *See id.*

As to the sexual assault allegations against Roe, the Report first determined by a preponderance of the evidence that Doe was not incapacitated on January 8, 2019, and it specifically concluded that her mental health concerns did not impede her ability to consent.  *See id.* at 120–22.  The Report further determined that even if Doe had been incapacitated, Roe would not have known based on her actions and statements at the time.  *Id.* at 119–21.  Because Doe's and Roe's statements about the evening were "irreconcilable" and neither party was particularly reliable, the Report could not conclude by a preponderance of the evidence that Doe did not consent.  *Id.* at 123.  The Report ultimately recommended that Roe be found not responsible for sexual assault.  *Id.* at 124, 127.

With respect to Roe's cross-complaint for alleged stalking and violation of the no-contact directive, the Report determined that "[Doe's] behavior did not constitute a violation of the Policy in the form of stalking."  *Id.* at 130.  Rather, any "fear and emotional distress" experienced was a result of Roe's own concern that he would be reported to the University.  *Id.* Further, the Report was unable to conclude, by the preponderance of evidence, that Doe had sought contact with Roe in February 2020.  *Id.* at 131.  As a result, the Report recommended that she be found not responsible as well.  *Id.*

After the release of the Report, Doe requested a hearing, which was tentatively scheduled for June 29, 2021.  SAC ¶ 186.  Pursuant to the 2019 GBM Policy, Doe was told that no witnesses would be called at the hearing and that there would be no cross examination.[9]  *Id.* ¶ 187; Hearing Schedule Letter, Doc. 12-1 at 113.

---

[9] The 2019 GBM Policy provides that, "[w]itnesses are not involved in the hearing process," Doc. 12-1 at 42, and the only additional documents that may be considered are written statements prepared by the students involved, *see id.*

On the date of the hearing, Doe did not attend and Roe subsequently chose to proceed without a hearing.  Hearing Decision Letter, Doc. 12-1 at 118.  Accordingly, the Hearing Panel deliberated based on the Report and the record before it.[10]  *Id.*; *see also* 2019 GBM Policy, Doc. 12-1 at 43.  According to Doe, she did not attend because the hearing would have been "a mere formality," her "participation would not have had any material effect," and it was within her Title IX rights not to submit to a "bad faith, discriminatory, proceeding."  Doc. 58 at 13.

On July 1, 2021, Doe was informed via letter that the Hearing Panel had affirmed the findings in the Report, concluding that she was competent to consent to sexual activity and that there was insufficient information to conclude by a preponderance of the evidence that affirmative consent was denied or withdrawn.  Hearing Decision Letter, Doc. 12-1 at 119.  She was told she could appeal the decision and was informed that any such appeal had to be submitted by July 14, 2021.  *Id.* at 120.  However, Doe did not file an appeal.  *See Doe*, 2022 WL 3666997, at *10.

The core of Doe's allegations in the SAC are the same as those set out in the FAC.  Doe realleges that the investigators improperly excluded medical records from Dr. Rachel Efron,[11] her clinical psychologist at Columbia Health, which she alleges could corroborate various types of trauma responses, namely "fawn" and "freeze."  SAC ¶¶ 192, 246.  And by excluding Dr. Efron's records, investigators improperly failed to recognize fawn and freeze as a response to trauma or a reaction to fear.  *Id.* ¶ 173.

---

[10] The 2019 GBM Policy provides in relevant part that, "[i]n cases where either the Complainant or Respondent *opts not to participate* in the hearing *after having previously requested a hearing* in their Disciplinary Action Agreement, the other party may request that a hearing not be held and *the Hearing Panel may render a decision based on the Investigative Report*, post-investigation addendum (if applicable), and any written submissions from the Complainant and/or Respondent."  Doc. 12-1 at 43 (emphasis added).

[11] According to Doe, Dr. Rachel Efron has a specialty in sexual and developmental trauma with over 28 years of experience at Columbia.  SAC ¶ 96.

Second, Doe alleges that the 2019 GBM Policy is vague and makes it effectively "impossible for a complainant to prove the alleged sexual assault." *Id.* ¶ 212.  Doe contends the policy is deficient because official decisions, or "bad faith interpretations," make it possible for universities to violate Title IX by only "nominally" complying. *Id.* ¶ 234.

Third, Doe alleges that from January 2019 to April 2019, she began encountering Roe at Butler Library, Columbia's main library, on a daily basis, and that every time she saw Roe, she felt "uneasy," "triggered," and "could not concentrate." *See id.* ¶¶ 57–58.  Eventually, this caused Doe to stop going to Butler Library, and that her reduced use of the University's main library qualifies as a loss of educational benefits. *See id.* ¶ 61.

In short, Doe alleges that she "would have [had] a significant chance at success in her Title IX claim if [she had been] allowed relevant inculpatory evidence from expert witnesses, and testimonials and the power of cross-examination." SAC ¶ 189.  Doe contends that the investigators' refusal to allow additional evidence during the hearing denied her the opportunity to have witnesses who could corroborate her story and otherwise made it "impossible" for her to prove her allegations. *Id.* ¶¶ 247, 251.

## B.  Procedural History

Doe filed her initial complaint on July 1, 2021, and requested a temporary restraining order to enjoin Columbia from concluding her GBM proceeding.  Docs. 1, 4.  On July 13, 2021, the Court denied her application for injunctive relief, and on July 20, 2021, she filed and served the FAC.  Docs. 8, 12.  Defendants moved to dismiss the FAC on October 13, 2021.  Doc. 46.  On August 25, 2022, the Court granted Defendants' motion, but provided Doe with limited leave to amend the complaint. *See Doe*, 2022 WL 3666997, at *18.

Case 1:21-cv-05839-ER   Document 85   Filed 06/27/23   Page 9 of 16

Doe filed the SAC on September 27, 2022.[12]  Doc. 73.  The SAC alleges a single claim of deliberate indifference.  Columbia moved to dismiss the SAC on November 18, 2022.  Doc. 76.  The motion was fully briefed on December 16, 2022.  Doc. 81.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678, (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for

---

[12] Doe filed the SAC with the Court's Pro Se Intake Office one day late, and in her email, she advised that she experienced a lack of internet connection at her residence.  The Court construed this as a request for an extension of time to file the SAC and granted the application.  *See* Doc. 72.  Accordingly, the Clerk of the Court was instructed to docket the SAC.  *Id.*

relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[.]"). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (internal quotation marks omitted).

The same standard applies to motions to dismiss in cases brought by *pro se* plaintiffs. *Davis v. Goodwill Indus. of Greater New York & New Jersey, Inc.*, 2017 WL 1194686, at *5 (S.D.N.Y. 2017) (citing *Zapolski v. Fed. Repub. of Germany*, 425 F. App'x 5, 6 (2d Cir. 2011)). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as "rais[ing] the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006) (citing *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the

defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678.  A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice.  *Id.* (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 557).

## III.    DISCUSSION

The Court considers Doe's single claim for deliberate indifference in violation of Title IX.  Doe alleges that (1) Columbia failed to adequately investigate her sexual assault complaint, (2) the 2019 GBM Policy was ambiguous, and (3) its use prevented Doe from being able to prove her case.  *See* SAC ¶¶ 227–30, 234, 245, 251.

Columbia contends that Doe has failed to allege a claim for deliberate indifference under Title IX as a matter of law.  In support of this argument, it argues that:  (1) Doe still has not alleged that she was denied educational opportunities or benefits; and (2) that Doe still has not shown that the University acted in a manner that was "clearly unreasonable" when responding to her allegations of gender-based misconduct.  Memo. in Supp., Doc. 77 at 8.

### A.  Title IX and the Deliberate Indifference Standard

Title IX prohibits discrimination on the basis of gender in educational programs and activities receiving federal financial assistance, providing, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  It is well settled that an aggrieved individual has an implied right of action under Title IX for injunctive relief and monetary damages.  *Fitzgerald v. Barnstable School Committee et al.*, 555 U.S. 246, 255 (2009).

The deliberate indifference standard set forth in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), makes clear that an educational institution may be held liable

11

for deliberate indifference under Title IX for known acts of sexual harassment in its programs or activities. *See* 526 U.S. at 643. To survive a motion to dismiss, a plaintiff alleging deliberate indifference must plead that (1) the school had "actual knowledge" of the harassment; (2) that the harassment was "so severe, pervasive, and objectively offensive" that it deprived the plaintiff of "access to the educational opportunities or benefits provided by the school;" and (3) that the school's response was "clearly unreasonable in light of the known circumstances." *Id.* at 648, 650.

### i.   Actual Knowledge

Here, the allegations before the Court make clear that Doe made her formal report of sexual misconduct on August 3, 2019. *See* SAC ¶ 94. Doe does not contend that Columbia knew of the incident before her formal complaint.[13] Instead, Doe concedes that Columbia received actual notice when she filed her report. *See* Opp'n, Doc. 78 at 13. Thus, the Court concludes that Columbia had actual knowledge of the alleged sexual assault when it was formally reported to the GBM office on August 3, 2019.

### ii.   Access to Educational Opportunities

Here, Doe alleges that for several months before she reported the alleged sexual assault, she was denied the educational benefits of the University's main library as a result of Roe's daily presence there. SAC ¶ 57. Doe underscores her contention that the University's main library

---

[13] The Court acknowledges that Doe made a call to the SCCS office on June 25, 2019, and met with Kelly and Blount in person on July 19 and July 23, 2019. Rep. at 3. On all three occasions, she refused to leave personal identifying information beyond her first name. *Id.* The Report states that on June 25, 2019 an incident report was filed and a SCCS case manager followed up on July 1, 2019, with no success. *Id.* On July 19 and 23, the SCCS reached out to Doe's school of study to connect her to resources. *Id.* From July 2019 to September 2019, Doe began working with clinical psychologist, Dr. Rachel Efron, from Columbia's Counseling and Psychological Services. SAC ¶ 95. Doe submitted these records to investigators, and the Report reflects that those records were examined. Rep. at 8. Whether such records were considered in the dispositive hearing makes no difference here, as this Court previously noted, Columbia evaluated such evidence in compliance with the 2019 GBM Policy and had the discretion to determine the relevance of any proffered evidence. *See Doe*, 2022 WL 3666997, at *16.

"has the most academic resources and spaces in comparison with any other library."  Opp'n,

Doc. 78 at 11.

　　According to Columbia, Doe's reduced use of the main library does not qualify as a loss

of educational benefits because it was merely one of twenty-two other libraries available to Doe,

and if it does, the loss from January 2019 to April 2019 completely pre-dates when the incident

was reported to Columbia.  Memo. in Supp., Doc. 77 at 9–10.  As such, Columbia argues that a

"discriminatory intent" cannot be found for a loss of access to an educational opportunity that it

did not yet know about.  *Id.* at 10.

　　Doe has failed to sufficiently plead the second *Davis* factor.  *See Davis*, 526 U.S. at 631.

As Columbia underscores, Doe's allegation regarding her access to Columbia's main library

completely pre-dates the filing of her formal report.  Memo. in Supp., Doc. 77 at 9–10.  And the

undisputed facts show that when Doe made her report to the GBM Office, Columbia sent letter

notices to both parties to cease contact with each other immediately and paired her with *pro bono*

counsel from Sanctuaries for Family.  *See* Rep. at 4; SAC ¶ 106.  Moreover, as Columbia also

emphasizes, during the period of time between the alleged assault and the initial report, Doe had

access to almost two dozen other University libraries.  Memo. in Supp., Doc. 77 at 9.

　　For these reasons, the SAC failed to plausibly plead that Doe's access to educational

opportunities was compromised.

### iii.  Clearly Unreasonable

　　Lastly, Doe's deliberate indifference claim fails because she cannot show that

Columbia's response to the alleged harassment was "clearly unreasonable."  To be clear, this is

not a "mere 'reasonableness' standard."  *Davis*, 526 U.S. at 649.  Title IX does not require

schools to "'remedy' peer harassment" or to "ensure that students conform their conduct to

certain rules." *Id.* at 648 (internal quotation marks and ellipses omitted).  To the contrary, a school "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.  In other words, for a court to find that a school acted with deliberate indifference, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred.  *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 Civ. 2200 (ER), 2013 WL 177911, at *6 (S.D.N.Y. Jan. 16, 2013), *aff'd*, 531 F. App'x 132 (2d Cir. 2013).

Here, no discriminatory intent can be inferred because Doe fails to make any allegations that would show Columbia's response to her complaint was deliberately indifferent.  She never asserts that Columbia's investigation was untimely, only that it was inadequate.  SAC ¶ 245; *see also* Opp'n, Doc. 78 at 13.  But the alleged inadequacy is undermined by the 2019 GBM Policy, which demonstrates that Columbia, at the time it investigated Doe's complaint, "had in place a comprehensive and considered . . . policy, and adhered to it in adjudicating Doe's claims." *Doe*, 2022 WL 3666997, at *13; *see also Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (concluding that where an educational institution takes timely and reasonable measures in good faith to end the harassment, even if the measures ultimately prove to be ineffective, it has not acted with deliberate indifference).  It is also undermined by the Report, which details the evidence the investigators considered, the timeline of the investigation, and when each of the five witnesses were interviewed.  *Id.* at 3–5, 7–11.  Not only was the investigation compliant with the 2019 Policy, but it also provided Doe with an opportunity to appeal; an opportunity which she declined.  *See* Decision Letter, Doc. 12-2 at 118–20; *Doe*, 2022 WL 3666997, at *10.  Given these circumstances, the Court cannot infer Columbia had any discriminatory intent.

As the Court addressed in its August 2022 Opinion, "[e]ven if Doe would have preferred 'a different type of investigation, or a more expansive one,' schools are 'not required [under Title IX] to proceed in any particular manner,' and students 'do not have a [Title IX] right to specific remedial measures.'" *Id.* at *14 (internal citations omitted).  Columbia's obligation was to respond to a Title IX violation in a manner that was not clearly unreasonable.  As the undisputed facts demonstrate, Columbia acted immediately after the complaint was filed and adjudicated the matter in accordance with a comprehensive and considered policy.  Again, "the standard is not whether the [school] responded in a particular manner, but whether [its] response was clearly unreasonable in light of all the known circumstances." *Soriano ex rel. Garcia v. Board of Educ. of City of New York*, No. 01 Civ. 4961 (JG), 2004 WL 2397610, at *4 (E.D.N.Y. Oct. 27, 2004).  Thus, Doe has failed to plead that Columbia's actions were clearly unreasonable in light of the known circumstances.

### B.  Dismissal with Prejudice

Columbia asks that the Court dismiss the SAC with prejudice pursuant to Rule 12(b)(6).  Doc. 77 at 4.

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also Gayle v. Larko*, No. 18 Civ. 3773 (ER), 2019 WL 4450551, at *4 (S.D.N.Y. Sept. 17, 2019).  Importantly, however, leave is unwarranted where "the problem with . . . [the] claims is 'substantive' and, thus, 'better pleading will not cure it.'" *Larko*, 2019 WL 4450551, at * 4 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Here, further amendment of the complaint would be futile.  Doe has had three opportunities to assert her claims, and she has enjoyed the "benefit of a ruling" that highlighted "the precise defects" in her allegations.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015).  Yet, she has failed to plausibly plead her single remaining claim.  Accordingly, Doe's SAC is dismissed with prejudice.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss the SAC is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 76, and close the case.

It is SO ORDERED.

Dated:   June 27, 2023
       New York, New York

_____
        Edgardo Ramos, U.S.D.J.